UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| **FIRED UP, INC.** | § | Case No. 14-10447 |
| | § | (Chapter 11) |
| Debtor.[1] | § | |
| | § | |
| | § | |

**EMERGENCY MOTION FOR AUTHORITY TO USE, SELL, OR LEASE CASH COLLATERAL IN THE ORDINARY COURSE, PROVIDE ADEQUATE PROTECTION AND FOR PRELIMINARY HEARING**

TO THE HONORABLE JUDGE OF SAID COURT:

**Fired Up, Inc.** ("Debtor"), Debtor in the above-styled and referenced case, hereby files this Emergency Motion Pursuant to 11 U.S.C. § 363 for Authority to Use, Sell, or Lease Cash Collateral in the Ordinary Course, Provide Adequate Protection and for Preliminary Hearing (the "Motion") and in support thereof respectfully states the following:

**JURISDICTION AND PROCEDURAL BACKGROUND**

1. On March 27, 2014 (the "Petition Date"), Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Texas, Austin Division ("Court"), thereby commencing this chapter 11 case ("Case"). Debtor continues in possession of its property and it is operating and managing its business as a debtor in possession pursuant to the provisions of 11 U.S.C. §§ 1107(a) and 1108.

---

[1] Until February 26, 2014, Debtor's business was being operated partially by the Debtor and partially by its two wholly owned subsidiaries, Kona Restaurant Group, Inc. and Carino's Italian Kitchen, Inc.. Those entities were merged into the Debtor on that date.

2. No trustee or examiner has been appointed in the Debtor's Chapter 11 Case, nor has a creditors' committee or other official committee been appointed pursuant to 11 U.S.C. § 1102.

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

4. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The basis for the relief herein is primarily grounded in 11 U.S.C. §§ 105(a) as supplemented and amplified by Fed. R. Bank. P. 6003.

## THE DEBTOR AND ITS BUSINESS

**Overview**

6. Fired Up, Inc. ("Fired Up") is a corporation based in Austin, Texas, which has been involved in the hospitality industry since 1997. It currently owns and operates forty-six (46) company-owned stores ("Company Stores") known as Johnny Carino's Italian ("Carino's") in seven states (Texas, Arkansas, Colorado, Louisiana, Idaho, Kansas and Missouri) and sixty-one (61) franchised or licensed locations in seventeen (17) states (California, Florida, Georgia, Indiana, Kentucky, Michigan, Montana, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Utah and Washington) and four other countries (Bahrain, Dubai, Egypt and Kuwait) ("Franchisees" or "Franchised Stores"). Carino's focuses on providing high quality, classic but contemporary, innovative Italian cuisine at an exceptional value in an authentic Italian atmosphere to a broad demographic from intimate "date nights" for young singles, to large family gatherings.

7. Prior to 2014, the business was operated through three entities: Fired Up, Inc. was the parent company. Ownership of Fired Up, Inc. as of the Petition Date was: 74.77% by

Creed Ford III, his wife and immediate family, 13.60% by Abdulghani Al-Ghunaim and Al-Ghunaim Trading Co., Ltd., and the remaining 11.63% percent by approximately 180 other shareholders. Kona Restaurant Group, Inc. ("Kona") was wholly owned by Fired Up, Inc. and was the franchisor for the Debtor's franchises and the lessee for most of the Company Store locations. Carino's Italian Kitchen, Inc. ("CIK"), also solely owned by Fired Up, Inc., operated the Company Stores. On February 26, 2014, after extensive consultation with its accountants, tax advisors and corporate attorneys, the three companies were merged into the Debtor, Fired Up, Inc.

8. Fired Up currently employs approximately 2,900 persons in its restaurants and corporate headquarters. Creed Ford III is the majority shareholder in Fired Up and also sits on its Board of Directors in addition to serving as President and as sole Chief Executive Officer since 2008.

**Company History**

9. Creed Ford, III ("Ford" or "Creed Ford") and Norman J. Abdallah formed Fired Up, Inc. in 1997 for the purpose of acquiring the Kona Restaurant Group from Brinker International, Inc. ("Brinker"). At that time, Kona operated the six-unit Johnny Carino's Italian Kitchen chain and one Kona Ranch Steakhouse. By 2006, Fired Up had expanded the Carino's concept to 173 company-owned and franchised locations in thirty (30) states and four (4) foreign countries.

10. By 2007, however, revenues had begun slipping and guest counts were down. The Company's initial business strategy was to rebrand and fine tune its concept. It began recreating itself as Carino's Italian and moving away from the old Johnny Carino's brands. However, before the success of this strategy could be determined, the 2008 recession created

3

significant additional challenges for the company. In the fiscal year ending June 25, 2008, the Company reported a net loss of $15.9 million.

11. Creed Ford sold the Chili's franchises which another of his businesses owned and operated in order to devote his full attention to the Carino's Italian brand. In 2008, he assumed the position of CEO in addition to being chairman of the board. In January of 2011, Mr. Ford arranged the redemption for $16 million of the preferred shares of the Debtor held by Rosewood Capital, which had been an investor in the company since 2002. The redemption was financed with a loan from FRG Capital, LLC, a company owned by the Ford family. As the largest and majority shareholder, Ford did not receive any consideration for the loan to Fired Up, Inc. to redeem the Rosewood preferred shares.

12. As a result of changes instituted by management under Ford's direction, the Company subsequently experienced several profitable years. However, by the end of the fiscal year ending June 26, 2013, the company reported a net loss of $5.9 million. It appeared that while a majority of the Company's stores were profitable, a minority of locations were consistently losing significant amounts of money. Ford instituted a comprehensive review of Fired Up's sixty-five (65) company-owned stores. From October 2013 through March 2014, the company closed a total of nineteen (19) locations which it had determined were unprofitable and likely to remain so.

**Financial Information**

13. Fired Up's real property assets consist of the land and building out of which a Company Store operated in Abilene, Texas, and is valued at $1.6 million. The Company Store at this location is no longer open and Fired Up is in the process of negotiating a sale of this property at a price which it believes to be fair market value. The remainder of Debtor's locations

4

are leased. Debtor holds long-term ground leases and owns the buildings on eleven of these locations located upon each piece of real property. The Debtor has valued these buildings at $6.2 million.[2] The Debtor estimates the book value of its tangible personal property assets at approximately $7.3 million. The Debtor also holds significant intangible property, including trademarks and other intellectual property. The company estimates that it owes $17.7 million in contractual secured debt, including $13.4 million to FRG Capital, LLC, $1.9 million to GE Capital Franchise Finance Corp., $600,000 to Independent Bank of Waco and $1.2 million to Prosperity Bank. The company owes $260,000 in delinquent *ad valorem* taxes; its current *ad valorem* property tax obligations, incurred but not due, are approximately $2.2 million. Debtor has current priority obligations to employees consisting of approximately $950,000 in wages, $400,000 in accrued vacation time and $70,000 in bonuses earned and owed. The Debtor owes $1.9 million in priority tax claims. The Company's draft schedules, which are still being prepared, reflect unsecured debts of $13.8 million, but this amount very likely overstates the Debtor's actual liabilities. Major unsecured liabilities include $2.8 million owed to AEI Fund Management, Inc. with regard to two shortfall notes, $3.3 million in contingent obligations with regard to leases to be rejected, $2.2 million owed to a former vendor and $620,000 owed to Independent Bank of Waco for a loan on a surrendered ground lease. Much of the remaining amounts scheduled consist of current amounts owed to vendors and estimated tax amounts to be paid under triple net leases in the future. In terms of numbers, only a handful of priority and general unsecured operating debts (*e.g.* vendors, utilities, taxes) have not been kept current and were not current at the time of filing.

---

[2] This number is based on the value of the building *with* the existing ground lease. A building has little value, if any, if its ground lease is terminated for any reason and the building belongs to the Lessor at the end of the ground lease. This valuation does not discount for these factors, which are significant.

14. For the fiscal year ending June 27, 2012, the company reported total revenues of $125.7 million and net income of $614,000. Guest counts for this period totaled 8.6 million. For the fiscal year ending June 26, 2013, the company reported total revenues of $120.8 million and a net loss of $5.9 million. Guest counts equaled 8.5 million. Annualized gross sales for the Company Stores for 2014 are expected to be about approximately $103 million. As of December 31, 2013, Net Operating Cash Flow was ($2.6 million); Net Operating Cash Flow going forward, after the store closings, is estimated to be at least $300,000 per month *positive* with an increase in the profitability of each of the operating stores of at least six percent (6%). Annualized General and Administrative costs have been reduced approximately $2.5 million from 2013 to 2014.

**Reasons for Filing Bankruptcy**

15. As discussed above, the Company began its own "out of court" reorganization in the last quarter of 2013: it closed unprofitable restaurants, it worked with the landlords of its closed stores to find other tenants or sell particular stores or work out terminations of leases and agreed damages owed. It significantly decreased fixed expenses. It began examining programs and other marketing strategies to increase revenues. However, while most of the Company's landlords and other creditors continued in these "bad times" with the collegial working relationship they had had with the Company and Creed Ford over decades, some did not. The actual timing of the filing on March 27, 2014 was influenced by two lawsuits—one by a former vendor which was aggressively seeking unreasonable repayment terms on an outstanding amount owed when that vendor and Debtor ceased doing business and the other by a former Landlord.

16. The general motivation behind the filing of its chapter 11 petition was to try to tie up the "loose ends" of the Company's self-imposed "reorganization" that did not appear capable

6

of being tied up without litigation. In particular, the provisions of the Bankruptcy Code with respect to the rejection of burdensome leases and the ability to propose and pay out its debts pursuant to a Plan without piecemeal prosecution by random uncooperative creditors undermining same were particularly attractive.

**Going Forward**

17. Debtor's projections when it began analyzing its profitable and unprofitable stores indicated that it had the ability to immediately start showing a net operating profit immediately upon the closing of its unprofitable locations with little additional growth in revenues. Its projections have been born out as these stores have been closed. Based on these projections, the Company is reasonably optimistic that without the continuing obligation of the unprofitable locations, it will be able to operate on a profitable basis and to devise a plan of reorganization for repayment of its existing obligations and those created from the lease rejections. It hopes that, with the burden of aggressive creditors continuing unrelated collection efforts, it will be able to better focus on efforts to better market itself, increase revenues and continue to cut costs.

### FACTUAL BACKGROUND ON NECESSITY FOR REQUESTED RELIEF

18. The Debtor has contractual secured debts with aggregate liabilities of approximately $17.1 million. FRG Capital, LLC holds a blanket lien upon the Debtor's assets. It is controlled by insiders of the Debtor and consents to use of cash collateral. GE Capital Franchise Corporation has liens upon the Debtor's interest in real and/or personal property at four of its locations. Independent Bank has a lien upon one of Debtor's locations. Prosperity has a lien upon a single location. Xerox has a lien upon an individual piece of equipment.

| Creditor | Debt Amount | Store# | Collateral | Insider? | First Perfection Date*/State |
|---|---|---|---|---|---|
| FRG Capital, LLC | $13,436,864.02 | N/A | All personal property wherever located, including but not limited to goods, equipment, inventory, accounts receivable and intellectual property. (Lien subordinated to Prosperity Bank re: 4157 Buffalo Gap Rd., Abilene, TX) | Yes | TX 01/20/2011 DE 01/20/2011 |
| General Electric Capital Corporation | $514,005.62 | #89 | Real property and all property used in connection with 7017 Garth Road, Baytown, TX 77521 | No | TX 6/17/2008 DE 6/17/2008 |
| GE Capital Franchise Corporation | $55,201.33 $784,866.95 | #103 | Real property and all restaurant equipment, machinery, furniture, appliances, trade fixtures, goods located at 3147 S. Military Drive, San Antonio, TX | | DE 11/14/2005 |
| GE Capital Franchise Corporation | $56,489.41 | #90 | All restaurant equipment, machinery, furniture, appliances, trade fixtures, goods located at 5750 Hwy. 6, Missouri City, Texas | | DE 11/14/2005 |
| GE Capital Franchise Finance Corporation | $473,907.46 | #87 | Leasehold estate in Lafayette, LA | | DE 01/23/2014 |
| Independent Bank | $607,451.26 | #78 | Machinery, equipment, furniture, fixtures, and other tangible personal property and proceeds located at 3050 Silverlake Village Drive, Pearland, Texas | | TX 02/11/2009 |
| Prosperity Bank | $1,185,251.29 | #102 | Equipment, general intangibles, deposit accounts, proceeds and all personal property used at 4157 Buffalo Gap Rd., Abilene, TX 79605 | No | TX 09/04/2012 |
| Xerox | | | Leased property: Xerox P4112CPC | | TX 02.09.2011 |

19. In addition to the contractual secured creditors, Debtor owes delinquent *ad valorem* taxes on personal property owned in the amount of $260,000 and approximately $2.0 million in current obligations to 155 local taxing entities that are not yet due. Debtor also has a Certificate of Deposit which is pledged to secure a letter of credit for the Debtor's non-subscriber workman's compensation policy.

20. Debtor generates Cash Collateral from the operation of its business when it generates proceeds and credit card accounts from sales of food and beverages on a daily basis in the ordinary course of its business. The assets likely to give rise to Cash Collateral consist of inventory of food and beverages, accounts receivable generated from sale of food and beverages and identifiable cash proceeds resulting from sale of food and beverages. On the other hand, it is Debtor's contention that furniture, fixtures, equipment, computers, software and real estate do not give rise to Cash Collateral. Until a plan of reorganization is confirmed in this case, Debtor must obtain approval for the use of the Cash Collateral. It is critical for Debtor to have access to its cash and other business property to continue to operate in the ordinary course of business and to pay normal operating expenses.

21. Debtor can meet its ongoing post-petition obligations only if it borrows funds post-petition to cover cash collateral as of the Petition Date and can begin generating non-encumbered post-petition cash collateral or it can use assets that it believes will be claimed as Cash Collateral. It believes the former will decrease the value of its business. Debtor believes the latter is preferable as it has generated multiple projections and believes it is able to cash flow post-petition if it has the funds available from or generated by its pre-petition cash collateral to pay its post-petition expenses. Thus, in order to continue operations as normal and to preserve

9

the value of the estate pending confirmation of a plan of reorganization, Debtor needs immediate authority to use the Cash Collateral.

**ARGUMENTS AND AUTHORITIES IN SUPPORT OF REQUEST FOR TEMPORARY AND FINAL USE OF CASH COLLATERAL**

22. Debtor requires immediate authority from the Court to use the Cash Collateral in the ordinary course of its business and on an interim basis until there is a final hearing on this Motion.

23. Debtor requests the authority to use cash collateral to operate its business.

24. Under 11 U.S.C. §363(c)(2), the Debtor may not use, sell, or lease the Cash Collateral without the Court's authority or consent. Section 363(e) allows the Court to grant this authority upon the provision of adequate protection to the secured parties.

25. Debtor requires the continued authority to use Cash Collateral beyond the interim period in order to continue its business and maintain the Property until it is sold and to confirm a plan of reorganization as quickly as possible. Debtor's need to use the Cash Collateral will continue during the pendency of this bankruptcy case.

26. Debtor also requests that this Court schedule a hearing for final approval on the use of Cash Collateral, on notice to creditors and parties in interest, in the event an objection is filed to the terms of the interim order.

27. The immediate and temporary approval for the use of the Cash Collateral is consistent with (i) Bankruptcy Code requirements for maintaining the going concern of a debtor's business operations; (ii) the law under 11 U.S.C. §§ 363 and 361 as to the use of cash collateral and adequate protection; and (iii) facilitating a successful reorganization under chapter 11 of the Bankruptcy Code.

28.     The failure to authorize the immediate use of Cash Collateral on which the secured parties hold liens will result in a swift and significant deterioration of Debtor's business. Failure to gain authority to use, sell, or lease such collateral will result in a cessation of Debtor's business activities, which would expose Debtor to additional liability and would leave unsecured creditors with little hope of distribution in this case.

29.     The Bankruptcy Code contemplates a debtor's use of collateral during the reorganization of its business. Sections 102(1) and 363 of the Bankruptcy Code provide that collateral may be used upon notice and opportunity for a hearing appropriate in the particular circumstances. Relief may be authorized without an actual hearing if there is insufficient time available and adequate protection has been provided. 11 U.S.C. § 363(e). The combination of Debtor's emergency needs to satisfy pending obligations and current operating needs, together with the provision of adequate protection are sufficient to authorize the interim use of the collateral as set forth herein.

30.     Section 361 of the Bankruptcy Code sets forth various types of adequate protection which Debtor may provide:

    a.  making periodic cash payments to the extent that the creditor suffers a decrease in the value of its interest in such property;

    b.  granting replacement liens in collateral to compensate the creditor for any decrease in the value of the creditor's interest in such property; or

    c.  granting other relief as will result in the realization of the indubitable equivalent of the creditor's interest in collateral.

31.     Debtor proposes to provide adequate protection to all parties with an interest in Cash Collateral in the following manner:

    a.  All creditors with an interest in Cash Collateral will be granted a replacement lien to the same extent, priority and validity as its pre-petition lien:

11

      b.      The Debtor will continue to operate its business in the ordinary course of business thus generating additional Cash Collateral; and

      c.      Debtor will maintain insurance upon the property giving rise to the Cash Collateral.

32. Debtor requests permission to pay its usual and customary operating expenses of the same type and approximate amounts set forth on the attached budget for the month of April 2014.

## REQUEST FOR EMERGENCY HEARING

33. Debtor requests that the Court schedule an emergency hearing on the Motion.

WHEREFORE, Debtor requests that the Court authorize the use, sale, or lease of Cash Collateral on an interim basis and, upon setting and conducting a final hearing, issue a final order authorizing the use, sale, or lease of such cash collateral with the adequate protection to the secured parties as set forth herein; and grant any other and further relief to which Debtor is entitled.

Dated: March 27, 2014.

Respectfully Submitted,

BARRON & NEWBURGER, P.C.

/s/Stephen W. Sather_____
Barbara Barron (SBN 01817300)
Stephen W. Sather (SBN 17657520)
1212 Guadalupe St Ste 104
Austin, Texas 78701-1837
Telephone: (512) 476-9103
Facsimile: (512) 476-9253

## **CERTIFICATE OF SERVICE**

  I certify that we directed North American Credit Services, Debtor's servicing agent, to serve a copy of the foregoing by first class mail, postage prepaid and properly addressed, on March 28, 2014, to all parties listed on the Service List attached to the filed copy of this Pleading and electronically by the Court's ECF system to all parties registered to receive such service. Copies of the matrix are not included in service copies but may be obtained from the Clerk of the Court or Debtor's counsel.

              /s/Stephen W. Sather
              Stephen W. Sather

EXHIBIT A - CASH COLLATERAL BUDGET

Profitablity Analysis

**FIRED UP, INC. BUDGET**

Period 10 FY14 - March 27, 2014 - April 30, 2014

|  | Yr over Yr Trend | Apr-14 P10 - 5 Weeks |
|---|---|---|
| **Revenue** | | |
| **Sales by Store** | **Assume 0% Incr over PY** | |
| 087- Lafayette | 0.0% | $ 119,515 |
| 037- Longmont | 0.0% | $ 138,953 |
| 094- San Angelo | 0.0% | $ 162,074 |
| 043- Boise | 0.0% | $ 144,175 |
| 033- New Braunfels | 0.0% | $ 157,786 |
| 112- Austin Slaughter | 0.0% | $ 157,173 |
| 107- Joplin | 0.0% | $ 157,803 |
| 108- KC Speedway | 0.0% | $ 146,016 |
| 049- Twin Falls | 0.0% | $ 184,887 |
| 075- Parmer Lane | 0.0% | $ 172,484 |
| 056- Rogers | 0.0% | $ 190,448 |
| 064- Cedar Park | 0.0% | $ 164,504 |
| 061- Parker | 0.0% | $ 153,610 |
| 031- Waco | 0.0% | $ 178,230 |
| 088- Colorado Springs | 0.0% | $ 158,292 |
| 078- Pearland | 0.0% | $ 165,354 |
| 089- Baytown | 0.0% | $ 178,064 |
| 071- Wallisville | 0.0% | $ 188,270 |
| 035- College Station | 0.0% | $ 204,519 |
| 054- Grand Prairie | 0.0% | $ 156,016 |
| 032- Round Rock | 0.0% | $ 197,066 |
| 040- Victoria | 0.0% | $ 194,668 |
| 082- Alexandria | 0.0% | $ 233,935 |
| 073- Meridian | 0.0% | $ 184,236 |
| 091- San Marcos | 0.0% | $ 213,146 |
| 055- Brodie | 0.0% | $ 212,580 |
| 052- Rockwall | 0.0% | $ 185,893 |
| 057- Loveland | 0.0% | $ 183,078 |
| 103- SA Military | 0.0% | $ 195,615 |
| 083- Pharr | 0.0% | $ 160,694 |
| 060- Waxahachie | 0.0% | $ 215,813 |
| 101- Amarillo | 0.0% | $ 181,482 |
| 048- Bandera | 0.0% | $ 193,054 |
| 053- Denton | 0.0% | $ 185,506 |
| 111- Hurst | 0.0% | $ 201,067 |
| 065- SA 410 | 0.0% | $ 214,306 |
| 029- Little Rock | 0.0% | $ 224,981 |
| 030- Katy | 0.0% | $ 264,128 |
| 045- Ammon | 0.0% | $ 241,880 |
| 105- Odessa | 0.0% | $ 295,213 |
| 034- Lake Jackson | 0.0% | $ 271,941 |
| 021- Lubbock | 0.0% | $ 278,572 |
| 069- Houston 290 | 0.0% | $ 284,870 |
| 041- Corpus Christi | 0.0% | $ 357,614 |
| 100- Midland | 0.0% | $ 323,196 |
| 038- Brownsville | 0.0% | $ 367,255 |
| 036- Laredo | 0.0% | $ 381,517 |
| | | |
| Company Total | 0.0% | $ 9,721,479 |

## EXHIBIT A - CASH COLLATERAL BUDGET

**FIRED UP, INC. BUDGET**

Period 10 FY14 - March 27, 2014 - April 30, 2014

|  |  |  | Yr over Yr Trend | Apr-14 P10 - 5 Weeks |
|---|---|---|---|---|
| **Direct Expenses** |  | Qtr Trend |  |  |
| Comps |  |  | 13.4% | $ 1,302,678 |
| Total COS |  |  | 25.5% | $ 2,478,977 |
| Tot Lab |  |  | 28.9% | $ 2,805,385 |
| Rest Exp |  |  | 3.6% | $ 351,367 |
| Facility |  |  | 8.1% | $ 786,374 |
| Oth Exp |  |  | 0.1% | $ 8,324 |
| *Total* |  |  |  | $ 7,733,105 |
| Ttl Non Ccontrollable Expense |  |  | 3.8% | $ 370,500 |
| Ttl Bon & Benef. |  |  | 1.5% | $ 143,280 |
| Rent |  | $ 679,898 |  | $ 679,898 |
| Prop Tax Due for Colorado April 30, 2014 |  | $ 8,090 |  | $ 8,090 |
| Interest |  | $ - |  | $ - |
| *Total* |  |  |  | $ 1,201,768 |
| **Total Cost Before G&A** |  |  |  | $ 8,934,873 |
| **Cash Flow from Stores** |  |  |  | $ 786,606 |
| *% Margin* |  |  |  | 8.1% |
| **General & Administrative** |  |  |  |  |
| Less: G&A excl Depr - details next page |  |  |  | $ (372,194) |
| Less Corp Debt Pymt -excl Rudy's Pymt Portion |  |  |  | - |
| Total Company Net Cash Flow |  |  |  | $ 414,412 |
| *% Margin* |  |  |  | 4.6% |

# FIRST MASTER LIMITED SERVICE LIST
*(March 27, 2014)*

**United States Trustee:**

Henry G. Hobbs, Valerie L. Wenger
Deborah Bynum
Office of the U.S. Trustee
903 San Jacinto Blvd., Room 230
Austin, TX 78701

**Debtor:**

Creed Ford, III
President/CEO
Ford Restaurant Group
1514 RR 620 South
Austin, TX 78734
cford@carinos.com

Margaret B. Smith, CPA
Director of Finance
Ford Restaurant Group
1514 RR 620 South
Austin, TX 78734
msmith@fordrestgrp.com

**Proposed Attorneys for Debtor:**

Barbara M. Barron
Stephen W. Sather
Barron & Newburger, P.C.
1212 Guadalupe Street, Suite 104
Austin, TX 78701
bbarron@bn-lawyers.com
ssather@bn-lawyers.com

Kareem Hajjar
Hajjar Sutherland Peters & Washmon, LLP
1205 Rio Grande Street
Austin, TX 78701
khajjar@hspwlegal.com

John Vernon
The Vernon Law Group, PLLC
4925 Greenville Avenue, Suite 200
Dallas, TX 75206
jvernon@vernonlawgroup.com

**Twenty Largest Unsecured Creditors:**

AEI Fund Management, Inc.
Attn: Brian Schulz
1300 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101

Ben E. Keith Company
Attn: Richard Grasso
601 E. 7th Street
Ft. Worth, TX 76113

Cassidy Turley Midwest, Inc.
Lockbox #129
P.O. Box 1575
Minneapolis, MN 55480-1575

Internal Revenue Service
Special Procedures Staff- Insolvency
P.O. Box 7346
Philadelphia, PA 19101-7346

National Retail Properties
450 S. Orange Avenue, suite 900
Orlando, FL 32801

Independent Bank of Waco
P.O. Box 21145
Waco, TX 76702

Glazier Foods Company
11303 Antoine
Houston, TX 77066

AEI Income & Growth Fund, LLC
30 East 7th Street, Suite 1300
St. Paul, MN 55101

Wilmington Center, LLC
9471 Lomitas Avenue
Beverly Hills, CA 90210

## FIRST MASTER LIMITED SERVICE LIST
*(March 27, 2014)*

**Twenty Largest Unsecured Creditors:**

RC Nelms, Jr., Hillcrest Trust
4659 Christopher Place
Dallas, TX 75204-1610

Texas Comptroller of Public Accounts
Revenue Acctg. Division-Bankruptcy
P.O. Box 13528
Austin, TX 78711-3528

Food Services of America
P.O. Box 839
Meridian, ID 83680

AEI Accredited Investor Fund 2002, Ltd.
1300 Minnesota World Trade Center
30 Seventh Street East
St. Paul, MN 55101-4901

ARC CAFÉ, LLC
American Realty Capital
200 Dryden Road, Suite 1100
Dresher, PA 19025

Pleasant Ridge Development Co., LLLP
11601 Pleasant Ridge Road, Suite 300
Little Rock, AR 72212

Shamrock Foods-Consolidated
Department 219
Denver, CO 80291-0219

Magdalena Properties, LLC
2340 Westcliffe Lane, #C
Walnut Creek, CA 94597

Texas Workforce Commission
Attn: Regulatory Integrity Division-SAU
101 E. 15th Street, Room 556
Austin, TX 78778-0001

GE Capital Franchise Finance Corp.
8377 E. Hartford Drive, Suite 200
Scottsdale, AZ 85255

**Twenty Largest Unsecured Creditors (cont'd):**

Gentilis, Inc.
6728 North Hills Drive
Texarkana, TX 75503

**Secured Creditors:**

FRG Capital, LLC
1514 RR 620 South
Austin, TX 78734

GE Capital Franchise Finance Corp.
Attn: Bond Harberts, Senior VP
500 West Monroe St., 21st Flr (21.N.105)
Chicago, IL 60661
bond.harberts@ge.com

Independent Bank of Waco
Attn: Charley Rigney
P.O. Box 21145
Waco, TX 76702

Prosperity Bank
Attn: Tim Cardinal
1415 RR 620 South
Austin, TX 78734

**Miscellaneous:**

Summit Energy
25716 Network Place
Chicago, IL 60673-1257

CASS
2675 Corporate Exchange Drive
Columbus, OH 43231

FinTech
7702 Woodland Center Blvd., Suite 50
Tampa, FL 33614

# **FIRST MASTER LIMITED SERVICE LIST**
*(March 27, 2014)*

**Miscellaneous (cont'd):**

Wells Fargo Bank, N.A.
Attn: Zakir A. Khan, AAP
90 South 7th Street, 9th Floor
MAC-N9305-09L
Minneapolis, MN 55479


**Requested Notice:**

Blake Rasner
Haley & Olson, P.C.
801 N. Valley Mills Drive, Suite 600
Waco, TX 76710
brasner@haleyolson.com

Jeffrey T. Wegner
Kutak Rock, LLP
1650 Farnam Street
Omaha, NE 68102-2186
jeffrey.wegner@kutakrock.com

William M. Kane
Traylor, Tompkins & Black, P.C.
751 Horizon Court, Suite 200
Grand Junction, CO 81506-8754
wmk@grandjunctionlaw.com

Jason P. Wylie
The Law Office of Jason Wylie
8553 N. Beach St., PMB 316
Fort Worth, TX 76244-4919
jason@jasonwylielaw.com