IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

IN RE: §
§
FIRED UP, INC. §            CASE NO. 14- *1 0 4 4 7*
§            (Chapter 11)
DEBTOR[1] §

## DECLARATION OF CREED FORD III IN SUPPORT OF DEBTOR'S PETITION AND FIRST DAY MOTIONS

I, Creed Ford III, pursuant to 28 U.S.C. § 1746 hereby declare that the following is true to the best of my knowledge, information and belief.

## INTRODUCTION

I am the CEO and Chairman of the Board of Fired Up, Inc. ("Fired Up"). I am familiar with the general business and financial affairs and the day-to-day operations of Fired Up , both as the pre-petition debtor and as it will be operating in the above-referenced chapter 11 case as the debtor in possession.

I submit this declaration ( "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of (i) the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") and (ii) the relief, in the form of motions for various relief that the Debtor has requested of the Court ("First Day Motions") along with the filing. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

---

[1] Until February 26, 2014, Debtor's business was being operated partially by the Debtor and partially by its two wholly owned subsidiaries, Kona Restaurant Group, Inc. and Carino's Italian Kitchen, Inc.. Those entities were merged into the Debtor on that date.

Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtor's senior management team and other advisors of the Debtor, my review of relevant documents, and/or my opinion based upon my experience and knowledge of the Debtor's operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

This Declaration is intended to provide a summary overview of the Debtor and this chapter 11 case. Sections I through V of this Declaration provide a description of the Debtor's businesses, pre-petition debt, financial information, and the events leading up to the commencement of this chapter 11 case. Section VI summarizes the First Day Motions and the relief sought, which the Debtor believes is crucial to its successful reorganization.

## BACKGROUND

### Overview of the Debtor and Its Business

Fired Up is a corporation based in Austin, Texas, which has been involved in the hospitality industry since 1997. It currently owns and operates forty-six (46) company-owned stores ("Company Stores") known as Johnny Carino's Italian ("Carino's") in seven states (Texas, Arkansas, Colorado, Louisiana, Idaho, Kansas and Missouri) and fifty-one (61) franchised or licensed locations in seventeen (17) states (California, Florida, Georgia, Indiana, Kentucky, Michigan, Montana, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Utah and Washington) and four other countries (Bahrain, Dubai, Egypt and Kuwait) ("Franchisees" or "Franchised Stores"). Carino's focuses on providing high quality, classic but contemporary, innovative Italian cuisine at an exceptional value in an authentic Italian atmosphere to a broad demographic from intimate "date nights" for young singles to large family gatherings.

Prior to 2014, the business was operated through three entities with the Debtor, Fired Up, Inc., being the parent company. Ownership of Fired Up, Inc. as of the Petition Date was: 74.77% by Creed Ford III, his wife and other immediate family, 13.60% by Abdulghani Al-Ghunaim and Al-Ghunaim Trading Co., Ltd., and the remaining 11.63% percent by approximately 180 other shareholders. Kona Restaurant Group, Inc. ("Kona") was wholly owned by Fired Up, Inc. and was franchisor for the Debtor's franchises and the lessee for most of the Company Store locations. Carino's Italian Kitchen, Inc. ("CIK"), also solely owned by Fired Up, Inc., operated the Company Stores. On February 26, 2014, after extensive consultation with its accountants, tax advisors and corporate attorneys, the three companies were merged into the Debtor, Fired Up.

Fired Up currently employs approximately 2,900 persons in its restaurants and corporate headquarters. I am the majority shareholder in Fired Up and also sit on its Board of Directors in addition to serving as President and as sole Chief Executive Officer since 2008.

**Company History**

Norman J. Abdallah and I formed Fired Up in 1997 for the purpose of acquiring the Kona Restaurant Group from Brinker International, Inc. ("Brinker"). At that time, Kona operated the six-unit Johnny Carino's Italian Kitchen chain and one Kona Ranch Steakhouse. By 2006, Fired Up had expanded the concept to 173 company-owned and franchised locations in thirty (30) states and four (4) foreign countries.

By 2007, however, revenues had begun slipping and guest counts were down. The Company's initial business strategy was to rebrand and fine tune its concept. It began recreating itself as Carino's Italian and moving away from the old Johnny Carino's brands. However, before the success of this strategy could be determined, the 2008 recession created significant

additional challenges for the company. In the fiscal year ending June 25, 2008, the Company reported a net loss of $15.9 million.

I sold the Chili's franchises which another of my businesses owned and operated in order to devote my full attention to the Carino's Italian brand. In 2008, I assumed the position of CEO in addition to being chairman of the board. In December of 2010, I arranged the redemption for $16 million of preferred shares of the Debtor held by Rosewood Capital, which had been an investor in the company since 2002. The redemption was financed with a loan from FRG Capital, LLC, a company owned by my Ford family. As the largest and majority shareholder, I did not receive any consideration for the loan to Fired Up, Inc. to redeem the Rosewood preferred shares.

As a result of changes instituted by management, the company subsequently experienced several profitable years. However, by the end of the fiscal year ending June 26, 2013, the company reported a net loss of $5.9 million. It appeared that, while a majority of the Company's stores were profitable, a minority of locations were consistently losing significant amounts of money. I instituted a comprehensive review of Fired Up's sixty-five (65) company-owned stores. From October 2013 through March 2014, the company closed a total of nineteen (19) locations which it had determined were unprofitable and likely to remain so.

**Financial Information**

Fired Up's real property assets consist of the land and building out of which a Company Store in Abilene, Texas operated and is valued at $1.6 million. The Company Store at this location is no longer open and Fired Up is in the process of negotiating a sale of this property at what it believes to be market price. The remainder of Debtor's locations are leased. Debtor holds long-term ground leases on eleven (11) of these locations and owns the buildings located

upon each piece of real property. The Debtor has valued these buildings at $6.2 million.[2] The Debtor estimates the book value of its tangible personal property assets at approximately $6.8 million. Debtor also holds significant intangible property, including trademarks and other intellectual property.

The Company is still preparing its Schedules for this filing and some of the data is still in flux. However, we estimate that it owes $17.1 million in contractual secured debts, including $13.4 million to FRG Capital, LLC, $1.9 million to GE Capital Corp., $1.2 million to Prosperity Bank and $600,000 to Independent Bank of Waco. We estimate that it owes delinquent *ad valorem* taxes on its property of $260,000 and current *ad valorem* property tax obligations, incurred but not due, are approximately $2.2 million. We estimate that the Company has current priority obligations to employees consisting of approximately $950,000 in wages, $400,000 in accrued vacation time and $70,000 in accrued bonuses and a total of $1.9 million in priority tax claims. The Company's draft schedules reflect unsecured debts of $13.8 million but this amount likely overstates Debtor's actual liabilities. Major liabilities include $2.8 million owed to AEI Fund Management, Inc. with regard to two shortfall notes, $3.3 million in contingent obligations with regard to leases to be rejected, $2.2 million owed to a former vendor and $620,000 owed to Independent Bank of Waco for a loan on a surrendered ground lease. Much of the remaining amounts scheduled consist of amounts owed to current vendors and estimated tax amounts to be paid under triple net leases in the future. In terms of numbers, only a handful of priority and general unsecured operating debts (*e.g.* vendors, utilities, taxes) have not been kept current and were not current at the time of filing.

---

[2] This number is based on the value of the building *with* the existing ground lease. A building has little value, if any, if its ground lease is terminated for any reason and the building belongs to the Lessor at the end of the ground lease. This valuation does not discount for these factors, which are significant.

For the fiscal year ending June 27, 2012, the company reported total revenues of $125.7 million and net income of $614,000. Guest counts for this period totaled 8.6 million. For the fiscal year ending June 26, 2013, the company reported total revenues of $120.8 million and a net loss of $5.9 million. Guest counts equaled 8.5 million. Annualized gross sales for the Company Stores for 2014 are expected to be about approximately $103 million. As of December 31, 2013, Net Operating Cash Flow was ($2.6 million); Net Operating Cash Flow going forward, after the store closings, is estimated to be at least $300,000 per month *positive* with an increase in the profitability of each of the operating stores of at least six percent (6%). Annualized General and Administrative costs have been reduced approximately $2.5 million from 2013 to 2014.

## Reasons for Filing Bankruptcy

As discussed above, the Company began its own "out of court" reorganization in the last quarter of 2013: it closed unprofitable restaurants, it worked with the landlords of its closed stores to find other tenants or sell particular stores or work out terminations of leases and agreed damages owed. It significantly decreased fixed expenses. It began examining programs and other marketing strategies to increase revenues. However, while most of the Company's landlords and other creditors continued in these "bad times" with the collegial working relationship they had had with the Company and me over decades, some did not. The actual timing of the filing on March 27, 2014 was influenced by two lawsuits—one by a former vendor which was aggressively seeking unreasonable repayment terms on an outstanding amount owed when that vendor and Debtor ceased doing business and the other by a former Landlord.

The general motivation behind the filing of the Company's chapter 11 was to try to tie up the "loose ends" of the Company's self-imposed "reorganization" that did not appear capable of

being tied up without litigation. In particular, the provisions of the Bankruptcy Code with respect to the rejection of burdensome leases and the ability to propose and pay out its debts pursuant to a Plan without random uncooperative creditors undermining same were particularly attractive.

**Going Forward**

Debtor's projections when it began analyzing its profitable and non-profitable stores showed its ability to immediately start showing a net operating profit immediately upon the closing of its unprofitable locations with little additional growth in revenues. Its projections have been born out as these stores have been closed. Based on these projections, I am reasonably optimistic that the Company will be able to operate on a profitable basis and to devise a plan of reorganization for repayment of its existing obligations and those created from the lease rejections. I hope that, with the burden of aggressive creditors continuing unrelated collection efforts being removed, I can focus Fired Up on further efforts to better market itself, increase revenues and continue to cut costs.

## FIRST DAY MOTIONS

Concurrently with the filing of its chapter 11 petition, the Debtor has filed a number of First Day Motions, which the Debtor believes are necessary to enable it to operate in chapter 11 with minimum disruption and loss of market share or productivity. The Debtor respectfully requests that the relief requested in each of the First Day Motions be granted. Such relief is a critical element in stabilizing and facilitating the Debtor's operations during the pendency of this chapter 11 case. A description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

Debtor is also respectfully requesting emergency consideration of the First Day Motions as they are all critical to maintain the Debtor's bankruptcy estate. Debtor needs emergency consideration of the First Day Motions to meet payroll and other current expenses. Without such consideration, Debtor's operations and the value of its bankruptcy estate would be, almost without a doubt, negatively affected.

## Motion Pursuant to 11 U.S.C. § 363 for Authority to Use, Sell, or Lease Cash Collateral in the Ordinary Course, Provide Adequate Protection and for Preliminary Hearing

Debtor has contractual secured debts with aggregate liabilities of approximately $17.1 million. FRG Capital, LLC holds a blanket lien upon the Debtor's assets. It is controlled by insiders of the Debtor and consents to use of cash collateral. GE Capital Franchise Corporation has liens upon the Debtor's interest in real and/or personal property at four of its locations. Independent Bank has a lien upon one of Debtor's locations and Prosperity on another. Xerox has a lien upon an individual piece of equipment.

| Creditor | Debt Amount | Store# | Collateral | Insider? | First Perfection Date*/State |
|---|---|---|---|---|---|
| FRG Capital, LLC | $13,436,864.02 | N/A | All personal property wherever located, including but not limited to goods, equipment, inventory, accounts receivable and intellectual property. (Lien subordinated to Prosperity Bank re: 4157 Buffalo Gap Rd., Abilene, TX) | Yes | TX 01/20/2011 DE 01/20/2011 |
| General Electric Capital Corporation | $514,005.62 | #89 | Real property and all property used in connection with 7017 Garth Road, | No | TX 6/17/2008 DE 6/17/2008 |

Ford Declaration 8

| | | | | | |
|---|---|---|---|---|---|
| | | | Baytown, TX 77521 | | |
| GE Capital Franchise Corporation | $55,201.33 $784,866.95 | #103 | Real property and all restaurant equipment, machinery, furniture, appliances, trade fixtures, goods located at 3147 S. Military Drive, San Antonio, TX | | DE 11/14/2005 |
| GE Capital Franchise Corporation | $56,489.41 | #90 | All restaurant equipment, machinery, furniture, appliances, trade fixtures, goods located at 5750 Hwy. 6, Missouri City, Texas | | DE 11/14/2005 |
| GE Capital Franchise Finance Corporation | $473,907.46 | #87 | Leasehold estate in Lafayette, LA | | DE 01/23/2014 |
| Independent Bank | $607,451.26 | #78 | Machinery, equipment, furniture, fixtures, and other tangible personal property and proceeds located at 3050 Silverlake Village Drive, Pearland, Texas | | TX 02/11/2009 |
| Prosperity Bank | $1,185,251.29 | #102 | Equipment, general intangibles, deposit accounts, proceeds and all personal property used at 4157 Buffalo Gap Rd., Abilene, TX 79605 | No | TX 09/04/2012 |
| Xerox | | | Leased property: Xerox P4112CPC | | TX 02.09/2011 |

In addition to the contractual secured creditors, Debtor owes delinquent ad valorem taxes on personal property owned in the amount of $260,000 and approximately $2.2 million in current obligations to 155 local taxing entities that are not yet due. The Debtor also has a Certificate of Deposit which is pledged to secure a letter of credit for the Debtor's non-subscriber workman's compensation policy.

Debtor generates Cash Collateral from the operation of its business when it generates proceeds and credit card accounts from sales of food and beverages on a daily basis in the ordinary course of its business. The assets likely to give rise to Cash Collateral consist of inventory of food and beverages, accounts receivable generated from sale of food and beverages and identifiable cash proceeds resulting from sale of food and beverages. On the other hand, it is the Debtor's contention that furniture, fixtures, equipment, computers, software and real estate do not give rise to Cash Collateral. Until a plan of reorganization is confirmed in this case, Debtor must obtain approval for the use of the Cash Collateral. It is critical for Debtor to have access to its cash and other business property to continue to operate in the ordinary course of business and to pay normal operating expenses.

Debtor can meet its ongoing post-petition obligations only if it borrows funds post-petition to cover cash collateral as of the Petition Date and can begin generating non-encumbered post-petition cash collateral or it can use assets that it believes will be claimed as Cash Collateral. It believes the former will decrease the value of its business. Debtor believes the latter is preferable as it has generated multiple projections and believes it is able to cash flow post-petition if it has the funds available from or generated by its pre-petition cash collateral to pay its post-petition expenses. Thus, in order to continue operations as normal and to preserve the value of the estate pending confirmation of a plan of reorganization, Debtor needs immediate

authority to use the Cash Collateral. Debtor's interim budget for use of Cash Collateral is attached to the Motion as Exhibit A.

## Motion to Authorize Payment of Prepetition Wages, Salaries, Bonuses, Reimbursable Employee Expenses and Benefits in the Ordinary Course of Business and to Establish Employee Noticing Procedures

*Payment of Prepetition Salaries, Wages, Bonuses, and Commissions*

As of March 27, 2014, Debtor employed approximately 2,876 employees, including 39 at the corporate office and 2,837 in its restaurants. Of these employees, approximately 195 work on a salaried basis and approximately 2,2681 are employed on an hourly basis. Debtor presently has seven employees earning a salary of at least $100,000 per year. The highest amount paid to any employee is $165,240.00 per year. In my capacity as Chairman of the Board and Chief Executive Officer, I receive compensation of $75,000 per year.

Employees are paid every other Friday. Payment is made nine days in arrears. The payroll every two weeks averages a net $950,000. The most recent payroll was made on March 21, 2014. As of the petition date, the Debtor owed fourteen days of wages for an aggregate amount of approximately $950,000. The next payroll date is April 4, 2014 and includes compensation for services rendered by employees from March 13, 2014 through March 26, 2014. The Debtor estimate that wages, salaries, commissions, and bonuses paid in the April 4 payroll will be approximately $950,000, all of which will relate to prepetition salaries, wages, bonuses, and commissions.

Store managers and catering managers earn bonuses on a monthly basis. Full-time hourly employees receive a bonus upon completing three, five, seven, ten, twelve and fifteen or more years with the company. The amount of bonuses owed as of the petition date is estimated at $70,000 and reflect those that are due at this time. All of the bonuses being paid by the Debtor

are paid pursuant to written policies which existed prior to bankruptcy and are part of the employees' regular compensation package. The Debtor does not seek to pay any bonuses out of the ordinary course of its business prior to bankruptcy and is not paying any bonuses as a result of the bankruptcy case.

In addition to regular compensation, full-time managers and corporate salaried and hourly employees accrue vacation time at a rate of two weeks per year for 0-5 years' tenure, three weeks per year for 6-10 years and four weeks per year for 10+ years. As of this date, 169 employees are owed an aggregate amount of vacation time of approximately $375,000.

### *Payment of Prepetition Healthcare and Insurance Claims*

The Debtor maintains various insurance plans for their employees (the "Insurance Program"). Through the Insurance Program, certain of the Debtor's employees receive health and dental insurance, life insurance, short term and long term disability insurance, and flexible spending accounts for which the employees make payroll deductions. The Debtor maintain the following plans with the administrators listed below (the "Administrators"):

| Benefit Plan | Administrator |
|---|---|
| Medical | Hourly Employees:<br>TPA--WEBTPA<br>Underwriter—Assurant<br>Salaried Employees:<br>Self-Insured through United Health Care |
| Dental | Hourly Employees:<br>TPA--WEBTPA<br>Underwriter—Assurant<br>Salaried Employees:<br>Reliant Standard Life Insurance |
| Vision | Hourly Employees:<br>TPA--WEBTPA<br>Underwriter—Assurant<br>Salaried Employees:<br>Vision Service Plan |
| AD&D | Reliance Standard Insurance |
| Short Term Disability | Reliance Standard Insurance |
| Long Term Disability | Reliance Standard Insurance |

| Voluntary Life | Reliance Standard Insurance (salaried employees) |

The Debtor's hourly employees receive medical, dental and discount vision insurance. Salaried employees also receive basic life and accidental death & dismemberment insurance, short and long term disability and an employee assistance/wellness program. Employees may participate in flexible spending accounts, a 401(k) plan, voluntary life insurance (paid by the employee) and voluntary accidental death and dismemberment insurance (paid by employee). Both hourly and salaried employees qualify for tuition assistance.

The Debtor has a self-insured health insurance plan for its salaried employees. Prior to July 1, 2013, the plan was administered by Aetna. Aetna has stated that there are no known but unpaid claims or claims being disputed. However, claims may be filed under the Aetna plan through June 30, 2014. The current insurance plan is administered by United Health Care. For the plan year ending June 30, 2014, United Health Care estimated that the Debtor would incur claims of $2,189,041.15. As of February 11, 2014, the Debtor had paid out $743,622.63, leaving an estimated obligation for the balance of the plan year of $1,445,418.82. However, the Debtor has reduced its staffing by approximately 17% since the beginning of the plan year. Assuming a 17% decrease in health care costs, the total estimated amount to pay would be $1,816,904 and the remaining balance for the plan year would be $1,073,281.

The Debtor maintains four special accounts for the payment of insurance benefits. The Debtor maintains a constant balance in these accounts. As claims come due, the administrator pays them from the account and then makes an ACH transfer from the Debtor's regular bank account to replenish the account. The insurance accounts are as follows:

| Account | Amount | Administrator | Insurance Type |
|---|---|---|---|
| BBVA Compass | $20,000.00 | TPA | Health, Dental and Vision Plans for Hourly Employees |
| CitiBank Delaware | $85,000.00 | SAMP | Prior Aetna Self-Funded Insurance Plan |
| Bank of America | $46,000.00 | United Health Care | Current Self-Funded Insurance Plan |
| Bank of America | $5,000.00 | United Health Care | Flexible Spending Account |

Additionally, the Debtor maintains a letter of credit to secure its self-insured workman's compensation program with Travelers. The letter of credit is secured by a certificate of deposit pledged to Wells Fargo Bank in the amount of $367,000.

### Payment of Prepetition Expenses Related to 401(k) Plan

Debtor maintains a 401(k) plan (the "401(k) Plan") administered by Principal Financial Group, which participating employees may defer a portion of their salary to help meet their future financial goals. It withholds from employee wages for contributions and matches some of these contributions. The Debtor's amount of matching totals approximately $1,550 per payroll period.

### Payment of Trust Fund Taxes

Debtor is required by law to withhold from an employee's wages amounts related to federal, state, and local income taxes, social security taxes, and Medicare taxes (the "Employee Taxes"). Debtor is required to (i) match the social security and Medicare taxes; (ii) based on a percentage of gross payroll, pay additional amounts for state and federal unemployment insurance; and (iii) remit these payroll taxes to various taxing authorities. For the first eight weeks of 2014, the employer's share of payroll taxes averaged $142,205 per two week pay period. The Debtor has certain accrued but unpaid trust fund taxes which relate to prepetition Employee Taxes.

***Other Programs***

Workers' compensation insurance for all of the Debtor's employees outside of the state of Texas is provided through an insurance policy with Travelers Insurance. Travelers administers the claims for all states other than Texas. Premiums for the Travelers policy are paid on a monthly basis and average $5,914. The Debtor was current upon its premium payments at the time of filing.

For employees inside the state of Texas, the Debtor is self-insured and carries a non-subscriber reinsurance umbrella policy through North American Specialty Insurance Co. The annual North American reinsurance policy premium is $100,007. The policy has a $50,000 retention limit and limits of $5,000,000 per single occurrence and a general policy aggregate level of $25,000,000.

The workers' compensation claims within the state of Texas are administered through a third-party claims administration firm, Anchor Claims Management. The approximate cost to administer claims for the 2013 premium year was $214,200. Monthly claims are paid under the reinsurance policy for workers within the state of Texas. Because payment of the workers' compensation claims is essential to employees who are affected, whom are essential to the Debtor's business, the Debtor seeks authorization to pay workers compensation claims as they arise, as ongoing claims payment will cover prepetition periods.

***Honoring Prepetition Checks and Electronic Transfers***

At any given time, the Debtor has a limited amount of outstanding checks to employees. Employees in Arkansas and Idaho receive paper checks while other employees have their compensation deposited electronically. The Debtor requests that, to the extent of funds on deposit, all applicable banks and other financial institutions shall be directed to receive, process, honor and pay all checks presented for payment and to honor all funds transfer requests made by the Debtor relating to the Employee Claims, whether such checks were presented or fund transfer requests were submitted prior to, or subsequent to, the Petition Date. The Debtor estimates prepetition checks in

transit aggregate $140,000 with the oldest check dating to July 2011. Further, the Debtor requests authority to issue post-petition checks, or to effect post-petition funds transfer requests in replacement of any checks or funds transfer requests with respect to its prepetition employee obligations dishonored or denied as a consequence of the commencement of this Case.

*Employee Noticing*

The Debtor's employees fall into two categories: those who are owed current wages for the "gap" period since the date of the last payroll and employees who will still be owed compensation after the first post-petition pay date. There are 179 employees who are owed accrued vacation time. While the Debtor is seeking authority to pay accrued vacation time in the ordinary course of business, these claims will remain owing as of the petition date. A list of the employees who will be owed continued obligations after the next pay date is attached to the Motion as Exhibit A. The Debtor has listed these creditors on the matrix and the schedules as with any other creditors. The remaining employees' claims will be paid shortly after the filing of the Petition if this motion is granted. The Debtor is requesting leave to omit the employees whose claims will be paid in full from the matrix and schedules and be noticed of the bankruptcy case only as follows:

a. *Hourly Employees*—all hourly employees are scheduled through a scheduling program. Immediately upon approval of this Order, Notice of the bankruptcy in the form attached as Exhibit B to the Motion will be loaded and employees will see it and need to read it in order to log on; and

b. *Salaried Employees*—each salaried employee will be sent a notice of the bankruptcy in the form attached to the Motion as Exhibit B to the email address he or she provided to the Debtor or, if no address has been provided, by United States Mail, Postage Prepaid.

Omitting these employees will substantially reduce the cost of noticing in this case and will avoid confusion among the employees with regard to payment of their current payroll obligations.

## [First] Motion to Reject Unexpired Leases of Non-Residential Real Property Nunc Pro Tunc

Approximately seven (7) months prior to the Petition Date, as part of an attempt to reverse the financial losses it was experiencing, Debtor commenced a unit-by-unit analysis of its Company Stores. The analysis clearly showed that: (i) 34 Company Stores were consistently profitable or, at worst breaking even; (ii) 14 Company Stores were consistently losing money; and (iii) 18 stores were "on the cusp."

In some instances where a Company Store was deemed unprofitable because of its performance over three or so years, direct competition or macro-economic circumstances that impacted the Debtor's customer base were deemed to be the cause: Debtor was unable to attract the necessary volume of business to sustain and justify continued operations at these restaurant locations, given their operating expenses—including the Non-Residential Real Property Leases, both ground and "full". In other instances, it was clear the only significant variable between profitability and loss was the rent and lease terms for certain locations and that, with concessions with respect to a particular lease and some fine-turning and improvement in operations, the particular units could become profitable.

Debtor made the determination to close those locations with respect to which it did not believe with some certainty it could mitigate or eliminate its losses in a relatively short period of time. Between September of 2013 and the Petition Date, it closed nineteen (19) stores as set forth herein[3]. As operations have ceased, it is appropriate for the Debtor to reject fifteen (15) of

---

[3] The Debtor also closed four additional stores during 2012 and the first six months of 2013. Those locations are not affected by this motion.

these Real Property Leases.[4]  Continuation of the leases would cause the Debtor to incur

expenses for which its estate would receive no value and would give rise to claims for

administrative expenses, which would unjustifiably skew the payment algorithm set forth in the

Bankruptcy Code.  Therefore, rejection of the following Real Property Leases is necessary:

Leases Proposed for <em>Nunc Pro Tunc</em> Rejection

| Store # | Lessor/Servicer | Lease Type | Leasehold Property Location |
|---|---|---|---|
| 85 | AEI Income & Growth Fund 25 LLC | Non-Residential Real Property (Full) | 2638 Derek Drive Lake Charles, LA 70607 |
| 98 | AEI Income & Growth Fund 25 LLC | Non-Residential Real Property (Full) | 5700 N. Elizabeth Street Pueblo, CO  81008 |
| 42 | Cassidy Turley Midwest, Inc. | Non-Residential Real Property (Full) | 421 E. Nolana Loop McAllen, TX  78504 |
| 44 | Cassidy Turley Midwest, Inc. | Non-Residential Real Property (Full) | 389 S. Wadsworth Blvd. Lakewood, CO  80226 |
| 66 | Cassidy Turley Midwest, Inc. | Non-Residential Real Property (Full) | 510 LBJ Freeway (West IH-635) Irving, TX  75063 |
| | Cassidy Turley Midwest, Inc. | Non-Residential Real Property (Full) | 960 N. Hwy 287 Mansfield, TX  76063 |

---

[4] Debtor is not seeking to reject four of the leases on the nineteen (19) closed stores at this time, as Debtor is pursuing options for the sale of its property and/or transfer of the leases which will net far more to the Debtor than it will save by rejection at this time.

| 81 | | | |
|----|----|----|----|
| 84 | Cassidy Turley Midwest, Inc. | Non-Residential Real Property (Full) | 411 B East Loop 281 Longview, TX 75605 |
| 51 | Gentilis, Inc. | Non-Residential Real Property (Full) | 3402 St. Michael Dr. Texarkana, TX 75503 |
| 95[5] | Moondance, Inc. | Non-Residential Real Property (Full) | 5900 S. Hulen St. Fort Worth, TX 76132 |
| 46 | National Retail Properties | Non-Residential Real Property (Full) | 3805 I-10 South Beaumont, TX 77705 |
| 50[6] | National Retail Properties | Non-Residential Real Property (Full) | 595 E. Round Grove Road Lewisville, TX 75067 |
| 47 | Native Land Investments, Ltd. | Non-Residential Real Property (Full) | 2473 28th Street Greeley, CO 80634 |
| 96 | RC NELMS JR. HILLCREST TRUST | Non-Residential Real Property (Full) | 1725 Loop 323 WSW Tyler, TX 75701 |

---

[5] This store is closed and the lease has been terminated. To the extent that any issue arises with respect to the termination, Debtor is requesting that the lease be rejected *nunc pro tunc* to the Petition Date in the event there is any subsequent issue with respect to the termination.
[6] This store is closed and the lease has been terminated. To the extent that any issue arises with respect to the termination, Debtor is requesting that the lease be rejected *nunc pro tunc* to the Petition Date in the event there is any subsequent issue with respect to the termination.

| | Wilmington Center, LLC | Non-Residential Real Property (Full) | |
|---|---|---|---|
| 59 | | | 2840 Highway 6 & 50, Grand Junction, CO |
| 90 | Magdalena Properties, | Non-Residential Real Property (Ground) | 5750 Hwy. 6, Missouri City, TX 77459 |
| 104 | Pleasant Ridge Development Co., LLLP | Non-Residential Real Property (Ground) | 11600 Pleasant Ridge Rd., West Little Rock, AR 72223 |
| 37 | AEI Accredited Investor Fund 2002, Ltd. | Non-Residential Real Property (Full) | 2033 Ken Pratt Blvd., Longmont, CO 80501 |

Specifically, the Real Property Leases set forth above must be rejected as the Debtor determined pre-petition, in its business judgment, to close the restaurants associated with the Real Property Leases. The restaurants were all closed prior to the Petition Date and the premises surrendered to the respective Landlords.[7] Accordingly, relief *nunc pro tunc* to the Petition Date is warranted.

## Motion to Authorize Maintenance of Certain Prepetition Bank Accounts and Cash Management System

Prior to commencing this Case, Debtor managed its cash, receivables and payables through a cash management system ("CMS") consisting of: (i) two banks (Wells Fargo and Cap One); (ii) fifty (50) store depository accounts, one for each Company Store[8] (three at Cap One and forty-seven at Wells Fargo); (iii) two Master Depository Accounts (one at Wells Fargo and

---

[7] Debtor, however, has continued to work with many of the Landlords of the Company Stores that have been closed. This includes attempting to find new tenants and, in some of these locations it has left the furniture, fixtures and equipment extant with the Landlord's permission so that the Landlord can show the premises in "turnkey" condition. This method of closing stores also provides potential buyers for Debtor's assets at higher than auction or distress sale values.

[8] One of the "store depository accounts" at Wells Fargo is located in San Marcus for Texas State "Bob Cat Bux" meal plan card deposits. It is being considered a store depository account for this Motion as it operates identically.

One at Cap One); (iii) one active Master Account; and (iv) four active disbursement accounts (Wells Fargo AP, Wells Fargo AP ACH, Wells Fargo Payroll, and Wells Fargo Fintech ACH). All the active accounts and one of the depository accounts were maintained at Wells Fargo ("Wells Fargo"); one Master Depository Account and two Store Depository Accounts were maintained at Cap One (collectively, the "Banks"). Debtor also maintained several other Wells Fargo accounts for stores that have recently been closed or are otherwise dormant, which are in the process of being closed. A schedule of the afore-described accounts at these Banks (collectively "Bank Accounts") is attached to the Motion as Exhibit A. The Bank Accounts and the transfer of funds from the different accounts that are part of the CMS are described below. Debtor reserves the right to seek authorization from the Court, if necessary, to implement changes to the CMS during the pendency of the Case.

Store level receipts are generated through local acceptance of cash, checks and credit cards. Cash and checks are deposited daily into each particular store's Store Depository Accounts and "swept" nightly into Master Depository Accounts at Wells Fargo and Cap One [9] In turn, the Master Depository Account is swept nightly into the Debtor's Master Account. Thus, at the beginning of each workday, each Store Depository Account and the Master Depository Account begin with a zero balance.

Debtor's Master Account was maintained as of the Petition Date at Wells Fargo. Funds from this account are utilized to fund all obligations and disbursement accounts of the Debtor. As of the Petition Date, Debtor paid its operating expenses and debt from four accounts— the ACH Account used for outgoing wire and other electronic transfers made by the Debtor the Payroll Account, a general disbursement account ("A/P Account"), and the Fintech Account

---

[9] Credit card receipts from MasterCard, Visa, American Express, Discover and Diners for all the Company Stores are deposited daily directly into the Master Account, as defined and discussed below.

which has been used for ten years by FinTech, a company which specializes in assisting restaurants and bars in paying their liquor bills within parameters set by each State in which the client operates.

Debtor is filing a separate motion requesting authorization to continue to pay employees, which payroll checks will clear against the Payroll Account. It is therefore necessary to maintain the pre-petition Payroll Account for the time reasonably necessary to allow all payroll checks outstanding as of the Petition Date to have cleared.

Debtor is self-insured for medical and workman's compensation insurance for its employees. Four of the providers and/or administrators ("Claims Administrators") of these programs require Debtor to maintain a constant, fixed balance account out of which they pay claims. As claims are paid from these "escrow" accounts, the money to reimburse each of the accounts is pulled from Debtor's ACH Account. These four accounts and the amounts required to fund them as of the Petition Date were:

| BANK | AMOUNT | PURPOSE | ADMINISTRATOR |
|------|--------|---------|---------------|
| BVA Compass (xxxxxx908) | $20,000 | TPA Claims | Combined Group Insurance Service |
| CitiBank SAMP (xxxxx181) | $85,000 | Medical from prior plan) | Aetna Self Funded |
| Wells Fargo | $387,00 LOC (cash security) | Workmen's Comp | Traveler's |
| Bank of America (xxxx2628) | $46,000 | Self-Funded Medical Pgm | United Healthcare |
| Bank of America (xxxx2615) | $5000 | Self-Funded Flexible Spending Acct | United Health Care |

While Debtor funds these "escrow" accounts and the accounts are in its name, the particular insurance company on each of the accounts above determines the balance required in each account and has complete control over the funds and how claims are paid from it.

With the exception of the "waivers" set forth and requested below, Debtor will comply with the requirements of the United States Trustee regarding the non-payment of prepetition obligations by closing the ACH, the A/P and the Fintech Accounts at Wells Fargo within forty-eight hours of the Petition Date. New replacement accounts for these accounts as well as a tax account will be opened at Prosperity Bank. A new Payroll Account will also be opened at Prosperity Bank for payrolls going forward but, with the Court's permission, the current Payroll Account at Wells Fargo will remain open post-petition for thirty days (30) to allow the uncleared checks as of the Petition Date to clear.

### Debtor's Motion for an Order Authorizing the Debtor to Honor Certain Prepetition Obligations to Customers and to Continue Certain Customer Programs and Practices

Debtor sells gift cards in varying amounts which customers can buy and use themselves, or give as gifts, for use at a future date. There were approximately 109,100 gift cards outstanding with a total of approximately $1,911,374.75 on them as of the Petition Date; of this amount, $409,009.00 of this amount was issued by locations that have been closed. Debtor's best estimate is that more than half of the total outstanding gift cards were issued more than four years ago and will never be used.

Gift card purchases increase over the holidays and are then heavily redeemed in the first few months of the year. In some cases the user of the gift card has never been to a Carino's restaurant before and, in other cases, the user is a frequent diner. Whether the customer is the buyer or the recipient of the gift card, new to Carino's or a frequent diner, an inability to use the card would likely cause irreparable harm to the Debtor through negative publicity and viral

internet postings which could and probably would negatively impact Debtor's guest count and, therefore, its revenues.

In markets where Debtor has recently closed store locations, Debtor proposes to pay a cash refund for the remaining balance on any gift card still held by customers in these areas, *provided* there is not another Carino's within a 25-mile radius. Debtor estimates that gift cards issued near recently closed locations constitute less than twenty percent (20%) of the total amount of gift cards. Based on its business judgment, Debtor believes that failing to refund the remaining balances on gift cards in markets where stores have been closed and there is no store nearby would likely cause irreparable harm to the Debtor through negative publicity and viral internet postings resulting in material decreases in Debtor's guest counts and revenue in Debtor's remaining stores. Moreover, the cost associated with refunding the balances on gift cards in markets affected by store closing is *de minimis* when compared to the harm and losses that Debtor could suffer if it fails to make good upon these obligations.

Debtor also offers other discounts and gift cards. Discount programs include such things as Groupon, "Buy One, Get One Free," and loyalty programs. Coupons and loyalty program benefits were issued or accrued prior to the Petition Date via multiple sources such as direct mail, flyers, and email. If customers are unable to use their coupons or discounts, it would likely undermine the entire concept of "loyalty programs", thereby causing the same type of irreparable harm to the Debtor.

### Motion Pursuant to 11 U.S.C. §§ 105(a) and 1107(a) and 7 U.S.C. § 499a et. seq. to Approve Critical Vendor and PACA Vendor Payments and Assume Certain Executory Contracts for Vendor Payments

In its day-to-day operations, Debtor relies heavily on many suppliers and service providers. Like many restaurants in the heavily competitive food service industry, Debtor relies on vendors to

provide it with the best goods and foodstuffs at the best prices, including "Perishable Agricultural Commodities" (as defined by the Perishable Agriculture Commodities Act ("PACA"))[10] and services. Debtor has established long-term, professional but friendly relationships with vendors who provide service to all its restaurants in all the areas in which the vendor does business as well as with smaller vendors in locations where Debtor's master vendor does not do business or the nature of the product or service requires a local company. As of the Petition Date, Debtor was generally paying its vendors on current terms with the exception of Ben E. Keith, a former vendor with whom the Debtor was engaged in litigation.

Debtor is seeking authority to maintain current payments to the following categories of critical vendors: (i) food and produce vendors; (b) liquor vendors; (c) utility vendors; and (d) certain other vendors it deems to be critical. While Debtor is currently doing business with over 215 vendors, my staff and I have identified sixty-seven (67) vendors who it deems at this time to be "critical" as set forth in Debtor's motion, along with the amount each is owed, whether payments to each are "current", and the approximate amount of the outstanding balance incurred within the twenty (20) days prior to the Petition Date. Of these sixty-seven (67) vendors, fifteen (15) are owed nothing, twenty-five (25) are owed less than $1000, and sixteen (16) are owed less than $15,000. The aggregate amount owed to these vendors is $1,260,022.38.

Approximately forty-four percent (44%) of the aggregate amount currently owed the vendors listed in the Exhibit, not including the sums payable to Ford Restaurant Group, is owed to Glazier Foods Company ("Glazier"), which is the major food supplier for all of the Company Stores. Debtor's purchases from Glazier average approximately $1.25 million monthly; Debtor is on thirty (30) day terms; as of the filing date, approximately one-third of the debt incurred to Glazier monthly

---

[10] Under the PACA, a "perishable agricultural commodity": (A) Means any of the following, whether or not frozen or packed in ice: Fresh fruits and fresh vegetables of every kind and character; and (B) Includes cherries in brine as defined by the Secretary in accordance with trade usages. 7 U.S.C. § 499a(b)(4)

was outstanding. Other food suppliers on the list include two other general food suppliers (*e.g.* Food Services of America and Sysco Lincoln) which supply foods in areas not covered by Glazier. It also includes ten (10) produce and four (4) dairy suppliers, as Debtor prides itself on attempting to use the freshest ingredients available at a reasonable price. Debtor, because of its volume, has been able to negotiate good contracts with respect to price and terms: while its suppliers should want to keep it as a customer, vendors cannot be expected to offer special terms or products with significant past due amounts owed—be it seven figures to Glazier or four figures to a small produce house. Moreover, because of the many proprietary products which the Debtor must stock, it requires considerable effort to change food vendors.

Timely payment of liquor vendors is critical because states acting under their police and regulatory powers condition the ability to sell alcohol in a retail establishment on maintaining a permit. Maintaining the permit in turn requires timely payment of liquor vendors. Debtor has utilized the services of Financial-Information Technologies, Inc. ("Fintech") since 2004 to manage and pay the majority of its liquor vendors. Fintech acts as a payment agent for the Debtor with respect to its liquor vendors and assures that payment is made according to the applicable state regulations. The Fintech system is very streamlined and electronic and provides the Debtor with substantial operational efficiencies in the payment of its liquor vendors. Debtor has approximately ten (10) liquor vendors which are not part of the Fintech system. Both Fintech and these vendors have been designated as critical vendors for the reasons stated above. Because of the way in which the Fintech system is set up (*e.g.* including ACH payments to suppliers very soon after invoices are received and verified) and Debtor's decision to do everything required to comply with state liquor laws, the amount owed to these vendors at any given time is *de minimus*.

Debtor has also contracted with Summit Energy Services ("Summit") since 2009 for management and payment of its utility accounts. Debtor pays utilities for 264 separate utility accounts in the Debtor's name through Summit. One portion of this agreement consists of Utility Bill

Management with a division of this company known as CASS. Under this portion of the agreement, CASS pays utility vendors daily as the bills come due and Debtor pays CASS through ACH transfers twice a week. Use of this system helps the Debtor to minimize its utility bills and ensures that utility bills are paid in a timely manner. Debtor believes that Summit Energy and CASS keep it in line with respect to the approximately 264 utility vendors for which it pays the bills. It is therefore not only requesting that CASS be designated as a critical vendor and maintain the procedures that have worked successfully for almost five years but also that Debtor be permitted to pay the 158 "non-CASS utilities", listed in Exhibit B, as critical vendors for the payment due just prior to filing, which will be the same or less than an amount for a deposit.

In addition to the Food and Produce Vendors, Liquor Vendors and Utility Vendors, the other critical vendors we have identified fall primarily into three categories—technology, marketing, and linen service. The critical nature of these services to a restaurant should be self-evident. In the case of a multiple restaurant chain spanning four countries, technology and marketing are especially critical.

Additionally, we believe it is critical that the Debtor be allowed to continue operating pursuant to its agreements with Fintech and Summit Energy Services and assume these contracts. These service companies have, one for ten years and the other for five, managed payables for the Debtor in two areas critical to its operations—liquor and lights (*i.e.* utilities). They have done so in a manner which has maintained Debtor's reputation and prompt payment history. While I do not have empirical proof, I also believe they have saved us as much, if not more, than we have paid them for their services.

## Motion for Interim and Final Order Providing Adequate Assurance of Utility Payments

In connection with the operation of its Company Stores and management of its franchises, Debtor obtains electricity, natural gas, water, telephone and internet services, cable,

and other similar services (collectively "Utility Services") from a number of utility companies. Summit Energy (now part of Schneider Electric) provides energy consulting services for the Debtor and CASS, a subsidiary, provides Utility Bill Management for all of Debtor's electricity, gas and water services. Debtor's telephone and internet services are provided by Centurylink and its cable by DirectTV. Annexed to the Motion as Exhibit A is a non-exclusive list of the Utility Companies and their affiliates which provided Utility Services to the Debtors as of the Petition Date ("Utility Service List"). The relief requested in the Motion Debtor has filed is for all Utility Companies providing Utility Services to the Debtor and is not limited to those listed on the Utility Service List.

In the twelve month period prior to the Petition Date, Debtor paid an average of approximately $425,000.00 per month on account of Utility Services. Historically, Debtor has had an excellent payment history with the Utility Companies and, to the best of its knowledge, there have been few (if any) material defaults or arrearages with respect to the Debtor's undisputed invoices for Utility Services. CASS has been handling the payment of Debtor's gas, electricity and water bills since 2009: its procedure is to pay an invoice within a day or two of when it comes due and funds these payments, with reimbursement from Debtor by ACH transfers twice a week. Debtor estimates that its cost, (not including utility deposits) for Utility Services going forward will be declining at least $54,000 per month in the months going forward as the utilities in closed stores are all turned off.

Uninterrupted utility service is critical to the ability of the Debtor to operate and, at the very least, maintain its value as of the Petition Date for the benefit of its creditors. Debtor currently pays for utilities at sixty-five[11] restaurants and its headquarters. Obviously, Debtor cannot operate these

---

[11] This number is higher than the number of Company Stores Debtor is currently operating as it has been continuing to pay utilities for its closed stores as part of its efforts to assist the landlords at these locations to relet or otherwise dispose of them. It will be reduced to forty-six stores on or before April 16, 2014, as Debtor will notify the landlords and the utility companies to disconnect Debtor's account.

facilities without utility service. Should any Utility refuse or discontinue service, Debtor would be forced to cease operations at the affected locations. Such a cessation would not only substantially disrupt operations but also negatively impact the perceptions of Debtor's customer base. The combination of the two clearly would result in loss of revenues but, even more importantly, could irreparably harm and jeopardize the reorganization efforts or other objectives of the Debtors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this the 26th day March, 2014.

Creed Ford III
President/Chief Executive Officer—Fired Up, Inc.