## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| FIRED UP, INC. | § | CASE NO. 14-10447-tmd |
| | § | (Chapter 11) |
| DEBTOR[1] | § | |

## MOTION FOR ORDER AUTHORIZING DEBTOR TO EMPLOY AND COMPENSATE CERTAIN NON-BANKRUPTCY PROFESSIONALS IN THE ORDINARY COURSE OF BUSINESS

**A hearing will be conducted on this matter on June 5, 2014 at 1:30 p.m. in Courtroom No. 1, 903 San Jacinto, Austin, TX 78701.**

**If you object to the relief requested, you must respond in writing, specifically answering each paragraph of this pleading. Unless otherwise directed by the Court, you must file your response with the Clerk of the Bankruptcy Court within 21 days from the date you were served with this pleading. You must serve a copy of your response on the person who sent you the notice; otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

TO THE HONORABLE JUDGE OF SAID COURT:

Fired Up, Inc. (the "Debtor") hereby files this Motion for Order Authorizing Debtor to Employ and Compensate Certain Non-Bankruptcy Professionals in the Ordinary Course of Business (the "Application").

Jurisdiction and Venue

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The Court has authority to grant the Application pursuant to 11 U.S.C. § 327(a).

---

[1] Until February 26, 2014, Debtor's business was being operated partially by the Debtor and partially by its two wholly owned subsidiaries, Kona Restaurant Group, Inc. and Carino's Italian Kitchen, Inc. Those entities were merged into the Debtor on that date.

Relief Requested

2.    The Debtor filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §101, et. seq., (the "Bankruptcy Code") on March 27, 2014 (the "Petition Date").

3.    The Debtor is operating its business and managing its assets as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.   This Court has not appointed a trustee or examiner; an official committee of unsecured creditors has been appointed.

4.    The Debtor hereby requests that the Court enter an order authorizing the Debtor to continue to employ and compensate the non-bankruptcy professionals identified in **Exhibit A** hereto (each, a "Non-Bankruptcy Professional," and collectively, the "Non-Bankruptcy Professionals"), in the ordinary course of their businesses for the services set forth in Exhibit A effective as of the commencement of this chapter 11 and without further order or approval of the Court. The Non-Bankruptcy Professionals perform services that are not intrinsically related to the Debtor's bankruptcy. Instead, the Non-Bankruptcy Professionals assist the Debtor with its ongoing business operations.  The Non-Bankruptcy Professionals fall into several categories:

a.    Attorneys paid directly by the Debtor's insurance carrier;

b.    Attorneys and accountants paid for discrete tasks not to exceed a fixed amount without further court approval;

c.    Insurance brokers paid a fixed monthly or annual amount; and

d.    Tax consultants paid a fixed amount per location plus a percentage of amounts saved to the Debtor.

Additionally, the Debtor requests that the Court establish procedures for the employment and compensation of additional non-bankruptcy professionals, as set forth in greater detail below.

5.      The Debtor seek an order confirming that the Debtor may (a) continue to employ the Non-Bankruptcy Professionals; and (b) compensate the Non-Bankruptcy Professionals, in amounts (or if applicable percentage amounts) not to exceed the proposed applicable Approved Payment payment listed (the "Approved Payment") without any further notice or order(s) of the Court. The Approved Payment is an amount equal to either the fixed payment amount or an estimated maximum amount. The current proposed amounts of the Approved Payment for each of the Non-Bankruptcy Professionals are set forth in Exhibit A. Payments to the Non-Bankruptcy Professionals will be subject to the terms and conditions of the order to approve the use of cash collateral (and budgets attached thereto) entered by this Court (the "Cash Collateral Order").

6. The Debtor may, in the ordinary course of its business, also require the services of additional non-bankruptcy professionals other than the Non-Bankruptcy Professionals (the "Additional Non-Bankruptcy Professionals," and together with the Non-Bankruptcy Professional, the "Ordinary Course Professionals"). The Debtor is also seeking authority to employ and compensate any such Additional Non-Bankruptcy Professionals in the ordinary course of their business. To the extent that the Debtor subsequently identifies any such Additional Non-Bankruptcy Professional(s), the Debtor will file a notice (the "Supplemental Notice") containing the name(s) of such professional(s), a brief description of the services to be rendered by such professional(s), and the Approved Payment for such professional(s). The Debtor will serve the Supplemental Notice on the Office of the United States Trustee, counsel for Official Committee of Unsecured Creditors (if then established), the Debtor' twenty largest unsecured creditors, and all parties requesting special notice (collectively, the "Notice Parties").

7.      Each of the Notice Parties will have fourteen (14) days after service of a Supplemental Notice (the "Objection Deadline") to raise any objection thereto. Any objection to a Supplemental Notice (each, an "Objection") must: (a) be in writing, (b) set forth the precise nature of

the Objection, and (c) be filed with the Court and served via U.S. Mail upon the Debtor and each of the other Notice Parties, on or before the Objection Deadline.

8.        If no timely Objection is filed and served with respect to a Supplemental Notice, then without further order of the Court, the Debtor will be authorized to employ and compensate (consistent with the applicable Approved Payment) the Additional Non-Bankruptcy Professional(s) that were the subject of such Supplemental Notice. As long as the Additional Non-Bankruptcy Professional's amount is within the Approved Payment, fee applications will not need to be filed.

9.        If a timely Objection is filed and served with respect to a Supplemental Notice, then the objecting party and the Debtor may attempt to resolve the Objection on a consensual basis. If the parties are unable to reach a consensual resolution of the Objection, then the Debtor will either: (a) file an application to employ the Additional Non-Bankruptcy Professional; and (b) set the matter for hearing with the Court on not less than fourteen (14) days' notice to each of the Notice Parties; or forego the proposed services of such Additional Non-Bankruptcy Professional.

10.       To the extent that the average monthly compensation sought by any Ordinary Course Professional for any three (3) consecutive months exceeds the applicable "Total" on Exhibit A, prior to receiving compensation from the Debtor of such excess amount, such Ordinary Course Professional shall obtain Court approval by filing a monthly statement, interim application and/or final application for allowance of such compensation in compliance with sections 330 and 331 of the Bankruptcy Code and any applicable order of this Court.

Argument and Authorities

### A. Employment of the Non-Bankruptcy Professionals is in the Ordinary Course of the Debtor' Businesses.

11.       A debtor in possession, standing in the shoes of the trustee, may continue to operate the debtor's business and manage property of the estate without prior approval of the Bankruptcy Court. *See* 11 U.S.C. §§ 1107(a) and 1108. Indeed, reflecting the Congressional policy which

dictated enactment of sections 1107(a) and 1108 of the Bankruptcy Code, i.e., to extricate the courts from estate administration, the debtor in possession's management decisions are entitled to a presumption of reasonableness. *See In re Johns-Manville Corp.*, 60 B.R. 612, 615 (Bankr. S.D. N.Y. 1986), and cases cited therein; *see also Bennett v. Williams*, 892 F.2d 822, 824 (9th Cir. 1989) (deference to trustee's business management decisions).

12.     Section 363 of the Bankruptcy Code further defines the scope of a debtor-in-possession's authority. Transactions or use of property in the ordinary course of business are permissible without notice or a hearing. See 11 U.S.C. § 363(c)(1). The ordinary course rule extends to the debtor-in-possession's hiring and firing of employees. *See In re Roth Am., Inc.*, 107 B.R. 44, 47 (Bankr. M.D. Pa. 1989). Indeed, the authority to make such employment decisions extends to persons who, in the vernacular, are known as professionals, so long as those persons are not subject to the limitations of section 327 of the Bankruptcy Code. *See In re Rusty Jones, Inc.*, 109 B.R. 838, 841-42 (Bankr. N.D. Ill. 1989); *see also Johns-Manville*, 60 B.R. at 615-19. In other words, neither the employment nor the compensation of persons employed in the day-to-day operations of a debtor's business are subject to prior court approval.

13.     Section 363(c)(1) of the Bankruptcy Code authorizes a debtor to employ and compensate ordinary course professionals, absent a court order to the contrary. The Debtor's employment and compensation of the Ordinary Course Professionals satisfies the two tests that courts typically apply to determine whether section 363(c)(1) applies: the so-called "vertical dimension" or "creditor's expectation" test, and the "horizontal dimension" or "industry-wide" test. *See Burlington N. R.R. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.)*, 853 F.2d 700 (9th Cir. 1988)

14.     As its name implies, the "creditor's expectation" test views a debtor-in- possession's actions from the vantage point of a hypothetical creditor in order to establish whether any given

transaction exposes creditors to an unanticipated economic risk. *See id.* at 705-06; *see also Johns-Manville*, 60 B.R. at 615-18. For instance:

> The primary focus of the vertical dimension test is thus on the debtor's internal operations and workings. The 'ordinariness' of actions taken by the debtor depends upon the nature, type and size of its business.

*Johns-Manville*, 60 B.R. at 617.

15.     The "industry-wide" litmus test, on the other hand, looks to "whether the postpetition transaction is of a type that other similar businesses would engage in as ordinary business." *Dant & Russell*, 853 F.2d at 704. The requisite showing as articulated in the cases is quite minimal. A transaction that would occur in the day-to-day operations of a company, no matter how infrequently, is "ordinary" for purposes of this examination. *See id.*; *see also In re D'Lites of Am., Inc.*, 108 B.R. 352, 355 (Bankr. N.D. Ga. 1989).

16.     Application of the vertical and horizontal tests to the Debtor's employment and compensation of the Ordinary Course Professionals demonstrates that the Debtor's actions would be covered by section 363(c)(1). The Debtor's creditors may reasonably assume that the operation of the Debtor's business will require the assistance of various non-bankruptcy professionals in connection with accounting, tax, regulatory and other matters. Further, it is predictable that the scope of the Debtor's day-to-day operations presents the need for routine professional services relating to specific matters that have no real bearing on the Debtor's overall financial condition and, therefore, no material effect on the management and supervision of the Debtor's estate.

17.     In *Johns-Manville*, the court dealt with a similar issue as that presented by this Motion. There, one of the official creditors' committees objected to the debtor-in-possession's employment, without court approval, of two lobbyists on the grounds that the retention was outside the ordinary course of the debtor's business. The court concluded that, because the employment satisfied the vertical and horizontal tests for ordinary course transactions, it was permissible without notice and a hearing. These same principles apply to the Ordinary Course Professionals upon which

the Debtor has relied and whose services the Debtor continues to require in the day-to-day operations of their business.

### B. The Ordinary Course Professionals are not Professional Persons Under Section 327 of the Bankruptcy Code.

18.     Generally speaking, section 327 of the Bankruptcy Code creates an exception to section 1108 of the Bankruptcy Code, which authorizes a debtor in possession to operate its business. Despite the fact that the employment of professionals including attorneys, accountants, appraisers, and auctioneers may be necessary to operate the debtor's business (and thus apparently authorized under section 1108), section 327 requires court approval for a specific category of professionals. See 11 U.S.C. § 327.

19.     Whether employment of a professional is authorized by the general mandate of section 1108, on the one hand, or whether specific approval is required under section 327, on the other, depends upon whether the professional is being employed to "represent or assist the [debtor] in carrying out the [debtor's] duties under this title." 11 U.S.C. § 327(a) (emphasis added). By its own terms, section 327 does not apply to entities (professional or not) whose services have no connection to the debtor's duties under the Bankruptcy Code. Thus, no court approval is required for a debtor to employ and compensate a professional whose services are limited to the debtor's day-to-day business operations.

20.     In *In re Seatrain Lines, Inc.*, the court held that section 327(a) was inapplicable to maritime engineers, despite their status as professionals, because the engineers would not play a "central role" and would not be "intimately involved" in the bankruptcy proceeding. 13 B.R. 980, 981 (Bankr. S.D.N.Y. 1981).

21.     *Seatrain*, which has been adopted by numerous courts, confirms that conventional nomenclature does not dictate whether an entity must be employed pursuant to section 327. As a general matter, education, specialized expertise, academic degrees, or government licenses may vest

an individual with the title "professional;" however, serving in an occupation with a "professional" title alone is insufficient to trigger the requirements of section 327.

22.   Regardless of whether the professional's services are "important to the functioning or mechanics of the debtor's business," if the debtor is not seeking to employ the professional "because of a need that arose incident to the bankruptcy," then section 327 does not apply. *See In re Century Inv. Fund VII Ltd. P'ship*, 96 B.R. 884 (Bankr. E.D. Wis. 1989) (section 327 does not apply to a professional whose services are "necessary whether a Chapter 11 has been filed or not" especially where "the nature of the services does not change significantly on account of the bankruptcy"); s*ee also In re Aladdin Petroleum Co.*, 85 B.R. 738, 740 (Bankr. W.D. Tex. 1998) (explaining that the factors considered by the courts in determining whether a person is a professional include the effect of the services on the administration of the case and how central the person's role is to the proceedings); *In re Lowry Graphics, Inc.*, 86 B.R. 74, 78 (Bankr. S.D. Tex. 1988) (citing *In re Seatrain Lines, Inc.*, 13 B.R. 980, 981 (Bankr. S.D. N.Y. 1981)) (holding the "professionals" under section 327 are limited to persons whose occupations play a central role in the administration of the estate); *In re Pac. Forest Indus., Inc.*, 95 B.R. 740, 743 (Bankr. C.D. Cal. 1989) (distinguishing between professionals who deal with the actual reorganization of a debtor, as opposed to just the ongoing business of a debtor, for purposes of section 327); *D'Lites of Am.*, 108 B.R. at 355 (section 327 does not apply to a professional who "provides services to the debtor that are necessary whether the petition was filed or not"); *In re Leslie Oil & Gas Co.*, 98 B.R. 774, 775 (Bankr. S.D. Ohio 1989) ("It is not the usual onlooker's perception that a person's occupation is a 'profession' which governs, but rather the substance of the person's role in a debtor's operation."); *In re Johns-Manville*, 60 B.R. at 621 (refusing to apply section 327 to lobbyists who were "not hired to represent or assist Manville in carrying out its duties under Title 11").

23.    Furthermore, a professional's involvement with the chapter 11 case must be substantial in order to elevate it into the class of "professional persons" that are subject to section

327. *Seatrain* cast this standard in terms of "centrality" or "intimate involvement" with the direction of the bankruptcy proceeding. *See Seatrain*, 13 B.R. at 981*; see also In re Aladdin Petroleum Co.*, 85 B.R. at 740 (holding that if a person actually impacts upon the administration of the debtor's estate, that person may be a professional regardless of the label given to its function); *In re Lowry Graphics, Inc.*, 86 B.R. at 74 (explaining that any entity may be a professional if its services intimately involve the administration of the estate). Practical considerations mandate such a reading of section 327. Because rules of statutory construction dictate that attorneys, accountants, appraisers, and auctioneers are only specific types of the catch-all "other professional persons" mentioned in the statute, a broad interpretation of the entities subject to section 327 would lead to potentially absurd results. *See Johns-Manville*, 60 B.R. at 620. If entities with only a tangential relationship to the reorganization process were subject to the retention and compensation requirements of sections 327-331 of the Bankruptcy Code, it would only create additional expenses and unnecessarily burden the Debtor, to the detriment of the estate and their creditors.

24.     The Debtor requires the services of the Ordinary Course Professionals regardless of the pendency of this Chapter 11 Case and those services will not significantly impact the direction of the Debtor' reorganization. Thus, the mere fact that the Ordinary Course Professionals may commonly be referred to as "professionals" should not trigger the array of procedural requirements for the employment and compensation of "professional persons" under section 327.

25.     The purposes for which prior court approval of employment of professional persons under section 327 were intended are inapplicable to the Debtor's employment of the Ordinary Course Professionals. In part, section 327 is intended to protect a chapter 11 debtor from hiring unnecessary business consultants, appraisers and attorneys to conduct the debtor's reorganization. *See In re Carolina Sales Corp.*, 45 B.R. 750, 753 (Bankr. E.D. N.C. 1985). The disinterestedness requirement of section 327(a) similarly is intended to prevent placing a person with conflicting interests in a

position of autonomy and control over the debtor's estate. *See In re Frederick Petroleum Corp.*, 75 B.R. 774, 779-80 (Bankr. S.D. Ohio 1987).

26. These policy concerns, which mandate compliance with sections 327-331 of the Bankruptcy Code, are not relevant to the Ordinary Course Professionals that are the subject of this Motion. The Debtor has used the services of the Non-Bankruptcy Professionals for a significant period of time prior to the Petition Date. Thus they cannot be viewed as imposing their services upon the Debtor post-petition. Furthermore, any Additional Non-Bankruptcy Professional that was not previously employed by the Debtor will be hired only on an as needed basis and will be subject to a Supplemental Notice and objection procedures discussed above. Finally, the financial arrangements with the Ordinary Course Professionals have been, and will continue to be, negotiated at arm's-length and subject to an applicable Approved Payment.

27. By definition, ordinary course professionals do not have autonomy and/or control over the debtor's reorganization. Instead, they are tasked with providing only discrete non-bankruptcy services. To the best of the Debtor' knowledge, the Non-Bankruptcy Professionals have no interest materially adverse to the Debtor, their estate, or their creditors with respect to the matters for which they are proposed to be employed.

Conclusion

28. WHEREFORE, the Debtor respectfully requests that the Court enter an order (a) authorizing the Debtor to continue to employ and compensate the Non-Bankruptcy Professionals within the applicable Approved Payment as set forth herein; and (b) providing such other and further relief as the Court deems to be just and proper.

Respectfully Submitted,

**BARRON & NEWBURGER, P.C.**
1212 Guadalupe, Suite 104
Austin, Texas 78701
(512) 476-9103 Ext. 220
(512) 476-9253 Facsimile

By:     */s/ Stephen W. Sather*
           Barbara M. Barron (SBN 01817300)
           Stephen W. Sather (SBN 17657520)

**PROPOSED ATTORNEYS FOR DEBTOR**

APPROVED:

FIRED UP, INC.

By:_____
       Creed Ford III
       President/Chief Executive Officer

## CERTIFICATE OF SERVICE

I certify that we directed North American Credit Services, Debtor's servicing agent, to serve a copy of the foregoing by first class mail, postage prepaid and properly addressed, on April 28, 2014, to all parties listed on the Service List attached to the filed copy of this Pleading and electronically by the Court's ECF system to all parties registered to receive such service. Copies of the matrix are not included in service copies but may be obtained from the Clerk of the Court or Debtor's counsel.

*/s/Stephen W. Sather*

**United States Trustee:**

Henry G. Hobbs
Deborah A. Bynum
Office of the U.S. Trustee
903 San Jacinto Blvd., Room 230
Austin, TX 78701
henry.g.hobbs@usdoj.gov
deborah.a.bynum@usdoj.gov

**Debtor:**

Creed Ford, III
President/CEO
Ford Restaurant Group
1514 RR 620 South
Austin, TX 78734
cford@carinos.com

Margaret B. Smith, CPA
Director of Finance
Ford Restaurant Group
1514 RR 620 South
Austin, TX 78734
msmith@fordrestgrp.com

**Proposed Attorneys for Debtor:**

Barbara M. Barron
Stephen W. Sather
Barron & Newburger, P.C.
1212 Guadalupe Street, Suite 104
Austin, TX 78701
bbarron@bn-lawyers.com
ssather@bn-lawyers.com

John Vernon
The Vernon Law Group, PLLC
4925 Greenville Avenue, Suite 200
Dallas, TX 75206
jvernon@vernonlawgroup.com

Kareem Hajjar
Hajjar Sutherland Peters, LLP
3144 Bee Caves Road
Austin, TX 78746
khajjar@legalstrategy.com

**20 Largest Unsecured Creditors:**

AEI Accredited Investor Fund 2002
Attn: Brian Schulz
1300 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
bschulz@aeifunds.com

AEI Fund Management, Inc.
Attn: Brian Schulz
1300 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
bschulz@aeifunds.com

ARC CAFÉ, LLC
American Realty Capital
Attn: Cindy Dip
200 Dryden Road, Suite 1100
Dresher, PA 19025
cdip@arlcap.com

Cassidy Turley Midwest, Inc.
Attn: Brian Schulz
1300 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
bschulz@aeifunds.com

Food Services of America
Attn: Lee Clark
P.O. Box 839
Meridian, ID 83680
lee_clark@fsafood.com
boise_ar@fsafood.com

GE Capital Franchise Finance Corp.
c/o Jeffrey T. Wegner
Kutak Rock, LLP
1650 Farnam Street
Omaha, NE 68102-2186
jeffrey.wegner@kutakrock.com

Gentilis, Inc.
Attn: Moja Lindsey
3400 Reeves Canyon Road
Redwood Valley, CA 95470
moja2@thelindseycompanies.com

Internal Revenue Service
Special Procedures Staff- Insolvency
P.O. Box 7346
Philadelphia, PA 19101-7346

Magdalena Properties, LLC
c/o R. Spencer Shytles
Graham Bright & Smith, P.C.
5420 LBJ Freeway, Suite 300
Dallas, TX 75240
rss@gbstxlaw.com

Pleasant Ridge Development Co.
Attn: Lou Schickel
11601 Pleasant Ridge Rd., Suite 300
Little Rock, AR 72212
lou@schickels.com
invoices@schickels.com

Mary Raney & Dick P. Wood, Jr., as
Trustees of RC Nelms Jr. Hillcrest Trst
c/o James H. Billingsley
Polsinelli, PC
2501 N. Harwood St., Suite 75201
Dallas, TX 75201
jbillingsley@polsinelli.com

Shamrock Foods-Consolidated
Attn: Jessica Harlow
Department 219
Denver, CO 80291-0219
jessica_harlow@shamrockfoods.com

Texas Comptroller of Public Accts.
c/o Jason A. Starks
Assistant Attorney General
Bankruptcy & Collections Division
P.O. Box 12548
Austin, TX 78711-2548
jason.starks@texasattorneygeneral.gov

Texas Workforce Commission
Attn: Regulatory Integrity Div-SAU
101 E. 15th Street, Room 556
Austin, TX 78778-0001
rid.taxbankruptcy@twc.state.tx.us

**Secured Creditors:**

FRG Capital, LLC
c/o Blake Rasner
Haley & Olson, P.C.
510 N. Valley Mills Drive, Suite 600
Waco, TX 76710
brasner@haleyolson.com

Prosperity Bank
c/o Lisa C. Fancher
Fritz, Byrne, Head & Harrison, PLLC
98 San Jacinto Blvd., Suite 2000
Austin, TX 78701-4286
lfancher@fbhh.com

**Unsecured Creditors Committee:**

AEI Income & Growth Fund 24, LLC
Robert P. Johnson
30 Seventh Street East, Suite 1300
St. Paul, MN 55101
bschulz@aeifunds.com

Ben E. Keith Company (interim chair)
Richard Grasso
P. O. Box 2628
Ft. Worth, TX 76112
rngrasso@benekeith.com

Glazier Foods Company
Art Innis
11303 Antoine Dr.
Houston, TX 77066
artinnis@glazierfoods.com

Independent Bank
Charley Rigney
8004 Woodway Dr., Suite 200
Waco, TX 76712
crigney@ibtx.com

National Retail Properties, Inc.
David G. Byrnes, Jr.
450 S. Orange Avenue, Suite 900
Orlando, FL 32801
david.byrnes@nnnreit.com

The Coca-Cola Company
William Kay, Sr. Bankruptcy Advisor
P.O. Box 1734
NAT 2008 Mail Stop
Atlanta, GA 30313
billkaye@jllconsultants.com

Wilmington Center, LLC
Attn: Fay Farzani
9471 Lomitas Avenue
Beverly Hills, CA 90210
fafar101@aol.com

**Proposed Counsel for Creditors'
Committee:**

Bradford J. Sandler
Pachulski, Stang, Ziehl & Jones, LLP
919 North Market St., 17th Floor
Wilmington, DE 19801
bsandler@pszjlaw.com

**Miscellaneous:**

Brownsville Public Utilities Board
c/o Gilbert L. Hamberg, Esq.
1038 Darby Drive
Yardley, PA 19067
ghamberg_3@msn.com

CASS
Attn: Frank Garcia
2675 Corporate Exchange Drive
Columbus, OH 43231
fgarcia@cassinfo.com

Fintech
Attn: Mandi Aiton
7702 Woodland Center Blvd., #50
Tampa, FL 33614
maiton@fintech.com

Summit Energy
Attn: Tim Ward
103 Historic Town Square
Lancaster, TX 75146
tim.ward@ems.schneider-electric.com

Wells Fargo Bank, N.A.
c/o James G. Ruiz
Winstead, P.C.
401 Congress Avenue, Suite 2100
Austin, TX 78701
jruiz@winstead.com

**Additional Notice:**

Bruce M. Wilpon
Special Assistant U.S. Attorney
Internal Revenue Service
300 E. 8th Street, Suite 601
Austin, TX 78701
bruce.m.wilpon@irscounsel.treas.gov

Jason P. Wylie
The Law Office of Jason Wylie
8553 N. Beach St., PMB 316
Fort Worth, TX 76244-4919
jason@jasonwylielaw.com

John M. Koneck
Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
jkoneck@fredlaw.com

Mackenzie S. Wallace
Thompson & Knight, LLP
1722 Routh Street, Suite 1500
Dallas, TX 75201
mackenzie.wallace@tklaw.com

Timothy E. Hudson
Thompson & Knight, LLP
1722 Routh Street, Suite 1500
Dallas, TX 75201
tim.hudson@tklaw.com

William M. Kane
Traylor, Tompkins & Black, P.C.
751 Horizon Court, Suite 200
Grand Junction, CO 81506-8754
wmk@grandjunctionlaw.com

**Notices of Appearance:**

Arlington ISD, Mansfield ISD
c/o Elizabeth Banda Calvo
Perdue, Brandon, Fielder, et al
P.O. Box 13430
Arlington, TX 76094-0430
ebcalvo@pbfcm.com

Texas Ad Valorem Taxing Entities
c/o Elizabeth Weller
Linebarger Goggan Blair & Sampson
2777 N. Stemmons Frwy, Suite 1000
Dallas, TX 75207
dallas.bankruptcy@publicans.com

GS II Meridian Crossroads, LLC
c/o Renee B. Weiss, Esq.
DDR Corp
P.O. Box 228042
Beachwood, OH 44122
rweiss@ddr.com

Atascocita 1692, LLC
c/o Michelle E. Shriro, Esq.
Singer & Levick, P.C.
16200 Addison Road, Suite 140
Addison, TX 75001
mshriro@singerlevick.com

RioCan America Management, Inc.
c/o R. Spencer Shytles
Graham Bright & Smith, P.C.
5420 LBJ Freeway, Suite 300
Dallas, TX 75240
rss@gbstxlaw.com

ARC CAFÉ, LLC
c/o R. Brandon Bundren
Duane Morris, LLP
1330 Post Oak Blvd., Suite 800
Houston, TX 77056-3166
rbbundren@duanemorris.com

Bexar County
c/o David G. Aelvoet
Linebarger Goggan Blair & Sampson
711 Navarro Street, Suite 300
San Antonio, TX 78205
sanantonio.bankruptcy@publicans.com

Tyler Independent School District
c/o Tab Beall
Perdue, Brandon, Fielder, et al
P.O. Box 2007
Tyler, TX 75710-2007
tbeall@pbfcm.com
tylbkc@pbfcm.com

ARC CAFE, LLC
c/o William C. Heuer
and Patricia H. Heer
Duane Morris, LLP
1540 Broadway
New York, NY 10036
wheuer@duanemorris.com
phheer@duanemorris.com

Inland American Retail Mgmt., LLC
c/o Kevin M. Newman, Esq.
Menter, Rudin & Trivelpiece, P.C.
308 Maltbie Street, Suite 200
Syracuse, NY 13204-1498
knewman@menterlaw.com

Texas Ad Valorem Taxing Entities
c/o Owen M. Sonik
Perdue, Brandon, Fielder, et al
1235 North Loop West, Suite 600
Houston, TX 77008
houbank@pbfcm.com

Missouri Department of Revenue
Bankruptcy Unit
Attn: S. Christopher Conway
P.O. Box 475
Jefferson City, MO 65105-0475
txwdecf@dor.mo.gov

National Retail Properties, LP
c/o John T. Bennett
and Cassandra Ann Sepanik
Thompson & Knight, LLP
1722 Routh Street, Suite 1500
Dallas, TX 75201
david.bennett@tklaw.com
cassandra.sepanik@tklaw.com

Hidalgo County & McAllen ISD
c/o John T. Banks
Perdue, Brandon, Fielder, et al
3301 Northland Drive, Suite 505
Austin, TX 78731
jbanks@pbfcm.com

RB River IV, LLC, et al
c/o Jeffrey Ackermann
Durio, McGoffin, Stagg & Ackermann
P.O. Box 51308
Lafayette, LA 70505-1308
jeffackermann@dmsfirm.com

Texas Ad Valorem Taxing Entities
c/o Lee Gordon
McCreary, Veselka, Bragg & Allen
P.O. Box 1269
Round Rock, TX 78680
lgordon@mvbalaw.com

Lubbock Central Appraisal District
c/o Laura J. Monroe
Perdue, Brandon, Fielder, et al
P.O. Box 817
Lubbock, TX 79408
lmonroe@pbfcm.com

City of Fort Worth
c/o Christopher B. Mosley
Senior Assistant City Attorney
1000 Throckmorton Street
Fort Worth, TX 76102
chris.mosley@fortworthtexas.gov

Texas Ad Valorem Taxing Entities
c/o Diane W. Sanders
Linebarger Goggan Blair & Sampson
P.O. Box 17428
Austin, TX 78760-7428
austin.bankruptcy@publicans.com

Texas Ad Valorem Taxing Entities
c/o John P. Dillman
Linebarger Goggan Blair & Sampson
P.O. Box 3064
Houston, TX 77253-3064
houston_bankruptcy@publicans.com

**EXHIBIT A**

| Non-Bankruptcy Professional | Services | Approved Payment |
|---|---|---|
| Ray Lego & Associates 6060 S. Willow Dr., Suite 100 Greenwood Village, CO 80111 (720) 963-7024 | Workers Compensation Attorney | Paid by Insurance Company |
| William E. Staehle 445 South Street PO Box 1938 Morristown, NJ  07962 (973) 631-7300 | Workers Compensation Attorney | Paid by Insurance Company |
| Dorsett Johnson & Swift, LLP 12912 Hill Country Blvd, Suite F-210 Austin, TX  78738 (512) 600-4366 | Attorney defending debtor on personal injury cases filed against it as a non-subscriber to the workers' compensation program | Paid by Insurance Company |
| | EEOC Claims | $160.00/hr. not to exceed $3,000 per year |
| Foster, Graham Milstein & Calisher, LLP 360 South Garfield St., 6th Flr. Denver, CO  80209 | Transferring three liquor licenses in Colorado | Engagement Agreement attached as Exhibit B Application fees of $8,500.00 (payable to state) + not more than $20,000.00 in total attorneys' fees |
| Holtzman Partners, LLP 1710 West Sixth Street Austin, TX  78703 (512) 610-7201 | 401k Plan Audit | Engagement Agreement attached as Exhibit C Not to exceed $10,000.00 in aggregate |
| McQueary Henry Bowles Troy 8144 Walnut Hill Lane, 16th Floor Dallas, TX  75231 (972) 770-1442 | Health Insurance Broker | Engagement Agreement attached as Exhibit D Flat fee of $5,533.68/mo. |
| Wortham Insurance & Risk Management 221 W. 6th St., Suite 1400 Austin, TX  78701 (512) 532-1537 | Casualty Insurance Broker | Engagement Agreement attached as Exhibit E Annual fee of $85,000.00 paid quarterly.  Also pay $17,910 per month for Liberty Property Insurance. |
| Tax Advisers Group | Personal Property Tax | Engagement Agreement |

| | | |
|---|---|---|
| 12400 Coit Rd., Suite 1270<br>Dallas, TX 75251<br>(972) 503-7506 | Consultant | attached as Exhibit F<br>$100/location + 25% of savings |
| Ryan, LLC<br>2800 Post Oak Blvd., 42nd Flr.<br>Houston, TX 77056<br>(713)629-0090 | Real Property Tax Consultant | Engagement Agreement attached as Exhibit G<br>$25/location + 33 1/3% of savings |
| | Sales Tax Consultant | Engagement Agreement attached as Exhibit H<br>33 1/3% of savings generally/ 40% of savings as a result of administrative hearings or legal proceedings |

Exhibit 8



FOSTER GRAHAM MILSTEIN & CALISHER, LLP
ATTORNEYS AT LAW

T 303-333-9810
F 303-333-9786
360 South Garfield Street
6th Floor
Denver, Colorado 80209

April 8, 2014

***Via U.S. Mail & Email: vlacy@carinos.com***

Fired Up, Inc.
ATTN: Vici Lacy
1514 RR 620 South
Lakeway, TX 78734

    Re:    Engagement Letter

Dear Vici:

       Thank you for selecting Foster Graham Milstein & Calisher, LLP ("FGMC" or "Firm") to represent Fired Up, Inc. ("Client," "You" or "Your") in the matter described below. We want to make sure You understand the basis for determining the fees we charge and that we agree on the scope of the services we are to provide.

       Our fees will be determined on the basis of time spent by the individuals who provide the services, at their hourly rates. Hourly rates vary with the experience and seniority of the individuals assigned and may be adjusted by us from time to time. I am the primary attorney responsible for Your matter and will charge $225.00 per hour for my work. Other attorneys and legal assistants in our Firm may also be utilized, and we will take Your preferences into account in selecting the individuals who will be involved in Your representation. We will not require a retainer for this matter.

       The hourly rates of lawyers at FGMC range from $150.00/hour to $425.00/hour; law clerks/document clerks are $50.00/hour; and legal assistants/paralegals range from $70.00/hour to $125.00/hour. We will bill You for expenses incurred on Your behalf, including photocopying, filing and recording fees, telecopy charges, courier and messenger charges, travel expenses, computerized research charges and other out-of-pocket expenses. We will not bill You for reasonable long-distance and facsimile charges. The Firm will not front purchase deposits, purchase amounts, closing costs, application costs or third-party vendor fees; rather, those costs and fees must be pre-paid or otherwise arranged for by You.

       Our statements are rendered monthly and, unless other arrangements are made, payment in full is due within 30 days after the date of the statement. Interest may be charged at one percent (1%) per month on all balances outstanding for more than 60 days. If You have questions concerning any bill, we request that You raise them promptly. This fee structure will apply to this and any future matters You may refer to the Firm unless other arrangements are made in writing. You agree to pay all attorney fees and collection costs if we have to file a legal action against You to pay our fees.

Fired Up, Inc.
Re:  Engagement Letter
April 8, 2014
Page 2


The scope of the services we have agreed to provide is to assist you in transferring Hotel & Restaurant class liquor licenses in Colorado Springs, Loveland, and Parker, CO. Should You also choose to retain our services for future matters in Colorado, the terms of this agreement will also apply to those matters.

We are required by federal law to inform you of our policies regarding privacy of client information.  In the course of advising You, we may collect non-public personal information from You. You should know that all non-public personal information that we receive from You is held in confidence and is not released to people outside the Firm except as necessary to carry out our representation of You, as otherwise agreed to by You, or as required under applicable law. While federal law requires us to inform You of our policy, it does not limit the attorney-client privilege or the confidentiality rules which are governed by state law and the rules of professional conduct. In order to guard Your non-public personal information, we maintain physical, electronic and procedural safeguards that comply with our professional standards.

We look forward to working closely with You on this matter.  While the Firm cannot guarantee the results which will be achieved, we will do our best to provide You with legal services of the highest quality.  If You have any questions concerning the matters set forth in this letter or the services we are providing to You, please do not hesitate to call me.

Please acknowledge Your agreement to the terms and conditions set forth in this engagement letter by signing where indicated below and returning a signed copy of this letter to us by U.S. mail, fax, or e-mail.  The original is Yours to keep.

The Firm and I thank You very much for retaining us for this matter.  We look forward to a successful working relationship with You.

Sincerely,

FOSTER GRAHAM MILSTEIN & CALISHER, LLP

Brian C. Proffitt

BCP/rm

Fired Up, Inc.
Re:  Engagement Letter
April 8, 2014
Page 3

AGREED AND ACCEPTED this _22nd_ day of _April_, 2014.

**FIRED UP, INC.**

By: _(signature)_

Print Name: _Harper Ford Rehme_

Its: _Secretary_

# HOLTZMAN PARTNERS

AUDIT · TAX · ADVISORY

January 31, 2014

Ms. Rachael Smith
Senior Benefits Manager
Fired Up, Inc.
13420 Galleria Circle, Building A, Suite 250
Austin, Texas 78738

Dear Ms. Rachael Smith:

We are pleased to confirm our acceptance and our understanding of the services we are to provide for Fired Up, Inc. 401(k) Plan for the year ended December 31, 2013 in connection with its annual reporting obligation under the Employee Retirement Income Security Act of 1974 (ERISA) by means of this letter.

Except as described below, you have requested that we audit the financial statements of Fired Up, Inc. 401(k) Plan, which comprise the statement of net assets available for benefits of Fired Up, Inc. 401(k) Plan as of December 31, 2013, and the related statement of changes in net assets available for benefits for the year then ended, and applicable supplemental schedules as of and for the year then ended, and the related notes to the financial statements, all of which are to be included in the plan's Form 5500 filing with the Department of Labor (DOL). The document we submit to you will include, as applicable, the following supplementary information that will be subjected to the auditing procedures applied in our audit of the financial statements:

    1) Assets (Held at End of Year) and Assets (Acquired and Disposed of Within Year)
    2) Loans or Fixed Income Obligations in Default or Classified as Uncollectible
    3) Leases in Default or Classified as Uncollectible
    4) Reportable Transactions
    5) Nonexempt Transactions
    6) Delinquent Participant Contributions

**Audit Objective and Procedures**

We will conduct our audit in accordance with auditing standards generally accepted in the United States of America (U.S. GAAS) except that, as permitted by Regulation 2520.103-8 of the DOL's Rules and Regulations for Reporting and Disclosure under ERISA and as instructed by you, we will not perform any auditing procedures with respect to information prepared and certified to by Principal Financial Group, the Custodian, in accordance with DOL Regulation 2520.103-5, other than comparing the information with the related information included in the financial statements and supplemental schedules. Because of the significance of the information that we will not audit, we will not express an opinion on the financial statements and supplemental schedules taken as a whole. The form and content of the information included in the financial statements and supplemental schedules, other than that derived from the information certified to by the Custodian, will be audited by us in accordance with U.S. GAAS, and will be subjected to tests of your accounting records and other procedures we consider necessary to enable us to express an opinion as to whether they are presented in compliance with the DOL's Rules and Regulations for Reporting and Disclosure under ERISA.

U.S. GAAS require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement, whether from (1) errors, (2) fraudulent financial reporting, (3) misappropriation of assets, or (4) violations of laws or governmental regulations, including prohibited transaction with parties in interest or other violations of ERISA rules and regulations, that are attributable to the plan or to acts by management or employees acting on behalf of the plan. An audit involves performing procedures to obtain, and examining, on a test basis, audit evidence supporting the amounts and disclosures in the financial statements.

Ms. Rachael Smith                                                                                                2
Fired Up, Inc. 401(k) Plan

The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements. The applicable investments and investment-related transactions certified by Principal Financial Group will not be tested.

Because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk that some material misstatements may not be detected exists, even though the audit is properly planned and performed in accordance with U.S. GAAS. In addition, an audit is not designed to detect immaterial misstatements or violations of laws or governmental regulations that do not have a direct and material effect on the financial statements. However, we will inform the appropriate level of management of any material errors or any fraudulent financial reporting or misappropriation of assets that come to our attention. Our responsibility as auditors is limited to the period covered by our audit and does not extend to any later periods for which we are not engaged as auditors. We also have no responsibility with respect to any electronic filings, such as the Form 5500 or SEC Form 11K.

In making our risk assessments, we consider internal control relevant to the plan's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the plan's internal control. However, we will communicate to you in writing concerning any significant deficiencies or material weaknesses in internal control relevant to the audit of the financial statements that we have identified during the audit.

Our firm may transmit confidential information that you provided us to third parties in order to facilitate delivering our services to you. As applicable, we have obtained confidentiality agreements with all our service providers to maintain the confidentiality of your information and we will take reasonable precautions to determine that they have the appropriate procedures in place to prevent the unauthorized release of confidential information to others. We will remain responsible for the work provided by any third-party service providers used under this agreement. By your signature below, you consent to having confidential information transmitted to entities outside the firm. Please feel free to inquire if you would like additional information regarding the transmission of confidential information to entities outside the firm.

As a part of our audit, we will perform certain procedures designed to consider the plan's compliance with its requirements to maintain tax exempt status. However, our audit is not designed for and should not be relied on to disclose any matters relating to the plan's qualification with respect to ERISA and IRS requirements.

You have not engaged us to prepare the plan's Form 5500 filing with the DOL. Because the audited financial statements are required to be filed with Form 5500, professional standards require that we read the Form 5500 prior to its filing. The purpose of this procedure is to consider whether information, or the manner of its presentation in Form 5500, is materially inconsistent with the information, or the manner of its presentation, appearing in the financial statements. These procedures are not sufficient nor are they intended to ensure that the form is completely and accurately prepared. In the event that our report is issued prior to our having read Form 5500, you agree not to attach our report to the financial statements included with the Form 5500 filing until we have read the completed Form 5500.

## Management's Responsibility

Our audit will be conducted on the basis that management or those charged with governance acknowledge and understand that they have responsibility:

1. For making all management decisions and performing all management functions;
2. For designating an individual with suitable skill, knowledge, or experience to oversee any bookkeeping or any non-attest services we provide, and for evaluating the adequacy and results of those services and accepting responsibility for them.
3. For the preparation and fair presentation of the financial statements in accordance with accounting principles generally accepted in the United States of America;

Ms. Rachael Smith                                                                                               3
Fired Up, Inc. 401(k) Plan

4.  For the design, implementation, and maintenance of internal control, including monitoring,  relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error;

5.  For the selection and application of accounting principles, and for establishing an accounting and financial reporting process for determining fair value measurements;

6.  For informing us about all known or suspected fraud affecting the plan and involving (1) plan management, (2) employees who have significant roles in internal control, and (3) others where the fraud could have a material effect on the financial statements; and informing us of your knowledge of any allegations of fraud or suspected fraud affecting the plan received in communications from employees, former employees, regulators, or others;

7.  For informing us of facts that may affect the financial statements, of which management may become aware during the period from the date of the auditor's report to the date the financial statements are issued;

8.  For identifying and ensuring that the plan complies with applicable laws and regulations;

9.  For preparing the supplementary information in conformity with the DOL's Rules and Regulations for Reporting and Disclosure under ERISA and ensuring its completeness and accuracy;

10. For adjusting the financial statements to correct material misstatements and confirming to us in the management representation letter that the effects of any uncorrected misstatements aggregated by us during the current engagement and pertaining to the current year under audit are immaterial, both individually and in the aggregate, to the financial statements as a whole; and

11. To provide us with:

   a.  Access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters;

   b.  Additional information that we may request from management for the purpose of the audit; and

   c.  Unrestricted access to persons within the plan from whom we determine it necessary to obtain audit evidence.

As part of our audit process, we will request from management and, when appropriate, those charged with governance, written confirmation concerning representations made to us in connection with the audit.

With regard to the supplementary information referred to above, you acknowledge and understand your responsibility: (a) for the preparation of the supplementary information in accordance with the applicable criteria; (b) to provide us with the appropriate written representations regarding supplementary information; (c) to include our report on the supplementary information in any document that contains the supplementary information and that indicates that we have reported on such supplementary information; and (d) to present the supplementary information with the audited financial statements, or if the supplementary information will not be presented with the audited financial statements, to make the audited financial statements readily available to the intended users of the supplementary information no later than the date of issuance by you of the supplementary information and our report thereon.

**Administration, Engagement and Miscellaneous Items**

We will issue a written report upon completion of our audit of the Plan's financial statements. Our report will be addressed to those charged with governance of the Plan. The auditor's report for a DOL limited-scope audit is generally a disclaimer of opinion due to the portion of the financial statements to which no audit procedures have been conducted. However, we cannot provide assurance that DOL limited scope opinion will be expressed. Circumstances may arise in which it is necessary for us to modify our opinion, add an emphasis-of-matter or other-matter paragraph(s), or withdraw from the engagement.

We understand that your employees will prepare all confirmations we request and will locate any documents or invoices selected by us for testing.

Mike Panozzo is the engagement partner for the audit services specified in this letter. His responsibilities include supervising the services performed as part of this engagement and signing or authorizing another qualified firm representative to sign the audit report. We expect to begin our audit on approximately April 1, 2014 and issue our report no later than July 31, 2014 and/or October 15, 2014, if extended. As you have instructed, our engagement does not include preparation of the Plan's Form 5500.

Ms. Rachael Smith                                                                                                                    4
Fired Up, Inc. 401(k) Plan

Our fees are based on the amount of time required at various levels of responsibility, plus actual out-of-pocket expenses. Invoices will be rendered each month as work progresses and are payable upon presentation. We estimate that our fee for the audit will be $10,000. The fee estimate is based on anticipated cooperation from your personnel and the assumption that unexpected circumstances will not be encountered during the audit. We will notify you immediately of any circumstances we encounter that could significantly affect this initial fee estimate. Whenever possible, we will attempt to use Company personnel to assist in the preparation of schedules and analyses of accounts. This effort could substantially reduce our time requirements and facilitate the timely conclusion of the audit.

If you intend to publish or otherwise reproduce the financial statements and make reference to our firm, you agree to provide us with printers' proofs or masters for our review and approval before printing. You also agree to provide us with a copy of the final reproduced material for our approval before it is distributed.

During the course of the engagement, we may communicate with you or your personnel via fax or e-mail, and you should be aware that communication in those mediums contains a risk of misdirected or intercepted communications.

During the course of the audit, we may observe opportunities for economy in, or improved controls over, your operations. We will bring such matters to the attention of the appropriate level of management, either orally or in writing.

The audit documentation for this engagement is the property of Holtzman Partners, LLP and constitutes confidential information. However, we may be requested to make certain audit documentation available to the U.S. Department of Labor pursuant to authority given to it by law or regulation, or to peer reviewers. If requested, access to such audit documentation will be provided under the supervision of Holtzman Partners, LLP personnel. Furthermore, upon request, we may provide copies of selected audit documentation to the U.S. Department of Labor. The U.S. Department of Labor may intend, or decide, to distribute the copies of information contained therein to others, including other governmental agencies.

In accordance with our firm policies, work may be suspended if your account becomes 45 days or more overdue and will not be resumed until your account is paid in full. If we elect to terminate our services for nonpayment, our engagement will be deemed to have been completed upon written notification of termination even if we have not completed our report. You will be obligated to compensate us for all time expended and to reimburse us for all out-of-pocket expenditures through the date of termination.

If any dispute arises among the parties hereto, the parties agree first to try in good faith to settle the dispute by mediation administered by the American Arbitration Association under its Rules for Professional Accounting and Related Services Disputes, before resorting to litigation. The costs of any mediation proceeding shall be shared equally by all parties.

Client and accountant both agree that any dispute over fees charged by the accountant to the client will be submitted for resolution by arbitration in accordance with the Rules for Professional Accounting and Related Services Disputes of the American Arbitration Association. Such arbitration shall be binding and final. IN AGREEING TO ARBITRATION, WE BOTH ACKNOWLEDGE THAT, IN THE EVENT OF A DISPUTE OVER FEES CHARGED BY THE ACCOUNTANT, EACH OF US IS GIVING UP THE RIGHT TO HAVE THE DISPUTE DECIDED IN A COURT OF LAW BEFORE A JUDGE OR JURY AND INSTEAD WE ARE ACCEPTING THE USE OF ARBITRATION FOR RESOLUTION.

We appreciate the opportunity to be of service to Fired Up, Inc. 401(k) Plan and believe this letter accurately summarizes the significant terms of our engagement. If you have any questions, please let us know. If you agree with the terms of our engagement as described in this letter, please sign and return this letter to us.

Respectfully,

*Holtzman Partners, LLP*

Holtzman Partners, LLP

Ms. Rachael Smith
Fired Up, Inc. 401(k) Plan

5

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


RESPONSE:

This letter correctly sets forth our understanding.

Acknowledged and agreed on behalf of Fired Up, Inc. 401(k) Plan by:

_____
(Signature)

Title: _____

Date: _____



**FIRED UP, INC.**

# Consulting/Brokerage Services

**PRESENTED BY:**
**KYLE MOSS**
**PRINCIPAL**

**MCQUEARY HENRY BOWLES TROY, L.L.P.**
**8144 WALNUT HILL LANE, 16TH FLOOR**
**Dallas, Texas  75231**
**972.770.1600**
***www.mhbt.com***

# CONSULTING AGREEMENT

This Consulting Agreement (the "Agreement") is made and entered into the month of July 2010 between Fired Up, Inc., Company ("Company") and Mc & H LIFE AGENCY, INC. ("Consultant") on the terms and conditions and for the considerations herein stated.

1. Company employs Consultant to perform certain services for Company in accordance with this Agreement and as set forth specifically on the attached Exhibit A.

2. The term of this Agreement will begin July 2010 and end July 2013. It is assumed that the contract will automatically renew on an annual basis unless a 30-day written notice is provided by either party. In addition, Company may terminate this Agreement at any time during its term or any renewal thereof by providing 30-day written notice to Consultant. Any special provisions concerning the term of this Agreement will be as set forth on Exhibit A.

3. Consultant will perform its services under this Agreement at its office in Dallas, Texas. Consultant, with its consent, may perform services at such other places as shall be requested by Company. Company will pay for any food and lodging for travel outside of and away from the office of the Consultant with the exception of the annual renewal meeting. Company will pay for any airfare and car rental for any travel outside of and away from office of the Consultant.

4. Consultant is acting as an independent contractor under this Agreement.

5. The fees payable to Consultant shall be $5,171.66 per month payable on the first of each month for July 2010 though June 2011. For the period of July 2011 through June 2012 the fee will increase 7% to $5,533.68 per month. For the period of July 2012 through June 2013 the fee will remain at $5,921.04 per month. Any unusual conditions concerning the payment of compensation to Consultant shall be set forth on Exhibit A. These fees are guaranteed to the Company. The exception to this guarantee is if the employer shows more than 20% growth in the plan participants. This would require a greater amount of service from the Consultant.

6. If Company requests Consultant to arrange for the services of others, all expenses of Consultant in the making of such services available and the fees and expenses of such others will be paid or reimbursed by the Company. Consultant shall not employ others without the prior authorization of Company.

7. All information received by Consultant in the performance of this Agreement (except information which is public knowledge or which is made known or available to the public by Company) shall be treated by Consultant as confidential and not be revealed to any other persons, firms or organizations except as required in the performance of this Agreement. Upon the termination of this Agreement, all such information shall be returned by the Consultant to Company.

8. This Agreement may be amended or modified by the parties hereto only by written amendment documents. Words used in the masculine shall apply to the feminine or neuter where applicable, and wherever the context dictates. The plural shall be read as the singular, and the singular as the plural.

9. THIS AGREEMENT SHALL BE CONSTRUED UNDER THE LAWS OF THE STATE OF TEXAS.  Venue of any action brought under or in respect of this Agreement shall be in Dallas County, Texas.

10. Neither the Company nor Consultant may assign its rights hereunder without the consent of the other.

11. In case any part of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, by a court of competent jurisdiction, the validity of any other term of this Agreement shall not be in any way affected thereby, and this Agreement shall be enforced in its present form or as may be modified by such court.

12. Any notice required to be given pursuant to the provisions of this Agreement shall be in writing, delivered in person or by certified mail, and mailed to the parties at the following addresses:

To Company:

Fired Up, Inc.
7500 Rialto Blvd., Ste 250
Austin, Texas  78735
Attention:  Vici Wilkerson

To Consultant:

Mc & H Life Agency, Inc.
8144 Walnut Hill Lane, 16th Floor
Dallas, Texas  75231

The parties may change these addresses by giving written notice of the change.

13. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors, permitted assigns or legal representatives.

MC & H LIFE AGENCY, INC.:                    COMPANY:

By_____          By_____
Print Name_____          Print Name____Brian Kelly_____
Date_____          Date_____10-20-10_____

Address:                                     Address:
8144 Walnut Hill Lane, 16th Floor            7500 Rialto Blvd., Ste. 250
Dallas, Texas 75231                          Austin, Texas  78735

2

# EXHIBIT A

**McQueary Henry Bowles Troy, L.L.P - Consultant**
**Fired Up, Inc. - Company**

**Services Provided:**

1. **ANALYSIS AND SELECTION OF:**

   - Medical Claims Vendors
   - Section 125 Vendors
   - Pharmacy Benefit Management Vendors
   - Stop Loss Contract Negotiations
   - Cobra Compliance and Administration Vendors
   - Medical Management Vendors
   - Mental Health Management Vendors
   - Zywave Analysis
   - Provider Access Analysis – Geo Access Report
   - Milliman Relationship Coordination

   All companies will be compared with the specific performance goals and objectives set by McQueary Henry Bowles Troy. Their ability to meet the criteria established McQueary Henry Bowles Troy and their financial pricing will be the primary driver of vendor selection. Special consideration will be given to those vendors who have a history of providing superior performance and their ability to hold down cost. In addition, focus will be on those vendors who offer specific financial guarantees.

2. IMPLEMENTATION OF THE PLAN OF BENEFITS AND EMPLOYEE COMMUNICATION - McQueary Henry Bowles Troy will provide enrollment assistance, customized employee communication planning and implementation of all new benefit vendors.

3. ONGOING MANAGEMENT OF VENDORS AND CLAIMS ANALYSIS – McQueary Henry Bowles Troy will conduct periodic claims and performance analysis of each vendor and present the findings to Fired Up, Inc. The staff at McQueary Henry Bowles Troy will meet with the staff at Fired Up, Inc. on an as needed basis to anticipate any problems and work with the vendors to correct any deficiencies.

   McQueary Henry Bowles Troy will act as the liaison between all vendors and Fired Up, Inc.



February 1, 2013

Brian Kelly, CFO
Fired Up, Inc.
7500 Rialto Blvd, #250
Austin, TX  78735

Re:   Insurance Broker Service Agreement

Dear Brian:

We are pleased that Wortham Insurance and Risk Management ("Wortham") has been selected as the insurance broker for Fired Up, Inc. ("Carino's") as respects the policies listed in Exhibit 1. Our objective is to continue to contribute our experience and energies toward the achievement of your goals.  The purpose of this letter is to further document the agreed negotiated compensation and give you an overview of what you can expect from us.

As your broker, we will:

1.  **Analytical Support -** Work with you to manage risk control costs.

    a.)     Analyze factors that are driving your cost of risk;

    b.)     Seek out creative solutions and explore alternatives;

    c.)     Develop, recommend, negotiate and implement cost-effective insurance and/or risk financing programs.

2.  **Marketing -** Give you access to the worldwide insurance marketplace.

    a.)     Act as your advocate with insurance companies;

    b.)     Negotiate on your behalf with insurance companies and keep you informed of significant developments;

    c.)     Coordinate visits with underwriters as required to properly market your insurance program;

February 4, 2013
Page 2

d.)     Endeavor to monitor the published financial information of your current insurers and alert you when their status falls below our minimum guidelines.  We will not place any insurance with carriers of which the rating and size are below our minimum guidelines without written approval from (client name).  We will not, however, be responsible for the solvency or ability to pay claims of any insurance carrier.  Insurers with whom your risks are placed will be deemed acceptable to you, in the absence of contrary instructions from you;

e.)     Follow up with insurance carriers for timely issuance of policies and endorsements;

f.)     Review policies and endorsements for accuracy and conformity to specifications and negotiated coverages;

g.)     In certain cases, placements that we make on your behalf may require the payment of various state surplus lines taxes and/or fees.  These state taxes and/or fees will be charged to you and identified separately on invoices covering these placements.  (Client name) may be responsible for taxes and/or fees in certain other states if applicable.  Wortham's compensation for these placements may also be subject to taxes and/or fees;

h.)     Utilize the services of other intermediaries, i.e., a wholesale broker or Lloyd's broker to assist in the marketing of your insurance, when in our professional judgment it is necessary or appropriate.  The compensation of such intermediaries is not included in our compensation hereunder and will be paid by insurers out of paid premiums.  Any such payments and amounts will be disclosed in advance;

i.)     Utilize the services of a local broker to assist with insurance requirements and/or service in certain foreign countries when it is necessary or appropriate.  The compensation of such brokers is not included in our compensation hereunder and will be paid by insurers out of paid premiums.  Any such payments and amounts will be disclosed in advance.

3. **Information -** Provide you with new ideas and information on a regular basis.

a.)     Seek to understand your business and provide creative business solutions.

b.)     Work with you to understand the risks of your business and identify solutions and products to manage, insure against, or eliminate those risks,

c.)     Keep you informed of significant changes and/or trends in the insurance marketplace and provide you with an annual forecast of market conditions.

d.)     Organize pre-renewal strategy meetings to discuss goals for upcoming renewal and our recommendations for changes or modifications.

e.)     Prepare an annual stewardship report for you.

February 4, 2013
Page 3

---

4. **<u>Administration</u>** - Deliver administrative support.

   a.)    Assist you in preparing underwriting information and insurance applications;

   b.)    Confirm coverage bound prior to expiration of your current policies and promptly deliver binders and/or confirmations of coverage;

   c.)    Process certificates of insurance on a timely basis;

   d.)    Review the accuracy of audits, rating adjustments, dividend calculations and loss runs;

   e.)    Provide you with detailed invoices.

   You are entitled to copies of reports and/or documents relating to your account. However, files are generally not retained for more than five years after the expiration date of a particular policy's term.

5. **<u>Claims</u>** - Take an aggressive, proactive approach to assist (client name) in controlling losses and acting as your advocate in the event of a claim.

   a.)    Analyze losses, identify trends and track significant claims;

   b.)    Recommend and coordinate loss control services;

   c.)    Act as liaison between you and your insurers;

   d.)    Work with you to design claims handling procedures;

   e.)    Evaluate insurance-related reserves.

6. **<u>Compensation</u>**

   Wortham will deliver the services as outlined in this agreement for the coverages listed in Exhibit 1 for an agreed negotiated annual commission/fee also outlined in Exhibit 1.

   a.)    Excess commissions paid by Underwriter (if any) will be carried forward and applied against our annual compensation for subsequent years unless (client name) directs otherwise.  No compensation of any sort, other than the annual agreed negotiated commission, related to any policy shall be paid without the pre-approval of (client name).

   b.)    In the event there is a significant change in your operations that affects the nature and scope of your program, we both agree to renegotiate this commission/fee as appropriate.

   c.)    The annual negotiated commission will be payable at the time the applicable policies are renewed.

February 4, 2013
Page 4

_____

      d.)     In the event Wortham earns any contingent commission income on any placements subject to the agreed commission or fee, a full disclosure will be made as requested by Carino's.

      e.)     Commission on other coverages and/or layers not listed in Exhibit 1 is to be mutually agreed.

**7.  Term**

This agreement is continuous until terminated.  Each contract year will be from February 1, 2013 to January 31, 2014 with the first period starting  February 1, 2013.  Wortham's obligation to render any and all services or any further services under this agreement will terminate at the end of the service period.  We do understand, however, that circumstances can change.  As such, both parties retain the right to terminate this agreement upon 45 days written notice.  In the event of termination, we will assist you in arranging a smooth transition process.  However, our obligation and the obligation of our affiliates to provide services to (client name) will cease upon the effective date of termination and all commission/fees to Wortham shall be fully earned for the applicable annual period once an order has been given for the placement.

Once again, we are pleased to be selected as your insurance broker and we look forward to working with you.

Sincerely,

Accepted and Agreed by:

John L. Wortham & Son, L.P.                  Fired Up, Inc.
By:  J. Wortham, L.L.C, General Partner

Signed: _____       Signed: _____
Name:  Rob Bridges                 Name: _____
Title:    Managing Director            Title:    _____
Date:    _____       Date:    _____



The following policies will be covered by the $85,000 annual base fee:

| Line of Coverage | Annual Fee |
|---|---|
| • Property | $ 85,000 |
| • Workers Compensation | Paid annually, quarterly, or monthly |
| • Texas Non Subscription | |
| • Auto | |
| • General Liability | |
| • Trade Name Restoration | |
| • Umbrella | |
| • Directors and Officers Liability | |
| • Crime | |

Compensation to be mutually agreed upon:

- Bonds
- RMIS Systems and Services
- Other policies not included above



### PROPERTY TAX ADMINISTRATIVE SERVICES AGREEMENT

This Property Tax Administrative Service Agreement ("Agreement") is entered into on this _2̲2̲_ day of November 2013 by and between Tax Advisors Group, Inc. ("TAG"), 12400 Coit Road, Suite 1270, Dallas, TX 75251, and Fired Up Inc. ("Client"), 1514 Ranch Road 620S, Austin, TX 78734-6210.  TAG will provide services to Client, in accordance with the following terms and provisions, for tax years 2014, 2015, 2016 and 2017 (the "Primary Term"), and any extension executed as described herein to cover all Business Personal Property.

*3 years/m̄↩*

1.  **Asset Data Information Request**:  Client shall furnish to TAG such information as TAG may reasonably request relating to Client's property, either real property or personal, relating to the services provided by TAG under the Agreement (the "Property"), including a description of the Property, original cost of the Property and year acquired, all by location of the Property.  This information shall be supplied in a computerized data format.  If the requested information is not forwarded to TAG by the requested date, any penalties for late filing imposed by any taxing authorities will be the sole responsibility of Client.  Accuracy of the information supplied to TAG shall remain the sole responsibility of Client.

2.  **Services**:  TAG will file renditions and, when necessary, meet with the appropriate property taxing authorities and boards of review, when in TAG's discretion such is necessary or appropriate to accomplish the lowest total taxes, TAG will also assist Client in litigation proceedings and negotiations if deemed necessary by Client to arrive at the final taxable value for any respective year(s) for purposes of this Agreement (the **"Services"**).  TAG will verify all statement(s) for accuracy before transmitting them to the Client for payment.

3.  **Real Estate Property Tax Savings**: The tax savings calculations for each Real Estate Property will be based on the value difference in the final taxable value for the year(s) covered by this Agreement and the current year notice of appraised value. In the event a notice of appraised value is not issued, the tax savings will be based on the value difference in the final taxable value and the previous year(s) value for the year(s) covered by this Agreement.

4.  **Business Personal Property Tax Savings**:  The tax savings calculations for Business Personal Property will be based on the value difference in the final taxable value for the year(s) covered by this Agreement and the appraised value that would have resulted using Client's current cost of fixed assets and inventory as of the assessment date(s), and as depreciated by the taxing unit or appraisal district for each year of this Agreement.  In the event the notice of appraised value is greater than the above method of tax preparation, the tax savings calculation will be based on the difference between the final taxable value and the notice of appraised value for the year(s) covered by this Agreement.

5.  **Value Difference for Tax Savings**:  The value difference for the Real Estate and Business Personal Property will be multiplied by the applicable tax rate for the tax year(s) covered by this Agreement for a total tax savings.

6.  **Fees for Services**:

    ❏   Contingency/Flat Fee:  25% contingency based on the tax savings, plus a flat fee of $ 100 per property location, payable on January 1st of each year covered by this Agreement.

The total fee for this service will be based on a percentage contingency based on the tax savings, plus a flat fee payable by January 1st of each year covered by this Agreement.  Contingency fees will be payable upon receipt of the tax savings report.  The tax savings report will be forwarded to the Client after the final value is established for the state in which the Property is located for each respective tax year.  TAG's invoice will be sent with the tax savings report and will reflect TAG's fee as calculated per this Agreement.

Unless otherwise described herein, the fee will be earned and payable in Dallas County, Texas, upon receipt of invoice.  Interest will be calculated and payable at the rate of one and one-half percent (1 ½%) per month, or eighteen percent (18%) per annum on the outstanding balance of any fees past 30 days.

7.  **Client Responsibility**: Unless otherwise agreed upon in writing between TAG and Client, any and all matters related to the Property, whether tax or otherwise, that are unrelated to the property tax year(s) stated in this Agreement, shall be the sole responsibility of Client. This will include, but is not limited to any tax bills received for tax years unrelated to any tax year statement contemplated in this Agreement.

8.  **Travel Expense Reimbursement**: Any travel expense incurred, not to exceed $ 500. in any tax year, including but not limited to expenses for airfare, auto rental, mileage, hotel, etc., will be billed at the time service is rendered.

9.  **Tax Refunds**: If for any reason a tax refund(s) to include return of penalty and interest is obtained for any tax year(s) prior to this Agreement, the recovery fee shall be calculated based on a contingency of fifty percent (50%) on any such refund(s).

10. **Term**: This Agreement shall expire on December 31, 2017 ~~2016~~ unless extended, or upon final determination of all unresolved issues related to the tax year(s) covered by this Agreement. In the event that neither party makes written notice of cancellation to the other party on or before August 1 of the last year of the Primary Term, or any applicable extension term, prior to the date of expiration, ~~this Agreement shall automatically be extended to cover an additional two (2) year period under the same terms and conditions as set forth herein.~~ *No auto renewal/mE*

11. **Executory Contract**: Each of TAG and Client agree that it has continuing obligations under this Agreement, which consist of TAG performing the services for the duration of this Agreement, and Client compensating TAG under the terms of the Agreement for the services performed.

This Agreement and its exhibits (if applicable) constitute the entire Agreement between the parties and supersede any prior Agreements, negotiations, understandings, or commitments.

AGREED to this 22 day of November 2013

Fired Up, Inc.

By: _Margaret B Smith_

Print Name: _Margaret B Smith_

Title: _Director of Finance_

TAX ADVISORS GROUP, INC.

By: _Wm. B___

Print Name: William Blankenship

Title: President

Exhibit G



## PROPERTY TAX PROFESSIONAL SERVICES AGREEMENT

This Property Tax Professional Services Agreement ("Agreement") is entered into as of the Effective Date by and between Ryan, LLC ("Ryan") and Client, pursuant to the following terms and conditions. The terms below, in quotation marks, have the meaning immediately following the quoted term.

| PARTIES AND TERM | | | |
|---|---|---|---|
| **Term** | **Meaning** | **Term** | **Meaning** |
| "Ryan" | Ryan, LLC, a Delaware limited liability company | "Client" | Fired Up, Inc. |
| Address | Three Galleria Tower 13155 Noel Road, Suite 100 | Address | 7500 Rialto Blvd., Suite 250 |
| City/State/Zip | Dallas, Texas 75240 | City/State/Zip | Austin, TX 78731 |
| "Engagement Principal" | Michael Henry | "Contact" | Margaret Smith |
| Email | michael.henry@ryan.com | Email | msmith@fordrestgrp.com |
| Telephone | 713.346.1599 | Telephone | 614.757.7492 |
| "Effective Date" | January 31, 2014 | "Term Date" | December 31, 2014 |
| "Tax Years" | 2014 | "Properties" | Listed in Exhibit A to this Agreement |

| PROFESSIONAL SERVICES ENGAGEMENT | | | | | | |
|---|---|---|---|---|---|---|
| **Engaged** | **"Services"** | **"Billing Unit"** | **"Fee Type"** | **"Fee Rate"** | **"Minimum Quantity"** | **"Minimum Annual Fee"** |
| **Consulting Services** | | | | | | |
| Yes | Appeals | Per Appeal | Performance Based | 33 1/3% | N/A | N/A |
| Yes | Assessment Review | Per Property | Included | Included in Appeals Services | N/A | N/A |
| No | Pre-Acquisition Reports | N/A | N/A | N/A | N/A | N/A |
| No | Consulting | N/A | N/A | N/A | N/A | N/A |
| No | Supplemental Appeal Services | N/A | N/A | N/A | N/A | N/A |
| No | Identification of Abatements and Exemptions | N/A | N/A | N/A | N/A | N/A |
| Yes | Tax Bill Administration | Per Tax Bill | Fixed | $25 | N/A | N/A |
| No | Assessment Administration | N/A | N/A | N/A | N/A | N/A |
| No | Database Implementation | N/A | N/A | N/A | N/A | N/A |

**Notes to Professional Services Engagement:** "Yes" or "No" in the Engaged column means Client has engaged Ryan or not engaged Ryan to provide the corresponding Services under this Agreement. "Included" in the Fee Type column means the fee for that Service is included in the fee charged for another companion Service. Any jurisdiction specific Service Riders are described in Exhibit C to this Agreement, if attached.

**Confirmation of Professional Services Engagement:** Client engages Ryan to perform the Services indicated above for the Properties as listed in Exhibit A to this Agreement and agrees to pay Ryan the Fee Type according to the Fee Rate as defined above and pursuant to the terms set forth below.

### This Offer Will Expire If Not Executed by Client by February 14, 2014

**Ryan**

| Ryan, LLC: | | Fired Up, Inc.: | |
|---|---|---|---|
| Signature: | *Michael Henry* | Signature: | *Margaret B. Smith* |
| Printed Name: | Michael Henry | Printed Name: | Margaret B. Smith |
| Title: | Principal | Title: | Director of Finance |
| Date: | January 31, 2014 | Date: | 2-28-14 |

## FEES AND EXPENSES

1. **Fees.**
   a. **"Performance Based"** shall be calculated by multiplying the Tax Savings by the "Fee Rate." Performance Based Fees are earned and billable upon the successful resolution of an appeal or decision. No Performance Based Fee shall be due on a matter if no Tax Savings are achieved. Ryan will provide Client with verification of the final resolution of a property tax appeal or decision by any reasonable documentation from the jurisdiction where the Property is situated. Client hereby transfers, conveys, and assigns to Ryan the rights to that portion of any tax refund, credit, or reduction Client receives equal to Ryan's fee based on the foregoing calculation, which assignment, transfer, and conveyance shall become effective immediately upon the submission of the applicable Tax Savings, filings, or claims. Further, it is the intention of the Parties that the assignment, transfer, and conveyance be severable and divisible from the Agreement and fully enforceable without regard to the termination of the Agreement. Ryan's fees shall be based upon the gross amounts attributable to Ryan and shall not be reduced by any existing liabilities of Client that may be applied or offset against such amounts. If Client obtains any Tax Savings using Ryan work products for any other properties, entities, or periods, Client agrees to notify Ryan and pay Ryan as outlined herein.

   b. **"Fixed"** shall be calculated by multiplying the Billing Unit by the Fee Rate.

   c. **"Hourly"** shall be calculated by multiplying the hours incurred by Ryan by its standard hourly rates in one-fourth (1/4th) hour increments. Ryan's standard hourly rates are listed in Exhibit B.

   d. **"Tax Savings"** shall mean the difference in the amount of tax otherwise payable prior to formally filing an appeal or informally requesting a change and the amount of tax payable as a result of the resolution of such appeal or change, and in the case of refunds, shall include taxes, interest, penalties, and any costs recovered. Tax Savings for newly identified property tax exemptions will be determined by multiplying the exempt property value by the current year's tax rate. Tax Savings shall include the cumulative total of Tax Savings for all tax years where a reduction is achieved by an appeal or where the results from an appeal are phased-in over multiple tax years. The property tax rate for the affected tax year will be used when possible for calculating Tax Savings, but if the

2



tax rate is not published or otherwise unavailable, the most recent published tax rate shall be used.

    e. **Fixed and Hourly Fee Annual Increases.** Fixed Fees and Hourly Fees will increase by the greater of four percent (4%) or the consumer price index (CPI-U), effective each January 1 during the Term of this Agreement.

2. **Expenses.**
    a. **Hourly Fee or Fixed Fee Services.** Where Ryan is performing Services for an Hourly Fee or Fixed Fee, Client shall reimburse Ryan for all reasonable out-of-pocket expenses, and Client shall be directly responsible for third-party professional fees and attorneys' fees.

    b. **Performance Based Fee Services.** Unless otherwise stated herein or agreed to in writing by the parties, where Ryan is performing Services for a Performance Based Fee, Client shall be directly responsible for any third-party professional fees and attorney fees. Client shall reimburse Ryan for filing fees. All other costs associated with performing the Services shall be assumed by Ryan.

    c. **Supplemental Appeal Services.** Where Ryan is performing Supplemental Appeal Services, Ryan shall assume all costs associated with performing the Services, including filing fees, third-party professional fees, and attorneys' fees.



## CONSULTING SERVICES

The Ryan deliverables and Client responsibilities for the Services engaged in this Agreement are described below. Any additional services requested by Client, but not specifically described below and engaged in this Agreement are out-of-scope services and will be billed to Client at the hourly rates set forth in Exhibit B, as may be increased per the terms of this Agreement.

1. **Property Tax Appeals.**
   a. Ryan responsibilities: Prepare and file appeals approved by Client; request information from Client to support appeals; prepare and file information supporting appeals; meet with assessor, appear at hearings, and provide expert testimony (all whenever advisable and permissible); and pursue appeals beyond the administrative process in Ryan's discretion and with the assistance of counsel.

   b. Conditions: If the services of an attorney are required to represent Client in pursuing an appeal, Ryan will continue to be paid Ryan's Performance Based Fee on the outcome of the appeal. Ryan shall recommend attorney(s) for Client's consideration to pursue the appeal. Client shall consult with Ryan with respect to the selection of the attorney, provided that Client shall engage the attorney and retain all aspects of the attorney-client relationship. Ryan will assist Client's legal counsel as an expert in property tax valuation to the extent permitted by applicable professional standards. If Client engages Ryan to perform Supplemental Appeal Services, Ryan's responsibilities shall be as set forth in "Supplemental Appeal Services" below.

   c. Client responsibilities: Client will provide information supporting appeals as requested by Ryan (which Ryan shall presume accurate), respond to recommendations to file appeals, execute forms authorizing Ryan to file appeals and represent Client, and forward all relevant property tax notices and correspondence to Ryan upon receipt. All decisions made in connection with appeals shall remain the sole responsibility of Client, provided that Client shall not unreasonably withhold, condition, or delay any approvals related to pursuing an appeal.

2. **Assessment Review.**
   a. Ryan responsibilities: Obtain assessed values and input into Client's database, request information from Client to prepare analysis, review assessor's appraisal records for accuracy when advisable, prepare analysis of assessed value for open tax years and compare to current assessed value, and provide appeal recommendations to Client.

3. **Tax Bill Administration.**
   a. Ryan responsibilities: Receive, date stamp, and scan tax bills; obtain missing tax bills; input tax information into Client's database; review tax bill input; and transmit tax payment information to Client.



b. Conditions:  Tax payments will be processed for a single installment, unless multiple installments are specifically required by the jurisdiction; multiple installment payments shall be submitted to Client in a single AP file for Client to designate actual payment dates; and Ryan will not research parcels, accounts, or tax bills for which Client is responsible for the tax liability by any means other than the information provided to Ryan by Client.

c. Client responsibilities:  Promptly forward all tax bills received by Client to Ryan, with time-sensitive tax bills being sent by either overnight mail or by email/fax to Ryan, and review tax bill data input.



## TERMS AND CONDITIONS

1. **Term.**

   a. This Agreement is effective from the Effective Date until the Term Date and shall automatically renew for additional one-year periods on the Term Date and on each anniversary of the Term Date (the "Renewal Date"). The execution by Client of a form authorizing Ryan to represent Client's properties before a state or local agency shall also be considered an extension of this Agreement to include the properties and the tax years covered by such authorization form. The initial term and any renewal terms shall be collectively referred to herein as the "Term" of this Agreement.

   b. If any Property that is subject to the terms of this agreement is sold, transferred, or otherwise disposed of by Client and Ryan will not be continuing to represent the property for the fee provided herein ("Termination Event"), and the basis of compensation set forth herein is an Hourly Fee or Fixed Fee, Client will be responsible for all undisputed fees for Services rendered and reimbursable expenses incurred by Ryan up to and including the effective date of the Termination Event. If any Property that is subject to the terms of this agreement is subject to a Termination Event and the basis of compensation is a Performance Based Fee, unless the parties agree to either: (i) allow Ryan to continue to represent the property for the fee provided herein or (ii) enter into a written agreement settling the issue of compensation, Client will be responsible for compensating Ryan for the Performance Based Fee as provided herein based upon all Tax Savings, including interest and penalties, identified by Ryan up to and including the date of the Termination Event, and which are subsequently received or otherwise realized by Client, regardless of whether Client allows Ryan to assist in obtaining such Tax Savings. Client agrees, represents, and warrants that it will notify Ryan promptly of Client's receipt of any Tax Savings that were previously identified by Ryan.

2. **Billing and Invoices.**

   a. All fees, reimbursable costs, and expenses, other than Performance Based Fees, shall be billed to Client in Ryan's discretion on a monthly basis as they are performed, completed, or incurred by Ryan. Performance Based Fees shall be billed upon the receipt of any refund or credit, or at the completion of an appeal, audit, or decision.

   b. Ryan's invoices are due upon receipt by Client and shall be paid within thirty (30) days. Any amount remaining unpaid shall accrue interest at the rate of one and one-half percent (1.5%) per month. Ryan may suspend or terminate the Services if a payment is not received by Ryan from Client within thirty (30) days of the invoice date. Client further agrees to pay all costs of collection, including, but not limited to, any collection agency or attorneys' fees, incurred by Ryan in connection with fees more than sixty (60) days past due. Ryan accepts checks, electronic funds transfers, credit cards, and purchasing cards. If payment is made using a credit card or purchasing card, Client authorizes Ryan to add a processing fee to the payment. Such processing fee is currently three percent (3%) of the payment amount and is subject to change upon thirty (30) days prior notice.



3. **Limitation on Liability.**

a. Ryan does not guarantee a particular result in a contested valuation matter, and Ryan shall not be liable for an adverse or unsatisfactory result unless such result is solely and directly caused by Ryan's negligence. Ryan shall not be liable for the following: (i) tax bills, assessments, or notices inaccurately mailed or issued outside of published notification dates by taxing jurisdictions; (ii) any failure or delay by Client in executing returns, forms, or letters of authorization; (iii) inaccurate, untimely, incomplete, or otherwise unreliable information provided by Client or third parties engaged by Client; (iv) inaccuracies in data or forms published by taxing authorities; (v) statutory, administrative, or judicial changes occurring after the submission of claims or filings to the taxing authority; (vi) property tax abatements, exemptions, incentives, or credits, unless Ryan is specifically engaged to provide such Services as provided in this Agreement; or, (vii) Ryan's failure to identify new or existing refund, exemption, or abatement opportunities whether or not Ryan has been engaged to provide Consulting Services for abatements and exemptions.

b. Ryan shall not be liable to Client for any claim, liability, damage, or expense under any theory ("Claim" or "Claims") in excess of the following: (i) for any single Claim, $20,000; and, (ii) for all Claims occurring in a twelve (12) month period, the lesser of $100,000, or the Fees paid by Client to Ryan for the specific Services giving rise to the Claim during the preceding twelve (12) months. Client may not assert any cause of action against Ryan more than one (1) year after the date the cause of action accrues. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR INDIRECT, EXEMPLARY, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES OR COSTS, INCLUDING LOST OR DAMAGED DATA, LOSS OF PROFIT OR GOODWILL, WHETHER FORESEEABLE OR NOT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

4. **Confidentiality and Ownership of Property.**

a. **Client Property and Confidentiality.** Except as provided below, all information that Client provides to Ryan shall be considered confidential, proprietary information, and Ryan shall not disclose such information to any third party or make use of such information except as required by law in fulfilling duties described by this Agreement, or to comply with an official order of a court of law or other mandatory legal process. Ryan shall return Client's confidential information upon request, provided however that Ryan shall have the right, subject to the use and disclosure obligations of this Agreement, to retain confidential information contained in (i) its professional work papers and (ii) secure, archival computer back-up tapes maintained in the ordinary course of business.

b. **Ryan Intellectual Property and Confidentiality.** Client acknowledges and agrees that, in the course of performance hereunder, Ryan may use products, materials, software applications, firmware, hardware, systems, programs, tools, methodologies, ideas, inventions, schematics, developments, discoveries, processes, know-how, concepts, engagement procedures and techniques, tax savings strategies, work papers, the Hosted Application, and any and all similar items arising out of or relating to Ryan's performance of the Services under this Agreement, including all derivative works thereof,

7



that are proprietary to Ryan (collectively "Proprietary Items"). As between Ryan and Client, Ryan shall exclusively own all Proprietary Items, any and all intellectual property rights arising therefrom including, without limitation, all patent, trademark, and copyright rights, trade secret rights, and other proprietary rights. Proprietary Items are deemed confidential and shall not be utilized by Client and/or disclosed to any third party without obtaining prior written approval from Ryan. Ryan shall retain the right to use and disclose its Proprietary Items, and Client shall not assert or cause to be asserted against Ryan or its personnel any prohibition or restraint from so doing. To the extent Ryan provides Client with access privileges to Client's database through the Internet (the "Hosted Application"), Ryan grants Client a limited, nonexclusive, nontransferable, revocable license to use the Hosted Application solely for the purpose of accessing Client's data. Client's right to access the Hosted Application shall cease upon any termination of this Agreement or revocation by Ryan of Client's access privileges, and Client shall destroy any thin client or locally hosted application used in conjunction with the Hosted Application, and shall destroy all user names and/or passwords associated with the Hosted Application. Ryan further grants Client a license to use for Client's internal business purposes reports, documents, applications, and similar materials developed by Ryan solely for the exclusive use of Client.

c.  **Exceptions.** The use and disclosure requirements of this section shall not apply to the information of either party that: (i) is already publicly known at the time of disclosure, (ii) becomes publicly known after disclosure through no fault of the recipient, (iii) is already known to recipient at the time of disclosure, (iv) is subsequently disclosed to recipient by third parties having no obligation of confidentiality to discloser, or (v) is independently developed or learned by recipient without use of or reference to the confidential information of the discloser.

5.  **Assignment.** This Agreement is binding on the parties and their respective successors and assigns. The rights and obligations of the parties may not be assigned or transferred in whole or in part, without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed, provided that either party may, upon written notice to the other, assign or transfer this Agreement, or any rights and obligations hereunder, either to an affiliate, related entity or a third-party successor to all or substantially all of the business, stock or assets of such party, in each case, without the prior consent of the non-assigning party. Client consents to the assignment of Ryan's rights and obligations to perform all Compliance Services to Ryan's affiliate, Ryan Tax Compliance Services, LLC. Ryan may withhold its consent to any assignment or transfer to a party that Ryan reasonably believes is a competitor of Ryan or if Ryan reasonably believes that such transfer will harm Ryan, economically or otherwise.

6.  **Independent Contractor.** Ryan will be acting as Client's independent contractor and consultant wherever allowed by the jurisdiction and not as an attorney or certified public accountant. The sole authority to engage and direct legal counsel shall remain with Client.

7.  **Notice.** Any notice to be given under this Agreement shall be given in writing and may be effected by personal delivery, by hand delivery via courier, by overnight reputable national



courier, or by placing such in the United States Postal Service certified mail, return receipt requested.  Notices to Client should be sent to the address indicated on the first page of this Agreement, and notices to Ryan should be addressed as follows:

> Ryan, LLC
> Three Galleria Tower
> 13155 Noel Road
> Suite 100
> Dallas, Texas 75240
> Attn: Chairman and CEO

With a copy to:    Attn: General Counsel

**8. Miscellaneous.**

   a.  All Services will be conducted and managed under the supervision of the Engagement Principal listed on page one of this Agreement.  The Engagement Principal will be responsible for staffing, project coordination, technical direction, and related issues.

   b.  This Agreement constitutes the entire agreement between the parties and supersedes all other oral and written proposals, representations, agreements, and other communications between the parties with respect to the subject matter.  Any change, waiver, modification, or other amendment of any provision of this Agreement shall be binding and effective only with the prior written consent of both Client and Ryan.

   c.  This Agreement shall be governed by and construed in accordance with the laws of the State of Texas (without regard to principles of conflicts of law).  Exclusive venue for any dispute with respect to this Agreement shall reside in a court of competent jurisdiction in Dallas County, Texas.  In the event of any legal action brought to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs.  The parties irrevocably waive all rights to trial by jury in any action, proceeding, or counterclaim relating to the Agreement.

   d.  The invalidity or unenforceability of any provisions of this Agreement in any jurisdiction shall not affect the validity, legality, or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality, or enforceability of this Agreement, including any such provision, in any other jurisdiction, it being intended that all rights and obligations of the Parties hereunder shall be enforceable to the fullest extent permitted by law.  Wherever possible, each provision of this Agreement shall be interpreted in a manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality, or unenforceability without invalidating the remainder of such provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.



## EXHIBIT A – PROPERTIES

If Properties are not listed below, the properties, parcels, and accounts in Client's file and database shall constitute the Properties subject to this Agreement. The date for determining the Properties subject to this Agreement shall be the Effective Date and each subsequent Renewal Date. Ryan will begin processing tax bills and assessments on the agreed upon Tax Bill and Assessment Start Date. Properties that are added to this Agreement shall become part of this Agreement on the date they are added. Client shall provide Ryan with a complete list of Properties from time-to-time upon request.

| STATE/COUNTY | ACCOUNT NUMBER | LOCATION | PROPERTY TYPE |
|---|---|---|---|
| AR-BENTON | 02-15162-000 | 535 N. 46th St. | REAL |
| AR-PULASKI | 23N0080000602 | 4221 WARDEN | REAL |
| AR-PULASKI | 43L0220000401 | 11600 PLEASANT RIDGE RD | REAL |
| CO-EL PASO | 53312-01-010 | 3015 NEW CENTER POINT | REAL |
| CO-MESA | 294509121005 | 2480 HWY 6 & 50 | REAL |
| CO-WELD | 095913400052 | 2473 W. 28th St. | REAL |
| CO-JEFFERSON | 095913400052 | 389 S. WADSWORTH BLVD | REAL |
| CO-BOULDER | 095913400052 | 2033 KEN PRATT BLVD | REAL |
| CO-LARIMER | 095913400052 | 1455 ROCKY MOUNTAIN AVE | REAL |
| CO-DOUGLAS | 095913400052 | 9355 CROWN CREST BLVD | REAL |
| CO-PUEBLO | 095913400052 | 5700 N ELIZABETH ST | REAL |
| ID-BONNEVILLE | 095913400052 | 2833 S. 25th E. | REAL |
| ID-ADA | 095913400052 | 1700 S. ENTERTAINMENT AVE | REAL |
| ID-ADA | 095913400052 | 3551 E. FAIRVIEW AVE | REAL |
| ID-TWIN FALLS | 095913400052 | 1921 BLUE LAKES BLVD NORTH | REAL |
| KS-WYANDOTTE | 095913400052 | 1706 VILLAGE WEST PARKWAY | REAL |
| LA-RAPIDES | 095913400052 | 3213 MACARTHUR DR | REAL |
| LA-LAFAYETTE | 095913400052 | 4321 AMBASSADOR CAFFERY PKWY | REAL |
| LA-CALCASIEU | 095913400052 | 2638 DEREK DR | REAL |
| MO-JASPER | 095913400052 | 137 N. RANGELINE RD | REAL |
| TX-BEXAR | 095913400052 | 3147 SE MILITARY DR | REAL |
| TX-BEXAR | 095913400052 | 11719 E BANDERA RD | REAL |
| TX-BEXAR | 095913400052 | 1301 N LOOP 1604 W | REAL |
| TX-BEXAR | 095913400052 | 231 SW LOOP 410 | REAL |
| TX-BRAZORIA | 095913400052 | 3050 SILVERLAKE VILLAGE DR | REAL |
| TX-BRAZORIA | 095913400052 | 106 E HIGHWAY 332 | REAL |
| TX-BRAZOS | 095913400052 | 620 HARVEY RD | REAL |
| TX-CAMERON | 095913400052 | 2600 EXPWY 77/83 | REAL |

*Additional Properties not originally listed in this Exhibit will become subject to the terms and conditions of this Agreement as if such Properties are listed in this Exhibit when: (a) Client sends an email to Ryan requesting that Services be performed for a Property or receipt of an LOA; and (b) Ryan replies by email to Client expressly acknowledging that Ryan will perform the Services requested on such Property. Ryan will not be responsible for providing Services for such Properties added to this Agreement for 30 days from the date of receipt by Ryan of such notice. The parties expressly agree that this process for adding Properties to the list of Properties in this Exhibit will not require a separate signed agreement by the parties, and the exchange of emails, as described herein, shall be construed to be a written and signed agreement between the parties.*



| STATE/COUNTY | ACCOUNT NUMBER | LOCATION | PROPERTY TYPE |
|---|---|---|---|
| TX-DALLAS | 095913400052 | 510 W LBJ FWY | REAL |
| TX-DALLAS | 095913400052 | 1414 GROSS ROAD | REAL |
| TX-DENTON | 095913400052 | 595 E. FM 3040 | REAL |
| TX-DENTON | 095913400052 | 1516 CENTRE PLACE DR | REAL |
| TX-ECTOR | 095913400052 | 5111 E 42ND ST | REAL |
| TX-ELLIS | 095913400052 | 988 W HIGHWAY 287 BYPASS | REAL |
| TX-FT BEND | 095913400052 | 5750 HIGHWAY 6 | REAL |
| TX-GRAYSON | 095913400052 | 306 E HWY 82 | REAL |
| TX-GREGG | 095913400052 | 411B E LOOP 281 | REAL |
| TX-HARRIS | 095913400052 | 21875 KATY FWY | REAL |
| TX-HARRIS | 095913400052 | 19820 NORTHWEST HWY | REAL |
| TX-HARRIS | 095913400052 | 5921 E. SAM HOUSTON PKWY | REAL |
| TX-HARRIS | 095913400052 | 7017 GARTH RD | REAL |
| TX-HAYS | 095913400052 | 1207 S IH 35 | REAL |
| TX-HIDALGO | 095913400052 | 601 S JACKSON RD TX | REAL |
| TX-HIDALGO | 095913400052 | 421 E NOLANA AVE STE B | REAL |
| TX-JEFFERSON | 095913400052 | 3805 INTERSTATE 10 S | REAL |
| TX-LUBBOCK | 095913400052 | 6821 SLIDE RD | REAL |
| TX-MCLENNAN | 095913400052 | 1411 N VALLEY MILLS | REAL |
| TX-MIDLAND | 095913400052 | LOOP 00250 N 4711 W | REAL |
| TX-POTTER-RANDALL | 095913400052 | 8400 W IH 40 | REAL |
| TX-ROCKWALL | 095913400052 | 819 E I30 | REAL |
| TX-SMITH | 095913400052 | 1725   LOOP 323 WSW | REAL |
| TX-TARRANT | 095913400052 | 2175 PRECINCT LINE RD | REAL |
| TX-TARRANT | 095913400052 | 2750 W IH-20 | REAL |
| TX-TARRANT | 095913400052 | 960 N US HWY 287 | REAL |
| TX-TARRANT | 095913400052 | 5900 S HULEN ST | REAL |
| TX-TAYLOR | 095913400052 | 4157 BUFFALO GAP RD | REAL |
| TX-TRAVIS | 095913400052 | 12901 N INTERSTATE HY 35 | REAL |
| TX-TRAVIS | 095913400052 | 5601 BRODIE LN 1600 | REAL |
| TX-TRAVIS | 095913400052 | 9500 S INTERSTATE HY 35 B | REAL |
| TX-WEBB | 095913400052 | 7603 SAN DARIO AVE | REAL |
| TX-WILLIAMSON | 095913400052 | 2600 IH 35 N | REAL |
| TX-WILLIAMSON | 095913400052 | 11620 RR 620 | REAL |

*Additional Properties not originally listed in this Exhibit will become subject to the terms and conditions of this Agreement as if such Properties are listed in this Exhibit when: (a) Client sends an email to Ryan requesting that Services be performed for a Property or receipt of an LOA; and (b) Ryan replies by email to Client expressly acknowledging that Ryan will perform the Services requested on such Property.  Ryan will not be responsible for providing Services for such Properties added to this Agreement for 30 days from the date of receipt by Ryan of such notice.  The parties expressly agree that this process for adding Properties to the list of Properties in this Exhibit will not require a separate signed agreement by the parties, and the exchange of emails, as described herein, shall be construed to be a written and signed agreement between the parties.*



| EXHIBIT B – FEE TERMS |
|---|

1.      **Hourly Rates**

Ryan's hourly rates are set forth in the schedules below and chargeable in one-fourth (1/4th) hour increments.

| Consulting Services Hourly Rates Schedule by Staff | |
|---|---|
| Principal | $500.00 Per Hour |
| Director | $400.00 Per Hour |
| Senior Manager | $375.00 Per Hour |
| Manager | $325.00 Per Hour |
| Team Leader | $275.00 Per Hour |
| Senior Consultant | $250.00 Per Hour |
| Lead Analyst | $250.00 Per Hour |
| Consultant | $200.00 Per Hour |
| Senior Analyst | $200.00 Per Hour |
| Senior Associate Consultant | $150.00 Per Hour |
| Associate Consultant | $125.00 Per Hour |
| Analyst | $125.00 Per Hour |
| Administrative | $ 75.00 Per Hour |



## EXHIBIT C – JURISDICTION-SPECIFIC SERVICE RIDERS

The terms of the following jurisdiction-specific Service Riders shall be added to the terms set forth above in this Agreement, if and to the extent applicable to the location where the Services will be performed.  Service Riders are intended to be interpreted consistently with the terms set forth above, but if there is a conflict in treatment of a matter, then the specific terms of the Service Riders shall control.

**Texas Properties and Texas Property Professionals.**
If Ryan is providing property tax consulting services under the Agreement, the following is deemed incorporated into the terms of the Agreement:  Ryan's Texas property tax professionals are regulated by The Texas Department of Licensing and Regulation, Post Office Box 12157, Austin, Texas 78711, 1.800.803.9202, 512.463.6599; website: www.license.state.tx.us/complaints.



Williams Tower
2800 Post Oak Boulevard
Suite 4200
Houston, TX 77056
Tel. 713.629.0090
Fax 713.629.0227

www.ryan.com

**SENT VIA ELECTRONIC MAIL**

January 9, 2013

Ms. Bridget Hoover
Director of Tax
Fired Up, Inc.
13420 Galleria Circle
Building A, Suite 250
Austin, Texas 78738

Re:     Texas Sales and Use Tax Services

Dear Ms. Hoover:

Thank you very much for the opportunity to assist you with minimizing the Texas sales and use tax liability of Fired Up, Inc. ("Fired Up"). As discussed, this letter (the "Agreement") outlines the terms and conditions of our engagement to assist Fired Up with a Texas sales and use tax credit review.

**ENGAGEMENT SCOPE**

Ryan, LLC ("Ryan") will assist Fired Up with a review of Fired Up's Texas sales and use tax payment records to identify tax refund and/or tax reduction opportunities. Our approach is specifically designed to target tax refund and/or tax reduction opportunities and use these opportunities to reduce Fired Up's Texas sales and use tax liability, without significant assistance or effort from personnel at Fired Up. We will perform this service for the following entities and/or locations:

Carino's Italian Kitchen, Inc. / Texas Operations

In the event of an audit, our engagement will include a review of audit exceptions scheduled by the Texas Comptroller of Public Accounts ("Comptroller") after Fired Up's tax, finance, or accounting department personnel have completed their own internal audit review. Our review of scheduled audit exceptions will begin only after receiving authorization from Fired Up. All requests for refunds, credits, or reductions made by Ryan are subject to Fired Up's approval. Fired Up agrees not to unduly withhold or delay such approval.

Ms. Bridget Hoover
Fired Up, Inc.
January 9, 2013
Page 2

## ENGAGEMENT PERIOD

Our review will cover the period January 1, 2010 through December 31, 2012.

## ELECTRONIC DATA FILES

Fired Up agrees to provide electronic data files to Ryan that will facilitate the identification and location of records to be reviewed.  Ryan generally utilizes general ledger, accounts payable, and sales and use tax accrual data in text/ASCII files, database files, or spreadsheet files.  Ryan will assist Fired Up's information systems personnel with determining the appropriate system file layouts, required data fields, file types, and transfer media.  Any out-of-pocket costs of preparing, modifying, or transferring such data will be the responsibility of Ryan.  Fired Up further agrees to assist Ryan in using Ryan's data extraction applications and other tools by providing all necessary access and configurations.  Fired Up acknowledges that Ryan's data extraction applications and other tools are proprietary to Ryan, and Fired Up shall acquire no rights whatsoever with respect to such applications and other tools.

## RESPONSIBILITIES

All services will be conducted under the supervision of Ms. Trisha C. Fortune, Principal, who serves as Client Principal for Fired Up.  Ms. Kelly S. Butler, Principal, will serve as the Engagement Principal for this project.  Mr. Chad Dunkin, Team Leader, will serve as Project Manager for this engagement and will be responsible for staffing, project coordination, technical direction, and related issues.  Additionally, throughout the course of this engagement, we will make every effort to arrange and schedule all work to avoid interruption to Fired Up's normal business operations.

## COMPENSATION

In the event Ryan obtains any tax refunds, credits, or reductions, Fired Up agrees to pay Ryan and hereby assigns to Ryan, as compensation for this service, thirty-three and one-third percent (33⅓%) of any tax refunds, credits, or reductions, including interest and penalties, that Fired Up receives from taxing authorities and/or vendors.  Fired Up agrees that Ryan's fees shall be based upon the gross amounts attributable to Ryan and shall not be reduced by any existing liabilities of Fired Up that may be applied or offset against such amounts.  If Fired Up obtains any tax refunds, credits, or reductions using Ryan work products for any other locations, entities, or periods, Fired Up agrees to notify Ryan and pay Ryan as outlined herein.

Fired Up agrees that Ryan has the right to engage legal counsel to represent Fired Up at Ryan's expense, subject to Fired Up's approval.  Fired Up further agrees not to unduly withhold such approval.  In the event Ryan obtains any refunds, credits, or reductions as a result of an

Ms. Bridget Hoover
Fired Up, Inc.
January 9, 2013
Page 3

administrative hearing or other legal action, Fired Up agrees to pay Ryan and hereby assigns to Ryan, as compensation for this service, forty percent (40%) of any tax refunds, credits, or reductions, including interest and penalties, that Fired Up receives as a result of such administrative hearing or other legal action. In the event no tax refunds, credits, or reductions are obtained, no fee will be due.

Ryan's fee for refunds or credits will be invoiced upon approval by the taxing authority, if applicable, and is due and payable within thirty (30) days of receipt of any refunds or credits. Ryan's fee for reductions of any audit assessment, including interest and penalty, will be invoiced upon approval by the taxing authority and is due and payable within thirty (30) days. Fired Up agrees to pay interest of one and one-half percent (1½%) per month on any past due fees.

## NOTICE

Any notice to be given under this Agreement shall be given in writing and may be made by personal delivery or hand delivery by courier, by overnight reputable national courier, or by placing such in the United States certified mail, return receipt requested. Notices to Fired Up should be sent to the address indicated on the first page of this Agreement and notices to Ryan should be addressed as follows:

> Ryan, LLC
> Three Galleria Tower
> 13155 Noel Road
> Suite 100
> Dallas, Texas 75240
> Attn: Chairman and CEO

With a copy to:     Attn: General Counsel

## INTEGRITY AND CONFIDENTIALITY

We guarantee that all matters associated with the professional services we render will be directed with the highest degree of professional integrity. Accordingly, all information that Fired Up makes available to Ryan shall be considered confidential, proprietary information, and Ryan shall not disclose such information to any third party except as required in fulfilling duties described by this Agreement or to comply with an official order of a court of law.

Additionally, Fired Up agrees that Ryan's work product, including specific engagement procedures and techniques, constitutes proprietary and exclusive information, and Fired Up further agrees not to disclose such information to any third party without obtaining prior written

Ms. Bridget Hoover
Fired Up, Inc.
January 9, 2013
Page 4

approval from Ryan. Additionally, Ryan's tax saving strategies constitute proprietary and exclusive information; provided, however, that notwithstanding the foregoing, Ryan does not limit Fired Up's disclosure of the tax treatment or the tax structures of the transactions. This Agreement does not include information independently developed by Fired Up, information previously known to Fired Up, or information rightfully received by Fired Up from a third party without confidential limitations.

## LAW GOVERNING AGREEMENT

This Agreement shall be governed by and construed in accordance with the laws of the State of Texas. Exclusive venue for any dispute with respect to this Agreement shall reside in a court of competent jurisdiction in Austin, Travis County, Texas.

## ACKNOWLEDGMENT

Thank you for the opportunity to assist you with this project. If the above terms and conditions meet with your approval, please sign and return the enclosed copy of this Agreement at your convenience. Upon acceptance, we will contact you to arrange a mutually acceptable time to begin our review. If you have any questions, or if you would like to discuss this Agreement further, please contact Ms. Trisha C. Fortune at 512.476.0022 or Ms. Kelly S. Butler at 713.629.0090.

**RYAN, LLC:**

By: _Kelly S Butler_

Name: Kelly S. Butler

Title: Principal

Date: _1-17-13_

**FIRED UP, INC.:**

By: _Bridget Hoover_

Name: Bridget Hoover

Title: Director of Tax

Date: _1/11/2013_