IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| FIRED UP, INC. | § | CASE NO. 14-10447-tmd |
| | § | (Chapter 11) |
| Debtor. | § | |

# DEBTOR AND THE UNSECURED CREDITORS COMMITTEE'S JOINT PLAN OF REORGANIZATION DATED SEPTEMBER 30, 2014

Barbara M. Barron
Stephen W. Sather
BARRON & NEWBURGER, P.C.
1212 Guadalupe, Suite 104
Austin, Texas  78701
(512) 476-9103
(512) 476-9253 (Facsimile)

ATTORNEYS FOR DEBTOR

Bradford J. Sandler
Joshua M. Fried
PACHULSKI STANG ZIEHL & JONES, LLP
919 N. Market Street 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705
(302) 652-4100

ATTORNEYS TO THE UNSECURED CREDITORS COMMITTEE

**TABLE OF CONTENTS**

**ARTICLE I - DEFINITION AND USE OF TERMS** ...........................................................................1
1.01 **Defined Terms** .........................................................................................................1
1.02 **Number and Gender of Words**...............................................................................9
1.03 **Terms Defined in the Bankruptcy Code** ............................................................10
1.04 **Headings** ...................................................................................................................10
1.05 **Interpretation** ..........................................................................................................10
1.06 **Time Computation** ..................................................................................................10
**ARTICLE II - PROVISIONS APPLICABLE TO ALL CLAIMS** ...............................................10
2.01 **Treatment of Claims** ...............................................................................................10
2.02 **Allowed Claims** ........................................................................................................10
2.03 **Amount of Claims** ...................................................................................................10
2.04 **Allowance of Post-Petition Interest, Fees and Costs**........................................11
2.05 **Filing of Claims Arising From Rejection of Unexpired Leases or Executory Contracts** ....11
2.06 **Filing of Administrative Claims** ...........................................................................11
2.07 **Filing of Cure Claims** .............................................................................................11
2.08 **Filing of Claims Arising from Avoidable Transfers** ..........................................11
2.09 **Filing of Contingent Claims** ..................................................................................11
2.10 **Objections to Claims** ...............................................................................................12
2.11 **Estimation of Claims** ..............................................................................................12
2.12 **No Distributions Pending Allowance** ...................................................................12
2.13 **Interest on Contested Claims** ................................................................................12
2.14 **Payment Dates for Claims to be Paid by the Debtor.**........................................12
2.15 **Purchased Claims** ...................................................................................................12
2.16 **Third Party Obligations**.........................................................................................12
2.17 **Surrender of Collateral** ..........................................................................................13
2.18 **Section 1111(b) Election** .........................................................................................13
2.19 **Valuation of Assets** .................................................................................................13
**ARTICLE III - CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS; IDENTIFICATION OF IMPAIRED CLASSES**..13
3.01 **Creation of Classes; Impairment** ..........................................................................13
3.02 **Elimination of Classes** ............................................................................................14
3.03 **Impairment Controversies** .....................................................................................14
**ARTICLE IV - CLASSIFICATION AND TREATMENT OF CLASSES UNDER THE PLAN** ................14
4.01 Class 1—Allowed Administrative Expense Claims ..............................................14
4.02 Class 2—Allowed Non-Tax Priority Claims ........................................................15
4.03 **Class 3—Allowed Claims of the Internal Revenue Service** .............................16
4.04 **Class 4—Allowed Claims of State and Local Taxing Authorities (Non-*Ad Valorem* Taxes**...17
4.05 **Class 5—Allowed Claims of Local Taxing Authorities for *Ad Valorem* Property Taxes** .....18
4.06 **Class 6—Claims of GE Capital Business Asset Funding as successor-in-interest to GE Capital Franchise Finance Corporation** .....19
4.07 **Class 7—Allowed Secured Claim of Prosperity Bank**......................................19
4.08 **Class 8—Allowed Secured Claim of Independent Bank** ...................................20
4.09 **Class 9—Allowed Secured Claims of FRG Capital, LLC** ................................21
4.10 **Class 10-- Unsecured Personal Injury and Employment Related Claims** ......22
4.11 **Class 11—Convenience Claims** .............................................................................23
4.12 **Class 12—Allowed General Unsecured Claims (Excluding Lease Rejection Claims)**........23
4.12 **Class 12—Allowed Unsecured Lease Rejection Claims** ....................................24
4.14 **Class 14—Contingent Claims** ................................................................................24
4.15 **Class 15—Equity Interests** ....................................................................................25
**ARTICLE V - ASSUMPTION AND REJECTION OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS**....25
5.01 **Assumption/Rejection of Executory Contracts and Unexpired Leases** ..........25
5.02 **Reservation of Rights** .............................................................................................25
5.03 **Disputes as to Executory/Unexpired Status** .......................................................26
5.04 **Expired Contracts or Leases** .................................................................................26
5.05 **Bar Date for Claims Based on Rejection** .............................................................26

5.06  Limitation on Claims Based on Rejection ..................................................................26
5.07  Claims Arising from Assumption or Rejection ...........................................................26
5.08  Cure of Defaults Upon Assumption ...........................................................................26
ARTICLE VI - PROVISIONS FOR THE RETENTION, ENFORCEMENT, SETTLEMENT, OR ADJUSTMENT OF CLAIMS
BELONGING TO THE DEBTOR AND THE ESTATE INCLUDING PREFERENCES AND CONVEYANCES ..........................27
6.01  Avoidance Actions .....................................................................................................27
  6.01.01      Preferences ..................................................................................................27
  6.01.02      Fraudulent Conveyances and Post-Petition Transfers Made Without Court Approval ..........27
6.02  Debtor's Other Causes of Action. ..............................................................................28
ARTICLE VII - ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF
CLAIMS OR EQUITY INTERESTS ..............................................................................................28
7.01  Classes Entitled to Vote .............................................................................................28
7.02  Class Acceptance Requirement ..................................................................................28
7.03  One Vote Per Holder ..................................................................................................28
7.04  Cramdown ..................................................................................................................28
ARTICLE VIII - EFFECT OF CONFIRMATION ...........................................................................28
8.01  Discharge ...................................................................................................................28
8.02.  Status of Property of the Estate After Confirmation. ...............................................28
8.03  Binding Nature of Plan ..............................................................................................29
8.04  Reliances ....................................................................................................................29
8.05.  Permanent Injunction ...............................................................................................29
8.06  Release ........................................................................................................................29
8.07  Exculpation ................................................................................................................29
ARTICLE IX - POST CONFIRMATION OWNERSHIP AND MANAGEMENT .....................................30
9.01  Ownership ..................................................................................................................30
9.02  Directors ....................................................................................................................30
9.03  Management ...............................................................................................................30
ARTICLE X - MEANS FOR IMPLEMENTATION OF PLAN ............................................................31
10.01  Implementation of the Plan ......................................................................................31
10.02  Sources of Funds for Implementation of the Plan ...................................................31
10.03  Authorization ...........................................................................................................33
10.04  Methodology for Collection and Disbursement under the Plan ..............................33
ARTICLE XI - PROVISIONS GOVERNING DISTRIBUTIONS ........................................................36
11.01  Distribution Responsibility ......................................................................................36
11.02  Payment/Delivery Agents .........................................................................................36
11.03  Date of Distributions ................................................................................................36
11.04  Cash Payment ...........................................................................................................37
11.05  One Distribution Per Holder ....................................................................................37
11.06  Delivery of Distributions ..........................................................................................37
11.07  Time Bar to Cash Payments .....................................................................................37
11.08  Effect of Pre-Confirmation Distributions ...............................................................37
11.09  Prepayment ...............................................................................................................37
ARTICLE XII - POST-CONFIRMATION PROCEDURE .................................................................38
12.01  Conditions Precedent to Effectiveness .....................................................................38
12.02  Dissolution of Committee .........................................................................................38
12.03  Compliance with All Applicable Laws ......................................................................38
12.04  U.S. Trustees Matters ...............................................................................................38
12.05  Compliance with Tax Requirements .........................................................................38
12.06  Application for Final Decree .....................................................................................38
ARTICLE XIII - MODIFICATION OF PLAN ..............................................................................38
ARTICLE XIV - RETENTION OF JURISDICTION ......................................................................39
14.01  Allowance of Claims .................................................................................................39
14.02  Proceedings Related to Executory Contracts and Unexpired Leases. .....................39
14.03  Plan Interpretation ...................................................................................................39
14.04  Plan Implementation ................................................................................................39
14.05  Plan Modification .....................................................................................................39

14.06 **Adjudication of Controversies**.................................................................................39
14.07 **Injunctive Relief** ...........................................................................................................40
14.08 **Interpleader Action** ......................................................................................................40
14.09 **Correct Minor Defects** ................................................................................................40
14.10 **Authorization of Fees and Expense**...........................................................................40
14.11 **Post-Confirmation Orders Regarding Confirmation** .............................................40
14.12 **Final Decree** ..................................................................................................................40
ARTICLE XV - DEFAULT AND OTHER RELATED PROVISIONS ...................................................40
ARTICLE XVI - MISCELLANEOUS PROVISIONS ........................................................................41
16.01 **Request for Relief Under 11 U.S.C. § 1129(b)**.........................................................41
16.02 **Revocation**....................................................................................................................41
16.03 **Effect of Withdrawal or Revocation** .........................................................................41
16.04 **Due Authorization by Creditors.**...............................................................................41
16.05 **Entire Agreement** ........................................................................................................41
16.06 **Section 1146 Exemption**..............................................................................................41
16.07 **Governing Law** .............................................................................................................41
16.08 **Post-Confirmation Noticing**.......................................................................................41
16.09 **Prohibition Against Discriminatory Treatment of the Debtor** ..............................42

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| **FIRED UP, INC.** | § | **CASE NO. 14-10447-tmd** |
| | § | **(Chapter 11)** |
| **Debtor.** | § | |

## DEBTOR AND THE UNSECURED CREDITORS COMMITTEE'S PLAN OF REORGANIZATION DATED SEPTEMBER 30, 2014

### ARTICLE I
### DEFINITION AND USE OF TERMS

1.01     **Defined Terms.**  Unless the context otherwise requires, capitalized terms shall have the meanings set forth in this Section 1.01.

1.01.01          **Abilene Property** means the real property located at 4157 Buffalo Gap Road in Abilene, Texas, out of which Debtor operated its Store No. 102 until December of 2013.

1.01.02          **Administrative Expense Claim** means any right to payment constituting a cost or expense of administration of the Case of the Debtor of the kind specified in § 503(b) and entitled to priority pursuant to §§ 507(a)(2) or 507(b), including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate and operating the businesses of the Debtor; (ii) Fee Claims; (iii) all fees and charges assessed against the Estate pursuant to 28 U.S.C. §§ 1911-1930 or the Bankruptcy Rules; and (iv) all obligations designated as Administrative Expense Claims pursuant to an order of the Bankruptcy Court.

1.01.03          **Administrative Expense Claims Bar Date** means, for any Administrative Claim, the date which is six (6) weeks (forty-day (42) days) after the Effective Date or such earlier deadline that has been or may be set by order of the Bankruptcy Court, for filing a request for allowance of such Administrative Claim and Fee Claims.

1.01.04          **Administrative Tax Claim** means a Claim by a governmental unit for taxes (including interest or penalties related to such taxes) for any tax year or period, all or a portion of which occurs or falls within the period from and including the Petition Date through the Effective Date.

1.01.05          **Ad Valorem Tax Claim** means the amount due by the Debtor for personal or real property taxes at the time the case was filed.

1.0106 **Affiliates** of a natural person refers to and includes his or her employees, agents, attorneys, legal representatives, spouse or partner, heirs, executors, and administrators, and their permitted successors and assigns. "Affiliates" of an entity refers to and includes its past and present parents, subsidiaries and affiliates, and their respective past and present officers, directors, shareholders, partners, agents, employees, attorneys and legal representatives, and their respective predecessors, heirs, executors, and administrators, and their permitted successors and assigns.

1.01.07 **Allowed** means when used with respect to a Claim or Equity Interest, (i) a Claim that has been scheduled by the Debtor in its Schedules as other than disputed, contingent or unliquidated that has not been superseded by a filed Proof of Claim and as to which the Debtor, GUC Trustee, or any other party in interest has not filed an objection on or before twenty-six (26) weeks (one hundred-eighty-two (182) days) after the Effective Date (unless such date is extended, for cause, by the Bankruptcy Court upon request of the Reorganized Debtor or the GUC Trustee); (ii) (A) any Claim (or portion thereof) that is set forth in a timely filed Proof of Claim or Interest as to which no action to dispute, deny, equitably subordinate or otherwise limit recovery with respect thereto, or alter priority thereof, has been filed within the earlier of the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or order of the Bankruptcy Court; (B) is otherwise consented to be deemed allowed by the Debtor (for Claims in Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and 15) and the GUC Trustee (for Claims in Classes 11, 12, 13, and); or (C) for which an Order is entered by the Court allowing such Claim or Equity Interest.

1.01.08 **Allowed Priority Tax Claim** means Allowed Claims under 11 U.S.C. § 507(a)(8).

1.01.09 **Allowed Priority Non-Tax Claim** means Allowed Claims under section 11 U.S.C. §§ 507(a)(1) through (7).

1.01.10 **Allowed Secured Claim** means an Allowed Claim secured by a lien, security interest or other charge or interest in property in which the Debtor has an interest, to the extent of the value thereof as determined in accordance with 11 U.S.C. § 506(a).

1.01.11 **Ballot** means the document approved by the Bankruptcy Court for voting on the Plan and for holders of Classes of Impaired Claims to elect acceptance or rejection of the Plan in accordance with the Plan and any voting instructions approved by the bankruptcy Court.

1.01.12 **Bankruptcy Code** or **Code** means the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

1.01.13 **Bankruptcy Court** means the United States Bankruptcy Court for the Western District of Texas, or such other Court that may have jurisdiction with respect to Debtor's chapter 11 case, including the United States District Court for the Western District of Texas to the extent reference of the chapter 11 case is withdrawn.

1.01.14 **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure, as amended, promulgated under 28 U.S.C. § 2075, and the Local Rules of the Bankruptcy Court of the Western District of Texas, as may be applicable from time to time to the Debtor's Chapter 11

case.

1.01.15    **Bar Date** means July 28, 2014, and September 23, 2014, the dates established by the Bankruptcy Court in this case for non-governmental and governmental units respectively to file a proof of claim or proof of interest with the Bankruptcy Court.

1.01.16    **Beneficiaries** means, collectively, the holders of Allowed Claims that are classified in Classes 11, 12, 13 and 14 of the Plan or claims in other classes that are designated to be paid *in pari passu* with the claims in Class 12.

1.01.17    **Business Day** means any date except Saturday, Sunday any "legal holiday" as defined in Fed. R. Bankr. P. 9006(a) or any other days on which commercial banks in Austin, Texas are authorized by law to be closed for business.

1.01.18    **CIII**   or **Creed Ford** means Creed Ford III, the current President and CEO of the Debtor as well as the holder individually of 6,174,840 shares or 51.14% percent of the current equity of the Debtor.

1.01.19    **CIV** means Creed Ford IV, the son of Creed Ford III and a minority shareholder in the Debtor, who is a principal in Pictoric, a company in which he holds fifty percent (50%) of the equity and which provides marketing and social media services to the Debtor.

1.01.20    **CIK** means Carino's Italian Kitchen, Inc., a Delaware corporation wholly owned by Kona Restaurant Group, Inc. ("KRG") which was responsible for virtually all the day-to-day operations of the Debtor's restaurants until February 26, 2014, when it was merged into KRG in Delaware.

1.01.21    **Case** means the above-styled and referenced chapter 11 bankruptcy case filed in this Court.

1.01.22    **Claim** means (i) any right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured;  (ii) any right to an equitable remedy for breach of performance of such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured; or (iii) rights, demands, debts, liabilities, controversies, and causes of action of any and every character, whether known or unknown, asserted or unasserted, liquidated or unliquidated, accrued or unaccrued, mature or unmatured, at law or in equity, whether originally possessed or owned or acquired by contractual or legal assignment or subrogation, whether in contract, in tort, or under statute, regulation or other law or legal principle or theory, including without limitation Claims for economic loss, lost profits, loss of capital, emotional distress, mental anguish, personal injuries, injury or damage to tangible or intangible personal property or to real property, and all other claims for actual, consequential, special or punitive damages in the present or in the future, arising at any time from the beginning of time through and including the confirmation of Effective Date of the Plan.

3

1.01.23     **Claimant** means any person or entity having or asserting a Claim in this Case.

1.01.24     **Class** or **Classes** mean all of the holders of Claims or Equity Interests that the Debtor and the Committee have designated pursuant to 11 U.S.C. § 1123(a)(1) as having substantially similar characteristics as described in Article IV of this Plan.

1.01.25     **Committee** means the Official Unsecured Creditors Committee in this case which was appointed by the Office of the United States Trustee on or about April 8, 2014.

1.01.26     **Company Stores** means those Carino's Italian restaurants owned and operated by the Debtor.

1.01.27     **Comptroller** means the Texas Comptroller of Public Accounts, which is responsible, *inter alia,* for the collection of sales, mixed beverage and franchise taxes for the State of Texas.

1.01.28     **Confirmation Date** means the date on which the Bankruptcy Court enters a Confirmation Order confirming Debtor's Plan.

1.01.29     **Confirmation Order** means the order confirming the Plan pursuant to 11 U.S.C. §1129.

1.01.30     **Contested** when used with respect to a Claim means a Claim against the Debtor that is not an Allowed Claim.

1.01.31     **Creditor** shall have the meaning specified by 11 U.S.C. § 101(9) of the Code.

1.01.32     **Creditor Default** means any actions taken by a creditor of the debtor in violation of this Plan.

1.01.33     **Cure Claim** means the amount agreed by the parties  or found by the Court to be necessary to cure any default or arrearage, together with the amount necessary to compensate for damages suffered as a result of such default or arrearage, on an unexpired lease or executory contract which has been assumed pursuant to 11 U.S.C. § 365, which Cure Claim shall be paid on the Effective Date or such other date as may be mutually agreed by the Debtor and the counterparty to such unexpired lease or executory contract..

1.01.34     **Debtor** means Fired Up, Inc., the Debtor and Debtor-in-Possession in the instant case and the Debtor post-confirmation, depending on the context.

1.01.35     **Disclosure Statement** means the Disclosure Statement prepared by the Debtor relating to its Chapter 11 case, as amended, modified or supplemented from time to time in accordance with the Code and Bankruptcy Rules.

1.01.36     **Disputed Claim** means any Claim as to which the Debtor or any other party in interest has interposed a timely objection or request for estimation in accordance with

the Code and the Bankruptcy Rules, which objection or request for estimation has not been withdrawn or determined by Final Order.

1.01.37 **Effective Date** means the first day of the second full month after the Order confirming Debtor's Plan becomes a Final Order provided the following conditions have been met: (i) there is a Final Order of confirmation and (ii) the GUC Trust is funded with the GUC Trust Assets.

1.01.38 **Equity Interest** means a pre-petition equity interest held by an individual or entity holding shares of stock in the Debtor.

1.01.39 **Estate** means the legal entity created to administer the property of the Debtor by the commencement of the Chapter 11 Case pursuant to 11 U.S.C. § 541 with respect to the Debtor.

1.01.40 **Exit Financing** means those sums originating from sources other than the Debtor in the form of loans and payment of the Allowed Claim of GE Capital Franchise Corporation or New Value to be used, at a minimum, for the Initial Funding of the GUC Trust which shall be used to pay Class 11, 12, 13 and 14 creditors under this Plan.

1.01.41 **Exculpated Parties** means each of the following in their capacity as such: (a) the Debtor (b) the Committee; (c) the GUC Trustee (as defined herein); (d) the Oversight Committee (as defined herein), and with respect to each of the foregoing entities, such entity's current equity holders (including, but not limited to shareholders, partnership interest holders, and limited liability company unit holders), affiliates, partners, subsidiaries, members, officers, directors, managers serving on a board of managers, principals, employees, agents, advisors, attorneys, accountants, consultants, representatives, and other professionals, together with their respective predecessors, successors, and assigns (in each case, solely in their capacity as such).

1.01.42 **Fee Claim** means a Claim under 11 U.S.C. §§330 or 503 for allowance of compensation and reimbursement of expenses to professionals in the Debtor's Case.

1.01.43 **Filed** means delivered to the Clerk of the Bankruptcy Court.

1.01.44 **Final Order** means an order or judgment entered by the Bankruptcy Court or any other court exercising jurisdiction over the subject matter and the parties as to which the time to appeal has expired and as to which a stay pending appeal has not been granted.

1.01.45 **Ford Family** means collectively Creed Ford III, Lynn Ford, Harper Ford Rehme, Creed Ford IV, any spouses, children or siblings of said individuals and those entities in which any of the foregoing individually or together own a controlling interest (including, but not limited to FRG Capital, LLC), and any affiliates, partners, subsidiaries, members, officers, directors, managers serving on a board of managers, principals, employees, agents, advisors, attorneys, accountants, consultants, representatives, and other professionals, together with their respective predecessors, successors, and assigns (in each case, solely in their capacity as such).

1.01.66 **Franchise Store** means a Carino's Italian restaurant owned and operated by a franchisee or licensee of the Debtor under a franchise or license agreement.

      1.01.47       **FUI** means Fired Up, Inc., the Debtor and Debtor-in-Possession in the instant case.

      1.01.48       **GE Capital** means GE Capital Business Asset Funding, the holder of five outstanding notes executed by both KRG and FUI with GE Capital Franchise Finance Corporation, three of which were secured by the buildings constructed by Debtor for three of its Company Stores with the proceeds of these loans and two of which were purchase money security interests for the furniture, fixtures and equipment purchased to outfit

      1.01.49       **General Unsecured Claim** or **GUC** means a Claim that does not have the benefit of Collateral to secure its repayment and is not entitled to priority under 11 U.S.C. § 507(a).

      1.01.50       **GUC Trust** means the trust established as part of this Plan for the purpose of collecting, holding, administering, distributing, and liquidating Trust Assets for the benefit of all creditors of the Debtor with unsecured claims as of the Petition Date with Allowed Claims, except those specifically excluded.

      1.01.51       **GUC Trust Agreement** means that Agreement executed as part of the implementation of this Plan which establishes the rights and responsibilities of the parties affected by the Trust and governs the administration of same.

      1.01.52       **GUC Trust Assets** means the Initial Funding, the Top-Up Funding (if any) and all causes of action of the Debtor arising under 11 U.S.C. § 547 except those against creditors who have continued to do business with the Debtor.

      1.01.53       **GUC Trustee** means the individual or entity designated to marshal the assets to be transferred to the Trust under the Plan, manage the GUC Trust, and distribute the assets to the Beneficiaries of the Trust as set forth in the Plan and the GUC Trust Agreement.

      1.01.54       **Impaired** means the treatment of an Allowed Claim pursuant to the Plan *unless,* with respect to such Claim, either (a) the Plan leaves unaltered the legal, equitable and contractual rights to which such Claim entitles the holder of such Claim or (b) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim to demand or receive accelerated payment of such Claim after occurrence of a default, the Debtor (i) cures any default that occurred before or after the commencement of the Case on the Petition Date, other than default of the kind specified in 11 U.S.C. § 365(b)(2), (ii) reinstates the maturity of such Claim as such maturity existed before such default, (iii) compensates the holder of such Claim for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law, and (iv) does not otherwise alter the legal, equitable or contractual rights to which such Claim entitles the holder of such Claim; or (c) the Plan provides that on the Effective Date the holder of such claim receives, on account of such Claim, cash equal to the Allowed Amount of such Claim.

      1.01.55       **Independent** means Independent Bank, a creditor with both unsecured and secured pre-petition claims against the Debtor.

1.01.56 **Initial Funding** means the amount to be transferred to the GUC Trust on or before the Effective Date of the Plan from the Debtor or its New Investors.

1.01.57 **KRG** means Kona Restaurant Group, Inc., a Delaware corporation, which wholly owned Carino's Italian Kitchen ("CIK") and was wholly owned by Debtor until February 26, 2014, when it was merged into the Debtor, a Texas corporation.

1.01.58 **Lease Cure Claim** means any Claim arising under or relating to any of the executory contracts or unexpired leases to which the Debtor was a party on the Petition Date and which is assumed pursuant to the Plan (including, without limitation, any Claim of breach of or default under such contract) and required to be paid in accordance with 11 U.S.C. § 365(b),

1.01.59 **Lease Rejection Claim** means the claim of a lessor under 11 U.S.C. § 502(b)(6).

1.01.60 **Lien** shall mean a contractual or statutory lien against an interest of the Debtor in real or personal property.

1.01.61 **Market Rate of Interest** means an interest rate sufficient to provide the present value of a claim pursuant to 11 U.S.C. sections 1129(a)(9) or 1129(b) as may be appropriate. A Market Rate of Interest shall be the prime rate effective on the Confirmation Date plus 1% unless the parties agree on another rate or the Court determines otherwise with regard to a specific Class of Claims.

1.01.62 **Net Distributable GUC Trust Assets** means, except as provided under the GUC Trust, the net proceeds of the GUC Trust Assets after paying, reserving for or satisfying, among other things, the operating and administrative expenses of the GUC Trust, including but not limited to all costs, expenses, and obligations incurred by the GUC Trustee (or professionals who may be employed by the GUC Trustee in administering the GUC Trust) in carrying out the GUC Trustee's responsibilities under the Plan and the GUC Trust Agreement, or in any manner connected, incidental or related thereto.

1.01.63 **New Capital** means that portion of the Initial Funding from third parties other than loans which shall be used for the Initial Funding of the GUC Trust and payment to GE Capital under this Plan and for which the individuals or entities contributing said sum(s) may receive equity in the Debtor.

1.01.64 **New Investors** means those individuals or entities contributing New Capital under this Plan.

1.01.65 **Oversecured Claim** means a Secured Claim which is secured by property which is valued at more than the amount of the Secured Claim. An Oversecured Claim shall be entitled to receive post-petition interest at the non-default contract rate and may also receive post-petition fees and costs if authorized by a contract.

1.01.66 **Oversight Committee** means that group of individuals selected to supervise the operations of the GUC Trustee and the GUC Trust.

1.01.67 **Person** means an individual, partnership, or corporation, but does not include a governmental unit unless the government unit acquires an asset as a result of operation of a loan guarantee agreement, or as receiver or liquidating agent, in which case such governmental unit shall be considered a person for purposes of 11 U.S.C. § 1102.

1.01.68 **Petition Date** means March 27, 2014, the date on which the Debtor filed its petition for relief in this Case under the Bankruptcy Code.

1.01.69 **Plan** means the Plan of Reorganization filed on September 30, 2014, as it may be amended, modified, or supplemented by the Debtor and the Unsecured Creditors Committee from time to time thereafter as permitted herein and by the Bankruptcy Court.

1.01.70 **Plan Agent** means the Debtor or any other person approved by the Court as of the Effective Date of the Plan to effectuate the Plan as confirmed for the benefit of all Claimants except with respect to those General Unsecured Claims in Classes 11, 12, 13 and 14 in which case the Plan Agent shall mean the GUC Trustee.

1.01.71 **Plan Proponents** means the Debtor and the Committee.

1.01.72 **Plan Supplement** means the compilation of documents and forms of documents, schedules and exhibits to the Plan, if any, to be filed by the Plan Proponents on or prior to the Plan Supplement Filing Date.

1.01.73 **Plan Supplement Filing Date** means the date on which the Plan Supplement, if any shall be filed with the Bankruptcy Court which date shall be at least ten (10) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice.

1.01.74 **Pre-Petition** means prior to the Petition Date.

1.01.75 **Priority Creditor** means a Creditor whose Claim is entitled to Priority under 11 U.S.C. § 507.

1.01.76 **Priority Non-Tax Claim** means a Claim arising under 11 U.S.C. §§ 507(a)(1) through (7).

1.01.77 **Priority Tax Claim** means a Claim arising under 11 U.S.C. § 507(a)(8).

1.01.78 **Property of the Estate** means all property in which the Debtor holds a legal or an equitable interest, including all property described in 11 U.S.C. § 541.

1.01.79 **Pro-Rata** means proportionately, based on the percentage that the amount of an Allowed Claim within a particular Class bears to the aggregate amount of all Allowed Claims in such Class.

1.01.80 **Prosperity** means Prosperity Bank, a secured creditor of the Debtor with a lien against the Abilene Property and all the personalty located in same and the financial institution holding all of Fired Up, Inc.'s debtor-in-possession accounts.

1.01.81	**Rejection Claim** means any Claim arising pursuant to 11 U.S.C. § 502(g) by reason of rejection by the Debtor of an executory contract or unexpired lease pursuant to 11 U.S.C. § 365 or 1123(b)(2).

1.01.82	**Released Parties** means the Debtor, the  Ford Family, FRG Capital, LLC, and such entities' current equity holders (including, but not limited to shareholders, partnership interest holders, and limited liability company unit holders), affiliates, partners, subsidiaries, members, officers, directors, managers serving on a board of managers, principals, employees, agents,  advisors, attorneys, accountants,  consultants, representatives, and other professionals, together with their respective predecessors, successors, and assigns (in each case, solely in their capacity as such.

1.01.83	**Reorganized Debtor** means the Debtor on or after the Effective Date.

1.01.84	**Secured Creditor** or **Secured Claimant** means Claimants holding an Allowed Claim secured by property of the Estate, which Claim is equal to the lesser of (i) the Allowed amount of such Claim, or (ii) the value of the Collateral.

1.01.85	**Secured Claim** means a Claim secured by a lien, security interest or other charge or interest in property in which the Debtor has an interest, to the extent of the value thereof as determined in accordance with 11 U.S.C. § 506(a).

1.01.86	**Substantial Consummation** means the first date upon which substantially all property intended to be transferred under the Plan is transferred to the Reorganized Debtor, management of the Reorganized Debtor is assumed by the management of the Reorganized Debtor proposed under the Plan, and distributions of money or property to creditors contemplated under the Plan begin.  Substantial Consummation shall not require that all or substantially all distributions under the Plan be completed, but merely that those distributions commence.

1.01.87	**Top-Up Funding** means any sums that may be required under the Plan to be transferred to the GUC Trust by the Debtor through Exit Financing or otherwise or New Capital after the Initial Funding.

1.01.88	**Voidable Transfer** means all transfers voidable under 11 U.S.C. §§ 544, 545, 547, 548, 549 and/or 550 or any other state or federal law permitting the avoidance of transfers of property.

1.01.89	**Voting Deadline** means 5:00 (prevailing Central time) on November ___, 2014.

1.02	**Number and Gender of Words.**  Whenever the singular number is used, it shall include the plural, and the plural shall include the singular, as appropriate to the context.  Words of any gender shall include each other gender where appropriate.

1.03    **Terms Defined in the Bankruptcy Code.**  Capitalized terms not specifically defined in Section 1.01 of the Plan shall have the definitions given those terms, if applicable, in the Bankruptcy Code.

1.04    **Headings**.  The headings and captions used in the Plan are for convenience only and shall not be deemed to limit, amplify or modify the terms of this Plan nor affect the meaning thereof.

1.05    **Interpretation.**  Unless otherwise specified, all section, article, and schedule references in this Plan are to the respective section in, article of, or schedule to this Plan, as the same may be amended, waived, or modified from time to time.  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Words denoting the singular number shall include the plural number and vice versa, and words denoting one gender shall include the other gender.

1.06    **Time Computation**.  In computing any time prescribed herein the provision of Fed. R. Bankr. P. 9006(a) shall apply.

# ARTICLE II
## PROVISIONS APPLICABLE TO ALL CLAIMS

2.01    **Treatment of Claims.**  This Plan is intended to treat and resolve all Claims against the Debtor and/or property of the Debtor of whatever character, whether contingent or liquidated, or whether allowed by the Bankruptcy Court pursuant to 11 U.S.C. § 502(a) as more specifically provided, *inter alia,* in Article IV of the Plan. Only Allowed Claims will be entitled to a distribution under the Plan.  The Plan is designed to insure that Claimants shall receive at least as much pursuant to this Plan as they would receive in a liquidation pursuant to chapter 7 of the Bankruptcy Code

2.02    **Allowed Claims**.  To receive a distribution under the Plan, a Creditor must have an Allowed Claim.

2.03    **Amount of Claims**.  If the Debtor has scheduled a Claim and has not indicated that such Claim is disputed, contingent, or unliquidated or subsequently files an objection to a Claim, then the amount scheduled by the Debtor shall control unless the Creditor files a Proof of Claim in a different amount.  If a creditor files a Proof of Claim, then the amount stated in the Proof of Claim shall control unless the Debtor or the GUC Trustee, as the case may be, files an objection to the Proof of Claim. If an objection to a Claim is filed, then the amount determined by the Court in a Final Order shall control.  As of the Effective Date except as otherwise provided in the Plan (i) with respect to Claims and Equity Interests identified in sections 4.01 through 4.10, 4.14 and 4.15 of the Plan, Classes 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 14 and 15, only the Debtor shall be permitted to file an objection to a Proof of Claim or a scheduled claim (by amending the schedules up to the Effective Date to the extent such scheduled claim is not disputed, contingent or unliquidated); and (ii) with respect to Claims identified in section 4.11 through 4.14 of the Plan, only the GUC Trustee shall be permitted to file an objection to a Proof of Claim or scheduled Claim in Classes 11, 12, 13 and 14.  Notwithstanding the foregoing,

Debtor and the GUC Trustee may agree to permit the other to file an objection in a class to which objections are limited to the other.

2.04    **Allowance of Post-Petition Interest, Fees and Costs**.    Unless otherwise provided, a Claim shall not be entitled to post-petition interest, fees or costs.    Neither the Reorganized Debtor nor the GUC Trustee, as applicable, shall be required to make specific objection to proofs of claim that allege a right to recover post-petition interest, penalties, fees and other accruals with respect to prepetition claims which are prohibited under 11 U.S.C. §502, and any claim amounts attributable to such post-petition interest, penalties, fees and other accruals shall be disallowed in full upon entry of the Confirmation Order.  Notwithstanding the foregoing, an Oversecured Claim shall be entitled to interest at the non-default contract or statutory rate from the date of the Petition until the Confirmation Date.  An Oversecured Claim arising under a contract shall be entitled to post-petition fees and costs if the contract so provides and if an application for allowance of post-petition fees and costs is timely filed and approved by the Court by a Final Order.  (A Claim may be determined to be an Oversecured Claim if so designated by the Plan or if determined by the Court by a Final Order.)  Any requests for allowance of post-petition fees or costs pursuant to 11 U.S.C. § 506(b) shall be filed within twenty-eight (28) days after the Effective Date or shall be barred.

2.05    **Filing of Claims Arising From Rejection of Unexpired Leases or Executory Contracts**.  Any Claims arising from the rejection of unexpired leases or executory contracts shall be filed by the date specified in the order rejecting such lease or contract.  If no date is specified, the date for filing a rejection claim shall be the later of (a) the general claims bar date of July 28, 2014 previously fixed in this case or (b) twenty-eight (28) days after service of any order approving the rejection of a lease or other executory contract as per the Bankruptcy Court's Order entered June 10, 2014 [Dkt. No. 255].

2.06    **Filing of Administrative Expense Claims**.  Any requests for allowance of Administrative Expense Claims (including Fee Claims) which are not specifically listed as undisputed or are listed without an amount and any requests for payment of Fee Claims shall be filed within six (6) weeks (forty-two (42) days) after the Effective Date or shall otherwise be barred.

2.07    **Filing of Cure Claims**.  Any Cure Claims shall be filed within four (4) weeks (twenty-eight (28) days) after the Effective Date or shall be barred unless otherwise agreed by the parties.

2.08    **Filing of Claims Arising from Avoidable Transfers.**  A person who is found to have received a voidable transfer shall have four (4) weeks (twenty-eight (28)) days following the date from which the order ruling that such transfer is avoidable or approving the settlement of a suit on an avoidable transfer becomes a Final Order in which to file a Claim in the amount of the settlement or the avoided transfer, whichever is less.

2.09    **Filing of Contingent Claims.**  Any claim relating to contribution or indemnity against the Debtor which is contingent as of the Effective Date shall not be allowed unless:  (a) the party makes a payment which gives rise to a right of contribution after the Effective Date; and (b) files a proof of claim by the Bar Date.

2.10    **Objections to Claims.**    Except as may otherwise be provided in this Plan or agreed to by the Debtor and the Committee in writing, only the GUC Trustee with respect to Classes 11, 12, 13, and 14 and the Debtor with respect to all other Classes and Class 14 may object to the allowance of a Claim.  Objections to the allowance of a Pre-Confirmation Claim must be made prior to twenty-six (26) weeks after the Effective Date or after such claim is filed, whichever is later; *provided, however,* that this period of time for the Debtor and the GUC Trustee may be extended by Order of the Bankruptcy Court without notice or a hearing. Additionally, the Reorganized Debtor and the GUC Trustee may object to any claim or move to intervene in any claim objection filed by the other if the particular Claim and the object thereto will impact the classes for which the other is responses for payment. Any Proof of Claim filed after the bar date(s) set by the Court shall be of no force and effect and shall be deemed disallowed.  Subject to the preceding sentences in this section, all Disputed Claims shall be litigated to Final Order by the Debtor or the GUC Trustee, as the case may be, and any settlement of a Disputed Claim shall not require approval of the Bankruptcy Court but shall require approval of the other to the extent there is an impact on a class for which the other is responsible for payment.

2.11    **Estimation of Claims.**  Upon timely motion made pursuant to Fed. R. Bankr. P. 3018, the Court shall estimate the amount of any disputed claim for the purposes of determining feasibility or any other issue relevant to confirmation of the Plan.

2.12    **No Distributions Pending Allowance**.  Disputed Claims shall not receive distributions until such time as the claim becomes an Allowed Claim.

2.13    **Interest on Disputed Claims**.  No interest shall accrue on a Disputed Claim during the period from the Effective Date until the date on which the claim is Allowed, if ever.

2.14    **Payment Dates for Claims to be Paid by the Debtor**.  Unless otherwise specified, all payments under the Plan to be paid by the Debtor with respect to Allowed Claims shall be due on the 16th day of the month.  The first payments under the Plan shall be due on the first payment date which is at least fifteen (15) days after the Effective Date.

2.15    **Purchased Claims**.  Subject to complying with applicable laws and rules of procedure, the classification of any Claim purchased by any Person shall not change the classification of such Claim.

2.16    **Third Party Obligations.  To the extent that any third party is jointly liable with the Debtor upon a Claim, whether by contract or by operation of law (including, but not limited to, a judgment), such obligation shall remain in force with respect to the Claim as modified by this Plan but not otherwise. (To the extent that a Claim is classified in more than one class, the liability of the third party shall extend to the obligations under each applicable class.)  All guarantees and other obligations shall be deemed modified to reflect the restructuring of the primary obligations under this Plan.  If the Plan is confirmed, a creditor may not enforce liability under a guaranty or other third party claim unless the Debtor defaults under the Plan.  In the event of default, only the amount owing under the Plan shall be recovered from the guarantor.  This provision is intended to apply even to creditors who had previously recovered judgments against the guarantor.  The affected**

**third party may agree to waive this provision by agreement signed in writing prior to the Effective Date.**

2.17 **Surrender of Collateral.** Wherever the Plan provides for surrender of collateral, it shall be the responsibility of the applicable secured creditor to make arrangements to take possession of such collateral from the Debtor at the expense of the secured creditor. Any such efforts shall be coordinated with the Debtor so as to minimize disruption to the Debtor's business. If any creditor shall fail to contact the Debtor to arrange to take possession of its collateral prior to twenty-eight (28) days after the Effective Date or shall fail to take actual possession within fifty-six (56) days from the Effective Date, such creditor shall waive its right to take possession of the collateral and the Debtor shall be entitled to retain such collateral free and clear of all liens and claims unless the parties agree to extend such deadline.

2.18 **Section 1111(b) Election.** Any election under Section 1111(b) shall be made in writing and shall be filed with the Court by the date of the hearing upon Debtor's Disclosure Statement. Debtor reserves the right to object to any Section 1111(b) election by a creditor whose collateral is of inconsequential value. In the event that a creditor makes a Section 1111(b) election which is not objected to, the Debtor shall continue to make the payments provided for in the specific class applicable to the creditor until such time as the total payments made equal the Allowed Claim of the creditor without post-petition interest, fees or costs. In the event that the creditor makes a Section 1111(b) election, its claim shall be deemed to be fully secured and the creditor shall not have an unsecured claim.

2.19 **Valuation of Assets.** Debtor's valuation of its assets shall control for purposes of this Plan, unless a Creditor files a Motion for Valuation contesting same within fourteen (14) days after entry of the Order approving the Disclosure Statement.

**ARTICLE III**
**CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS;**
**IDENTIFICATION OF IMPAIRED CLASSES**

3.01 **Creation of Classes; Impairment**. The Debtor creates the following classes for purposes of organization only with respect to Administrative Claims and Priority Tax Claims; and for purposes, of organization, voting, and all confirmation matters with respect to other Claims and Equity Interests in the Debtor as follows:

| | |
|---|---|
| Class 1 | Allowed Administrative Claims |
| Class 2 | Allowed Non-Tax Priority Claims |
| Class 3 | Allowed Claims of the Internal Revenue Service |
| Class 4 | Allowed Claims of State and Local Taxing Authorities—Non-*Ad Valorem* Tax Claims |
| Class 5 | Allowed Claims of Local Taxing Authorities—*Ad Valorem* Tax Claims |
| Class 6 | Claims of GE Capital Franchise Finance Corporation |
| Class 7 | Allowed Claim of Prosperity Bank |
| Class 8 | Allowed Secured Claim of Independent Bank |
| Class 9 | Allowed Claim of FRG Capital, LLC |

| | |
|---|---|
| Class 10 | Allowed Unsecured Personal Injury and Employment-Related Claims |
| Class 11 | Allowed Convenience Claims |
| Class 12 | Allowed General Unsecured Claims |
| Class 13 | Allowed Unsecured Lease Rejection Claims |
| Class 14 | Contingent Claims |
| Class 15 | Equity Interests |

Of the foregoing, only Classes 1, 2, 7, and 15 are not impaired; all other classes are impaired under this Plan.

3.02   **Elimination of Classes**.   Any class that is not occupied as of the date of the hearing on confirmation of this Plan by an Allowed Claim or a claim temporarily allowed pursuant to Fed.R.Bankr.P. 3018 shall be deemed deleted from this Plan for purpose of voting on acceptance or rejection of this Plan and for the purpose of determining whether this Plan has been accepted by such class pursuant to 11 U.S.C. § 1129.

3.03   **Impairment Controversies**.   If a controversy arises as to whether any Claim or Equity Interest, or any class of Claims or class of Equity Interests, is impaired under this Plan, such class shall be treated as specified in this Plan unless the Bankruptcy Court shall determine such controversy upon motion of the party challenging the characterization of a particular Claim or Equity Interest under this Plan.

**ARTICLE IV**

**CLASSIFICATION AND**
**TREATMENT OF CLASSES UNDER THE PLAN**

4.01   **Class 1—Allowed Administrative Expense Claims.**[1]

    (a)    Class 1 consists of all Administrative Expense Claims (including, but not limited to, those arising under 11 U.S.C. § 503(b)(9).

    (b)    Unless otherwise agreed or as set forth herein as a result of a prior agreement, each holder of an Allowed Administrative Expense Claim other than recurring vendor claims and tax claims that come due in the ordinary course of business shall be paid the amount of its Allowed Administrative Expense Claim on the later of the Effective Date or within seven (7) days after the date that a Final Order is entered approving the Administrative Expense Claim, unless otherwise agreed to by and between the Debtor and the holder of such claim.

    (c)    Vendor and other current payables qualifying as Allowed Administrative Expense arising in the ordinary course of business shall be paid according to their terms.

---

[1] While administrative and priority claims are usually not "classified", the proponents of the Plan have done so in this case for ease of reference; the "classification" of these claims does not alter the statutory rights of such claimants under the Bankruptcy Code.

(d)     No Administrative Expense claims, except for vendor claims arising in the ordinary course of business as well as U.S. Trustee's Fees, shall be paid except as approved by Court Order. Proofs of claim asserting putative Administrative Expense Claims, even if not objected to, shall not be sufficient to constitute approval of an Administrative Expense Claim.

(e)     Allowed Fee Claims incurred through confirmation only by professionals retained by the Debtor will be paid upon the entry of an Order by the Bankruptcy Court approving same with such fees to be paid on the later of the Effective Date or within seven (7) days after entry of a Final Order approving said Claims, unless the parties agree to a later date. The Reorganized Debtor shall be responsible only for the professional's fees incurred by the Debtor's professionals after confirmation.

(f)     Allowed Fee Claims incurred through confirmation by all professionals retained by the Committee will be paid upon the entry of an Order by the Bankruptcy Court approving same from and by the GUC Trust on the later of the Effective Date or within seven (7) days after entry of a Final Order approving such Fee Claims. Committee Professionals shall also look to the GUC Trust only for fees they incur after confirmation.

(g)     Claims for United States Trustee's fees will be paid by the Debtor as they come due, both before and after the Effective Date.

(h)     Except for payment of the Allowed Fee Claims of Committee professionals and any reimbursement of expenses incurred after confirmation by Committee member, which shall be payable from the GUC Trust, the Reorganized Debtor is solely responsible for payment of all Allowed Class 1 Claims.

(i)     Class 1 is not impaired.

4.02    **Class 2—Allowed Non-Tax Priority Claims.**

(a)     Class 2 consists of Allowed Non-Tax Priority Claims under 11 U.S.C. § 507(a). The only Claims falling into this Class as of the Petition Date were those for Wages, Salaries and Commissions pursuant to 11 U.S.C. §§ 507(a)(4) and (5)(collectively, "Prepetition Employee Claims").

(b)     *Pre-Petition Employee Claims* owed on Petition Date, except as set forth below, were fully paid to all employees other than insiders pursuant to a Bankruptcy Court Order entered on April 3, 2014. To the extent any Prepetition Employee claims were not paid or paid less than the amount owed and are filed and allowed (if not scheduled or disputed), the amount of each Allowed Prepetition Employee Claim in this class shall be paid by the Debtor on the later of the Effective Date or seven (7) days after the entry of a Final Order allowing said Claim.

(c)     *Accrued Vacation, Severance or Sick Leave* (collectively, "Employee Vacation Claims:)") earned and owed as of the Petition Date were not paid pursuant to the Bankruptcy Court's Order of April 3, 2014. Employee Vacation Claims have been and will continue to be paid and or otherwise honored by the Debtor in the ordinary course of business according to the Debtor's pre-petition practices and procedures.

15

(d)  *Employee Programs.* Employee Programs ("Employee Program Claims") include, but are not limited to Claims arising from medical, dental, life and disability insurance, 401(k) investment programs and workers' compensation programs. The Bankruptcy Court's Order of April 3, 2014, allowed Debtor to continue its Employee Programs and to collect and distribute any and all pre-petition amounts attributable to its 401(k) Plan. To the extent Debtor discovers any shortfalls of any type with respect to these programs or any of its providers file claims giving rise to Employee Program Claims, any such amounts shall be paid by the Debtor on the later of the Effective Date or seven (7) days of the Final Order on a particular Claim.

(e)  *Other Employee Claims.* As of the Petition Date, there were two Employee Claims pending against the Debtor ("Miscellaneous Employee Priority Claims"), which Debtor disputes and which constitute Disputed Claims. Neither appears to qualify as a Priority Claim. However, to the extent that a Miscellaneous Employee Claim is tried and Debtor does not prevail or wishes to settle any such Claims, that portion of any judgment against the Debtor that falls into this Class as an Allowed Miscellaneous Employee Claim  shall be paid by the Debtor as an Allowed Priority Non-Tax Claim up to the ceiling set for in 11 U.S.C §§ 507(a)(4) and (5) within seven (7) days after the judgment or order approving the settlement, whichever is appropriate, becomes a Final Order. Any recovery in excess of the ceiling or which falls outside the ambit of 11 U.S.C. §§ 507(a)(4) and (5) shall be classified as a Class 10 Claim and shall be paid *in pari passu* with the treatment afforded other claims in Class 10.

(f)  Class 2 is not impaired.

4.03  **Class 3—Allowed Claims of the Internal Revenue Service.**

(a)  Class 3 consists of all the Allowed Claims of the Internal Revenue Service ("IRS" or "Service"). Said claims are for FUTA (Form 940) taxes owed by the Debtor for 2013 and the employer's portion of WT-FICA (Form 941) taxes for the first quarter of 2014 up to the Petition Date.

(b)  Debtor will pay the allowed priority portion of these claims in the approximate amount of $904,000 over forty-eight (48) months, beginning on the 16th day of the second full month after the Effective Date with interest at 3% per annum. The first forty-seven payments shall be $20,000.00 and the forty-eighth payment shall consist of the remainder owed.

(c)  The allowed general unsecured claim of the Service (approximately $266,000.00) shall be paid as a Class 12 General Unsecured Claims or the Class 11 Convenience Class Creditors, should the Service elect to reduce its claim to be eligible for treatment as a Class 11 Claimant.

(d)  Debtor has remained in tax compliance since the Petition Date. It shall remain in federal tax compliance after the Effective Date. This includes, but is not limited to, timely filing returns, making tax deposits, and paying taxes on the due date. Any failure of it to do so shall constitute a default by the Debtor under this Plan.

16

(e)     The Allowed Priority Tax Claim of the IRS is a non-dischargeable debt, except as otherwise provided for in the Bankruptcy Code or agreed to herein, and, if the Debtor should default, the IRS is no longer subject to the provisions of the Bankruptcy Code and may take actions against the Debtor authorized by applicable non-bankruptcy law to collect said debt.

(f)     Except for payment of the Service's allowed general unsecured claim, the Reorganized Debtor is solely responsible for payment of all Allowed Class 3 Claims.

(g)     Class 3 is impaired.

**4.04    Class 4—Allowed Claims of State and Local Taxing Authorities (Non-*Ad Valorem* Taxes.**

(a)     Class 4 consists of the pre- and post-petition claims of the taxing authorities of the taxing jurisdiction in which Debtor conducts business for one or more of the following taxes:  sales, income, franchise, employment or liquor taxes.

(b)     In particular, Debtor's Schedules reflect a total owed for taxes in this class of $975,159.56. This amount did not reflect certain pre- and post-petition payments on this amount.  Adjusting the amounts initially scheduled with more up-to-date information, Debtor estimates the amount owed as of this date to be approximately $ 343,900.00.

(c)     As of the Effective Date of the Plan, Debtor will be current on all pre- and post-petition filings of any kind due to all Class 4 state and local taxing authorities and will be current in its payments for all post-petition taxes due to these authorities which accrued and have become due post-petition.

(d)     Debtor shall pay Class 4 including interest accruing at 4.25% per annum from the Effective Date in forty-seven (47) monthly installments of $7,804.00 beginning on the 16th day of the second full month after the Effective Date and continuing with an identical amount on the 16th day of each month thereafter with the remainder due on the 16th day of the 48th month.   The Allowed Claims in this class with be paid *pro-rata* based on each taxing authority's Allowed Claim to the total Allowed Claims in the class.  If the claims of the creditors in this class do not qualify and/or are not allowed as a priority claim pursuant to 11 U.S.C. § 507(a)(8)(*e.g.* penalties), they will be paid as Class 12 General Unsecured Creditors or with the Class 11 Convenience Class, if a particular creditor falls in to this Class or elects to reduce its Claim  to qualify for payment as part of said Class.

(e)     To the extent any claim is disputed, payments will begin on the later of the date set forth above or the 16th day of the first full month after the Order Allowing the Claim(s) becomes final and non-appealable; the first payment will bring the allowed claim *in pari passu* with the other creditors in the class and subsequent payments will be made *pro rata* with distributions to the other claims in the class.

(f)     Class 4 Allowed General Unsecured Claims will be paid as Class 12 General Unsecured Claims.

(f)     Class 4 is impaired.

17

4.05    **Class 5—Allowed Claims of Local Taxing Authorities for *Ad Valorem* Property Taxes.**

(a)    Class 5 consists of the Allowed Claims of Local Taxing authorities for all *ad valorem* property taxes for real and personal property owned by the Debtor as of the Petition Date.

(b)    *Pre-Petition Ad Valorem Tax Claims on Business Personal Property.* Debtor is responsible for the *ad valorem* property taxes on its business personal property ("BPP Taxes").    Debtor estimates that it owes $250,750.00 for unpaid BPP Taxes for all tax years through 2014.  This sub-class of taxes will be paid along with interest at the statutory rate for each particular taxing jurisdiction[2] beginning on the 16th day of the second full month after the Effective Date and continuing on the 16th day of the succeeding forty-six (46) months in a like amount with a balloon payment of the remainder owed on the 16th day of the forty-eighth (48th) month in the approximate amount of $6,585.00 per month. Creditors in this class will be paid *pro rata* based on the amount of each of their claims compared to the total amount of allowed claims in the Class  These taxes will be paid only up to the value of the estate's interest in the personal property located in the taxing jurisdiction pursuant to 11 U.S.C. § 502(b)(3).

(c)    *Pre-Petition Ad Valorem Real Property Tax Claims*

    (i)    *Assumed Leases—Real Property Tax Claims Through 2013.* Subject to Section 5.08, *infra,* or another agreement by the Debtor with a particular landlord whose lease/leases are being assumed, delinquencies through 2013 will be paid on the later of the 16th day of the second full month after the Effective Date or within seven (7) days of the date an order of the Bankruptcy Court approving the assumption of a particular lease or, if the amount is disputed, determining the amount of the claim becomes final and non-appealable.

    (ii)    *Assumed Leases—2014 Real Property Tax Claims.*  Real property taxes for 2014 will be paid as they come due.

    (iii)    *Rejected Leases.*  Class 5 does *not* include real property taxes for which Debtor is derivatively responsible by virtue of its non-residential real property leases.  The delinquent real property *ad valorem* taxes owed by the Debtor as part of a lease it has rejected or ultimately rejects as part of this Plan will be paid as part of a particular landlord's allowed general unsecured claim *pro rata* along with the other creditors with Class 13 General Unsecured Claims, subject to the landlord's compliance with Article V and Section 5.05 in particular.

(d)    To the extent any claim is disputed, payments will begin on the later of the

---

[2] For purposes of the numbers in this Plan and the projections being used to support it and because the majority of Debtor's assets and largest number of its restaurants are in Texas, the statutory rate in Texas of 12% per annum has been used.

date set forth above or the 16th day of the first full month after the Order Allowing the Claim(s) becomes a Final Order and non-appealable; the first payment will bring the allowed claim *in pari passu* with the other creditors in the class and subsequent payments will be made *pro rata* with distributions to the other claims in the class.

(e)    The taxing authorities will retain any liens to which they are entitled under state law until such time as their Allowed Claims are paid in full.

(f)    Class 5 is impaired.

4.06    **Class 6—Claims of GE Capital Business Asset Funding as successor-in-interest to GE Capital Franchise Finance Corporation.**

(a)    Class 6 consists of the Claims of GE Capital in the total principal amount of approximately $2,154,000.00. These Claims are based on five notes. The proceeds of three of these notes were used to construct the buildings out of which Debtor's restaurant in Lafayette, Louisiana (Store No. 87) was operated and its restaurants in San Antonio Texas (Store No 103) and Baytown, Texas (Store No. 89) are still operating; GE Capital has liens against all three buildings. The proceeds from the other two loans were used to purchase the furniture, fixtures, and equipment for Stores 103 and 89 and GE Capital holds purchase money security interests on this personalty for both of these notes. GE asserts that these five (5) notes are cross-collateralized with each other and other loans between the Debtor.

(b)    The amount of GE Capital's Secured Claim is not easily ascertainable. If Debtor is able to sell the building and its contents in Lafayette, the Lafayette Loan will be almost fully secured. Similarly, if it continues to operate the San Antonio and Baytown restaurants, those loans will be close to, if not fully, secured. However, if the buildings revert to the landlords at these three locations, the claims for these five loans will be, for all intents and purposes, unsecured.

(c)    Debtor will pay GE Capital in full and final satisfaction of GE Capital's Allowed Claims a lump sum payment of $830,000.00 less any sums paid as adequate protection on or before December 15, 2014.

(d)    Should the Debtor default on its payment or payments to GE Capital under this Plan, GE Capital may exercise all of its rights and remedies under applicable non-bankruptcy law, including but not limited to, the right to conduct a non-judicial foreclosure sale. However, GE Capital must provide Debtor with notice and an opportunity to cure pursuant to Article XV of the Plan.

(e)    GE Capital shall retain the liens on its collateral until it has been paid in full pursuant to Paragraph 4.06(c), *supra*, unless otherwise agreed to by the parties. GE Capital agrees to look solely to its collateral and the Reorganized Debtor for the satisfaction of its claims and waives any Claims that would otherwise constitute general unsecured Class 11, 12, 13 or 14 Claims payable from the GUC Trust Assets.

(f)    Class 6 is impaired.

4.07    **Class 7—Allowed Secured Claim of Prosperity Bank.**

19

(a) Class 7 consists of the secured claim of Prosperity Bank in the approximate amount of $1,179,872.55 arising out of its refinancing in 2012 of the real and personal property used by the Debtor in the operations of its Company Store 102 located at 4157 Buffalo Gap Road, Abilene, Texas ("Abilene Property"). This restaurant was closed in December of 2013.

(b) Debtor has been actively marketing the Abilene Property since December of 2013. On or about June 14, 2014, Debtor entered into a Contract of Sale with LG Acquisitions, LLC for the Abilene Property in the amount of $1,725,000. This Contract of Sale was approved by the Court but was timely terminated by LG Acquisitions during its contingency period. Moondance Investments, Ltd., a Texas limited partnership owned by Lynn Ford and Creed Ford III, has offered to purchase the Abilene Property for the same purchase price less the six percent (6%) commission that would have been paid under the LG Acquisitions Contract. An Order has been requested of the Court to permit any offer received within six percent (6%) of the $1,725,000 purchase price without further Court approval.

(c) Prosperity Bank's Allowed Claim will be paid in full out of the proceeds of the sale of the Abilene Property at closing in full and final satisfaction of same. To the extent its claim is disputed, the Abilene Property shall be sold free and clear of liens and other encumbrance and proceeds sufficient to pay the amount Prosperity Bank believes it is owed will be escrowed until an Order Allowing the Claim(s) becomes final and non-appealable, at which time Prosperity Bank will be paid the full amount allowed out of the escrow.

(d) Should the Abilene Property not have been sold on or before the Effective Date, Debtor will bring its payments under the Prosperity Real Estate Lien Note current, to the extent they are not, on or before fifteen (15) days after the Effective Date and begin making the monthly payments due under said Note on the 16th day of the following month. Debtor does not believe it will be required to pay anything to bring the Note current as it has been providing adequate protection to Prosperity during the pendency of the case. Monthly payments of $ 10,123.80 will continue until such time as the Abilene Property is sold.

(e) Class 7 is not impaired.

4.08 **Class 8—Allowed Secured Claim of Independent Bank.**

(a) Class 8 consists of the secured claim of Independent Bank pursuant to a Promissory Note dated December 10, 2008, and modified on December 5, 2011, in the original principal amount of $812,000.00 ("Pearland Note"). The Note is secured by a Deed of Trust on real estate with all improvements locally known as 3050 Silverlake Village Drive, Pearland, Texas and a UCC-1 on the furniture, fixtures and equipment located on the premises. As of the Petition Date, the outstanding amount owed to Independent Bank was $603,252.58.

(b)    Independent Bank shall be treated as fully secured on the Pearland Note as of the Petition Date. In full and final satisfaction of the Pearland Note obligations on any claim by Independent Bank arising from this Note, the Class 8 Allowed Claim will be treated as fully secured and paid as follows: (i) adequate protection payments until the Effective Date; (ii) $10,200.00 fifteen (15) days after the Effective Date; and (iii) the same amount on the 16th day of each succeeding month for the next seventy (70) months with a balloon payment in the seventy-second (72nd) month. Interest will accrue at 4.25% per annum.

(c)    Should the Debtor default on its payments to Independent Bank under this Plan, Independent Bank may exercise all of its rights and remedies under applicable non-bankruptcy law, including but not limited to, the right to conduct a non-judicial foreclosure. However, Independent Bank must provide Debtor with notice and an opportunity to cure pursuant to Article XV of the Plan.

(d)    Independent Bank shall retain the liens on its collateral until it has been paid in full pursuant as set forth in Paragraph 4.08(b), *supra.* Independent Bank agrees to look solely to its collateral, the proceeds thereof, and the Reorganized Debtor for the satisfaction its Claims and waives any Claims that would otherwise constitute general unsecured Class 11, 12, 14 or 14 Claims payable from the GUC Trust Assets..

(e)    Class 8 is impaired.

**4.09    Class 9—Allowed Secured Claims of FRG Capital, LLC.**

(a)    Class 9 consists of the Allowed Claims of FRG Capital, LLC, a limited liability company wholly owned by Creed Ford III and Lynn Ford. The original promissory note in the principal amount of $13,000,000.00 was executed by Debtor on or about January 1, 2011, for the purchase of the preferred stock of Rosewood Capital and was secured by a blanket lien on all of Debtor's personal property, both tangible and intangible. A second promissory note ("Secured Revolving Promissory Note") was executed on or about February 5, 2013. The Secured Revolving Promissory Note was also secured by all of Debtor's tangible and intangible personal property. The total amount owed by the Debtor to FRG Capital as of the Petition Date, according to FRG Capital's Proof of Claim, was $ 13,560,385.76.

(b)    On May 20, 2014, the Unsecured Creditors Committee in this case made demand that the Debtor commence an action against insiders of the Debtor, including FRG Capital, or assign these claims to the Committee for prosecution. In particular, it asserted that FRG's loans to Debtor should be avoided, recharacterized or subordinated. Prior to the Petition Date and prior to this demand letter, Debtor investigated these transactions; subsequent to the demand letter, it continued its investigation—including, but not limited to, the retention of neutral professionals. Debtor believed and continues to believe that these claims are without merit.

(c)    As part of a settlement by and between the Committee representing the unsecured creditors in this case and the Debtor, the Ford Family, and FRG

21

Capital which is represented by this Joint Plan, FRG Capital agreed to reduce its Allowed Secured Claim and accept less favorable repayment terms than non-insider creditors in exchange for a release of any and all claims of the estate or the creditors against it and its principals and the directors and officers of the Debtor.  More particularly,

    (i)    FRG Capital's Allowed Secured Claim will be reduced to $11,500,000.00 ("FRG Plan Claim") on the Effective Date of the Plan; and

    (ii)    the FRG Plan Claim shall continue to be secured by the blanket lien currently in place to secured the two existing notes;

(d)    Assuming the conditions set forth in Paragraph 4.09(c) have been met, the FRG Capital Plan Claim shall be satisfied by making ninety-six (96) monthly payments along with interest accruing at 4.25% per annum, beginning on the 16th day of the month of the Effective Date and continuing on the 16th day of each month thereafter.  The Claim will be amortized over eight (8) years.  Monthly payments shall be $102,088.00. The 96th payment shall be a balloon payment of approximately $4,500,000.  These payments will be in full and final satisfaction of FRG Capital's claims against the estate.  Current adequate protection payments will continue up to the Effective date.

(e)    Should the Debtor default on its payments to FRG Capital under this Plan, FRG Capital may exercise all of its rights and remedies under applicable non-bankruptcy law, including but not limited to, the right to conduct a non-judicial foreclosure.  However, FRG Capital must provide Debtor with notice and an opportunity to cure pursuant to Article XV of the Plan.

(f)    FRG Capital shall retain the liens on its collateral until it has been paid in full pursuant as set forth in Paragraph 4.09(b), *supra.*  FRG Capital agrees to look solely to its collateral, the proceeds thereof and the Reorganized Debtor for the satisfaction of its Claims and waives any Claims that would otherwise constitute general unsecured Class 12, 13 or 14 Claims payable from the GUC Trust Assets.

(g)    Class 9 is impaired.

### 4.10    Class 10-- Unsecured Personal Injury and Employment Related Claims

(a)    Class 10 consists of any Claims against the Debtor asserting personal injury or employment related claims against the Debtor as of the Effective Date, including, but not limited to, those claims discussed in Article IX of the Disclosure Statement.

(b)    The Reorganized Debtor will pay Allowed Claims in Class 10 that arose prior to the Effective Date if, as and when due in the ordinary course of business.  Class 10 claimants shall receive such treatment as agreed upon between the Reorganized Debtor and the Allowed Claimholder or, if no agreement is reached, the same final percentage distribution on its Allowed Claim as that received by the holders of Allowed Claims of the Class 12, 13 and 14 Creditors from the GUC Trust (*see* Paragraph 4.12, *infra*).  The Reorganized Debtor is responsible for satisfaction of all

Allowed Class 10 Claims and the Class 10 Creditors shall have no claim against the assets of the GUC Trust.

(c)    Class 10 is impaired.

**4.11**    **Class 11—Convenience Claims.**

(a)    Class 11 consists of all unsecured, non-priority claimants with Allowed Claims in the amount of $2,000.00 or less or holders of Allowed Claims in excess of $2,000.00 which reduce their claims to $2,000.00.

(b)    Creditors with Allowed Convenience Claims will be paid an amount equal to 45% of the amount of their Allowed Claims in a single payment without interest as soon as practicable following the Effective Date; *provided, however,* that the distribution date for Allowed Convenience Claims shall be in the sole determination of the GUC Trustee.

(c)    Distributions to holders of Allowed Class 11 Claims shall be made by the GUC Trustee from the Net Distributable GUC Trust Assets.

(d)    Any creditor in Class 11 may opt out of this class and elect to receive treatment under Class 12.  Any creditor wishing to opt out of Class 11 shall do so by giving written notice to the Debtor's counsel on or before the deadline for voting upon the Plan.

(e)    Any creditor in Class 12 may opt out of said class and elect treatment as a Class 11 Creditor if it reduces its claim to the cap on claims in this class.

(f)    Class 11 is impaired.

**4.12**    **Class 12—Allowed General Unsecured Claims (Excluding Lease Rejection Claims)**

(a)    Class 12 consists of all General Unsecured Claims not expressly classified or dealt with elsewhere in the Plan, including the general unsecured portion of secured or priority Claims except as otherwise provided herein.

(b)    The GUC Trust is initially being funded through Exit Financing on New Capital that has been obtained by the Debtor in the total amount of $4.48 million and maybe subsequently receive Top Off Funding as more specifically described in Paragraph 4.13 and 10.02.01.  Class 12 creditors with Allowed Claims will receive from the GUC Trustee at least one distribution from the Net Distributable GUC Trust Assets.  The Plan Proponents estimate that the distribution will be at least twenty-eight percent (28%).

(d)    Holders of Allowed Claim in Class 12 will be receiving distributions *pro-rata* from the Net Distributable GUC Trust Assets along with holders of Allowed Claims in Class 13 and Class 14, if any.

(c)    The GUC Trust is the sole source for *pro rata* distributions to holders of Allowed Class 12 Claims.

(d)    Class 12 is impaired.

4.13    **Class 13—Allowed Unsecured Lease Rejection Claims.**

(a)    Class 13 consists of the Allowed Lease Rejection Claims of landlords on leases for locations where Debtor has closed a Company Store since January of 2013.

(b)    Creditors in this Class other than Megaplex Four (Store No. 70, Mesquite, Texas) will receive Net Distributable GUC Trust Assets *pro-rata* along with holders of Allowed Class 11, 12 and 14 Claims.

(c)    *Allowed Claims of Leases Rejected After August 1, 2014.* If a lease is rejected by Motion or confirmation of this Plan after August 1, 2014, the allowed Lease Rejection Claim for said lease shall be included in Class 13 and treated with the other claims in this Class. However, Debtor shall be responsible for contributing Top Off Funding to the GUC Trust in the amount of twenty-five percent (25%) of the allowed Lease Rejection Claim for said lease on the later of the Initial Funding of the GUC Trust or within seven (7) days of the date the order allowing the Lease Rejection Claim becomes a Final Order. Any top Off Funding contributed by the Debtor pursuant to this section shall become part of the corpus of the GUC Trust.

(c)    *Megaplex Four.* Megaplex Four is the landlord with respect to the Mesquite lease, which premises are being leased for the benefit of and being paid by Stateside, LLC, an entity which is an insider of Debtor's controlling shareholder, Creed Ford III. In full and final satisfaction of its Allowed Claim, if any, Megaplex Four shall receive the same percentage of its allowed claim but said amount shall be paid by the Reorganized Debtor from the Reorganized Debtor's assets and not by the GUC Trustee from the GUC Trust Assets.

(d)    Except as set forth herein, the GUC Trust is the sole source for *pro rata* distributions to holders of Allowed Class 13 Claims.

(e)    Class 13 is impaired.

4.14    **Class 14—Contingent Claims.**

(a)    Class 14 consists of those individuals or entities that have guaranteed an obligation or are jointly and severally liable on any liability with respect to which the Debtor is the primary obligor; *provided, however,* that Class 14 shall not apply to any Released Parties, insiders of the Debtor or the Ford Family.

(b)    No Class 14 creditor will receive a payment under this Plan on account of a contingent liability as defined herein until and unless: (i) demand is made upon said creditor; (ii) the creditor satisfies the obligation in whole or in part; (iii) the creditor files a claim according to the procedures set forth in Paragraph 2.09, *supra.;* and (iv) such Claim becomes an Allowed Claim.

(c)    A Class 14 Creditor with an Allowed Claim shall begin receiving payments along with the Class 12 and 13 Creditors at the next scheduled Class 12 and 13 distribution. The Class 14 Creditor shall receive that portion of the distributions necessary to bring said creditor *in pari passu*

with the creditors receiving Class 12 and 13 distributions, at which time the creditor shall receiving distributions *pro-rata* going forward.

(d)     Class 14 is impaired

### 4.15    Class 15—Equity Interests.

(a)     Class 15 consists of the Equity Interests in the Debtor as of the Effective Date.

(b)     Class 15 Equity Interests shall remain the same after the Effective Date.

(c)     No distributions will be made on Class 15 Equity Interests in the Reorganized Debtor until:  (i) the GUC is fully funded as set forth herein except as may be necessary to cover tax liability for taxes passed through from the Debtor; (ii) the claims of GE Capital are satisfied pursuant to the provisions of this Plan; and (iii) all payments due under the Plan within twenty-eight (28) days of the Effective Date are paid.  This restriction, however, does not apply to salaries for any Equity Interest Holder who may be performing the duties of an employee of the Reorganized Debtor or a contractor of the Reorganized Debtor or a vendor of the Reorganized Debtor, as long as such payments do not exceed market rate for such goods and/or services

(d)     Class 15 is not impaired.

### ARTICLE V
### ASSUMPTION AND REJECTION OF UNEXPIRED
### LEASES AND EXECUTORY CONTRACTS

5.01    **Assumption/Rejection of Executory Contracts and Unexpired Leases.**  Debtor shall reject all Unexpired Leases of Non-Residential Real Property and Executory Contracts not specifically assumed or rejected on or before the Effective Date pursuant to 11 U.S.C. § 1123(b)(2).

5.01.01         Exhibit E attached to the Disclosure Statement that accompanies this Plan sets out the executory contracts in effect as of the Petition Date which Debtor intends to assume and those in effect as of the Petition Date which it intends to assume but as amended, modified, or redrafted by the parties post-petition.

5.01.02         To the extent an order approving assumption has not been entered or the contracts specifically enumerated herein, Debtor shall be deemed to have rejected any and all other such executory contracts; Lease Rejection Claims shall be subject to Top-Off Funding.

5.02    **Reservation of Rights.**  Pursuant to 11 U.S.C. § 365, Debtor shall have the right to assume or reject on or before the Effective Date any executory contract or unexpired lease of non-residential real property or may change the status of any lease or executory contract listed above (to the extent permitted under the Bankruptcy Code).  Any additional or changed assumptions or rejections shall be noted in the Confirmation Order.

5.03 **Disputes as to Executory/Unexpired Status**. Notwithstanding Section 5.04, *infra,* of this Plan, if on the Effective Date there is a pending dispute filed with the Bankruptcy Court as to whether a contract is executory or a lease is unexpired, the Debtor's right to assume or reject such contract or lease shall be extended until the date that is twenty-eight (28) days after entry of a Final Order by the Bankruptcy Court determining that the contract is executory or the lease is unexpired. In the event that a contract is not listed as executory in the Disclosure Statement filed in connection herewith, such contract shall be deemed not to be executory unless an objection is filed timely with the Bankruptcy Court.

5.04 **Expired Contracts or Leases.** Any contract or lease that expired pursuant to its terms prior to the Effective Date and that has not been assumed or rejected by Final Order prior to the Effective Date or herein is hereby specifically rejected.

5.05 **Bar Date for Claims Based on Rejection.** If the rejection of an executory contract or unexpired lease results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not heretofore evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable unless a proof of claim is filed with the Bankruptcy Court and served upon the Reorganized Debtor and its counsel of record as follows: (a) if the Claim arises from the rejection of an executory contract or unexpired lease by operation of any provision of this Plan, twenty-eight (28) days after the Effective Date; (b) if the Claim arises from the rejection of any executory contract or unexpired lease pursuant to a Final Order of the Bankruptcy Court (other than the Confirmation Order) authorizing rejection of such contract or lease, twenty-eight (28) days after entry of such Final Order; or (c) if the Claim arises from the rejection of an executory contract or unexpired lease that is rejected after withdrawal of the assumption thereof pursuant to Section 5.02 of this Plan, twenty-eight (28) days after service of notice of the assumption withdrawal. The foregoing applies only to Claims arising from the rejection of an executory contract or unexpired lease not rejected prior to the Effective Date; any other Claims held by a party to a rejected contract or lease shall have been evidenced by a proof of claim filed by earlier applicable bar dates or shall be barred and unenforceable.

5.06 **Limitation on Claims Based on Rejection.** Any Rejection Claim based upon the rejection of an unexpired lease of real property either prior to the Confirmation Date or upon the entry of the Confirmation Order shall be limited in accordance with 11 U.S.C. § 502(b)(6) and state law mitigation requirements. Nothing contained herein shall be deemed an admission by the Debtor that such rejection gives rise to or results in a Claim or shall be deemed a waiver by the Debtor of any objection to such Claim, if asserted.

5.07 **Claims Arising from Assumption or Rejection**. All Allowed Claims arising from the rejection of an executory contract or unexpired lease shall be treated as Class 11 or 13 Claims pursuant to Sections 4.11 or 4.12 of this Plan unless otherwise ordered by Final Order of the Bankruptcy Court; and all other Allowed Claims relating to an executory contract or unexpired lease shall have such status as they may be entitled to under the Bankruptcy Code as determined by Final Order of the Bankruptcy Court.

5.08 **Cure of Defaults Upon Assumption**. Upon the assumption of any executory contract or unexpired lease pursuant to this Article V, all defaults, including, without limitation, defaults specified in 11 U.S.C. § 365(1) and any defaults specified in 11 U.S.C. § 365(b)(2), shall be deemed cured except to the extent written demand for the cure of or demonstration of

ability to cure any default has been filed with the Bankruptcy Court and served upon the Reorganized Debtor by the non-Debtor party to such executory contract or unexpired lease within twenty-eight (28) days after the Effective Date or an Order has previously been entered by the Court establishing the amount required to cure and the method for same.  In the absence of a timely demand in accordance with the foregoing, the Reorganized Debtor's obligation to cure or demonstrate the ability to cure shall be deemed satisfied, waived, released and discharged.  If any non-Debtor party to such executory contract or unexpired lease timely serves and files such written demand and the Reorganized Debtor files an objection in writing to such demand within twenty-eight (28) days thereafter, the Bankruptcy Court shall, by the issuance of a Final Order, determine the amount actually due and owing in respect of such demand or shall approve the settlement of such demand.

### ARTICLE VI
### PROVISIONS FOR THE RETENTION, ENFORCEMENT, SETTLEMENT, OR ADJUSTMENT OF CLAIMS BELONGING TO THE DEBTOR AND THE ESTATE INCLUDING PREFERENCES AND CONVEYANCES

6.01    **Avoidance Actions.**    There are three types of actions established by the Bankruptcy Code for the benefit of debtors:  actions to recover avoidable preferences under 11 U.S.C. § 547, actions to recover fraudulent conveyances under 11 U.S.C. § 548 and actions to recover unauthorized post-petition transfers under 11 U.S.C. § 549.  Debtor reserves its rights to pursue any causes of action currently known or unknown created by the Bankruptcy Code, specifically including claims created by Chapter 5 of the Bankruptcy Code, except as to any such claims released or assigned by the Debtor to the GUC Trust or otherwise under this Plan.

6.01.01    **Preferences.**    Section 547 allows a Debtor-in-Possession to recover "voidable preferences"—*to wit,* payments made within ninety (90) days prior to bankruptcy (or within one (1) year if made to an insider) on an antecedent debt while the Debtor is insolvent which allows a creditor to recover more than it would have if the payment had not been made and the Debtor's assets were liquidated under Chapter 7.  Certain payments are protected from recovery as preferences.  These include payments made in the ordinary course of business or upon ordinary business terms and payments representing a substantially contemporaneous exchange.  Attached to the Disclosure Statement as Exhibit E are a list of payments made by the Debtor to non-insiders within ninety (90) and to insiders within one (1) year of the Petition Date.  The right to pursue all other payments listed on this exhibit is hereby preserved and retained for assignment to and enforcement by the GUC Trust for the benefit of General Unsecured Creditors subsequent to the Effective Date with the following exception:  no preference actions against Released Parties as defined under this Plan or against vendors of the Debtor with whom Debtor has done or is doing business with the Debtor post-petition shall be assigned  to or pursued by the GUC Trust.  Any preference claims with regard to parties continuing to do business with the Debtor shall be reserved by the Debtor and may be pursued or released by the Debtor in the exercise of its business judgment.

6.01.02    **Fraudulent Conveyances and Post-Petition Transfers Made Without Court Approval.**  Section 548 allows a Debtor-in-Possession to recover certain transfers made within one year of Petition Date while the Debtor was insolvent which either was made with fraudulent intent or was made without receiving reasonably equivalent value.  Section 549

27

permits the Debtor-in-Possession to avoid a transfer of property that was not authorized under title 11 or the Court.

6.02  **Debtor's Other Causes of Action.**  All Claims of any kind or character whatsoever in favor of the Debtor or the estate against third parties to the extent not specifically compromised and released pursuant to this Plan, specifically including claims under Chapter 5 of the Bankruptcy Code and specifically excluding any claims against the Ford Family, Released Parties and Exculpated Parties defined hereunder, are preserved and retained by the Debtor against third parties, whether nor not included by name in the Disclosure Statement, whether currently known or unknown.  Only those claims specifically compromised and released pursuant to this Plan or any agreement referred to and incorporated herein are excepted from the foregoing.  Notwithstanding the foregoing, nothing in this paragraph is intended to abrogate the assignment of certain causes of action in Paragraph 6.01.01 to the GUC Trust.

**ARTICLE VII**
**ACCEPTANCE OR REJECTION OF PLAN; EFFECT OF**
**REJECTION BY ONE OR MORE CLASSES OF CLAIMS**
**OR EQUITY INTERESTS**

7.01  **Classes Entitled to Vote**.  Each impaired class of Claims or Equity Interests shall be entitled to vote separately to accept or reject this Plan.  Any unimpaired class of Claims shall not be entitled to vote to accept or reject this Plan.

7.02  **Class Acceptance Requirement.**  A class of Claims shall have accepted this Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (½) in number of the Allowed Claims of such class that have timely and properly voted on this Plan.

7.03  **One Vote Per Holder**.  If a holder of a Claim holds more than one Claim in any one class, all Claims of such holder in such class shall be aggregated and deemed to be one Claim for purposes of determining the number of Claims voting on this Plan.

7.04  **Cramdown**.  Notwithstanding the rejection of this Plan by any class of Claims or Equity Interests, the Debtor may request that the Bankruptcy Court confirm this Plan in accordance with 11 U.S.C. § 1129(b).

**ARTICLE VIII**
**EFFECT OF CONFIRMATION**

8.01  **Discharge.**  Pursuant to 11 U.S.C. §§ 524 and 1141(d), Debtor shall be discharged from its debts, obligations and liabilities arising prior to the Effective Date except as provided by this Plan..

8.02  **Status of Property of the Estate After Confirmation.**  Confirmation of the Plan shall vest the Property of the Estate in the Reorganized Debtor free and clear of all claims and liens except as expressly provided in the Plan; *provided tha*t if the Plan is not substantially

28

consummated, the property of the Estate shall revest in the Estate upon conversion to chapter 7 or entry of an order revoking confirmation of the Plan.

8.03    **Binding Nature of Plan.**  Pursuant to 11 U.S.C. § 1141, the provisions of the confirmed Plan shall bind the Debtor and its Creditors and the holders of its Equity Interests existing as of the Effective Date, whether or not the Claim or Equity Interest is impaired under the Plan and whether or not such Creditor or Equity Interest Holder has accepted the Plan.  The distributions provided for Claimants shall not be subject to any Claim by another creditor or interest holder by reason of any assertion of a contractual right of subordination.

8.04    **Reliances**.  Debtor and its respective affiliates, officers, directors, shareholders, members, representatives, attorneys, financial advisor, and agents may rely upon the opinions of counsel, certified public accountants, and other experts or professionals employed by the Debtor.

8.05    **Permanent Injunction.**  Confirmation of the Plan shall result in the issuance of a permanent injunction against the commencement or continuation of any judicial, administrative, or other action or proceeding on account of any Claims against the Debtor that arose prior to the Confirmation Date, unless such action is authorized by this Plan or 11 U.S.C. § 1141.

8.06    **Release.**  Except for the obligations created under this Plan, all creditors and other parties-in-interest scheduled or otherwise with notice of this case shall be considered upon confirmation to have for themselves and their affiliates unconditionally and irrevocably released, remised, acquitted and forever discharged Debtor and its Affiliates, the Ford Family (as defined herein) and its Affiliates, and FRG Capital, LLC and its Affiliates for all rights, demands, debts, liabilities, controversies, and causes of action of any and every character, whether known or unknown, asserted or unasserted, liquidated or unliquidated, accrued or unaccrued, mature or unmatured, at law or in equity, whether originally possessed or owned or acquired by contractual or legal assignment or subrogation, whether in contract, in tort, or under statute, regulation or other law or legal principle or theory, including without limitation Claims for economic loss, lost profits, loss of capital, emotional distress, mental anguish, personal injuries, injury or damage to tangible or intangible personal property or to real property, and all other claims for actual, consequential, special or punitive damages in the present or in the future, arising at any time from the beginning of time through and including the confirmation date of this Plan.

8.07    **Exculpation.**  No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim related to any act or omission derived from, based upon, related to, or arising from the chapter 11 Case, the marketing process, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan (including any term sheets related thereto), or any contract, instrument, release, or other agreement or document created or entered into in connection with the marketing process, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Consummation, and the administration and implementation of the Chapter 11 Cases and the Plan; provided, however, the foregoing shall not be deemed to release, affect, or limit any of the rights and obligations of the Exculpated Parties from, or exculpate the Exculpated Parties with respect to, any of the Exculpated Parties' obligations or covenants arising under the Confirmation Order, the Plan, the Plan Supplement, and any contracts, instruments, releases, and other agreements or documents delivered in connection with, or contemplated by, the foregoing; provided, however, that the foregoing shall not release or exculpate any of the Exculpated Parties for acts of gross

negligence or willful misconduct as determined by final order, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have participated in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Securities pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

## ARTICLE IX
### POST CONFIRMATION OWNERSHIP AND MANAGEMENT

9.01    **Ownership.**  The Ford Family currently holds or controls 77% of existing equity interests.  While Lynn and Creed Ford are providing New Value to the Debtor through their guarantee of Debtor's Exit Financing (*see* Paragraph 10.02.02 below), they will retain the same equity interests in the Reorganized Debtor as they currently hold in the Debtor, as will all other current equity interests.

9.02    **Directors.**  It is anticipated at this time that the Debtor's current Board of Directors shall act as the Board for the Reorganized Debtor, at least for the first twelve (12) months after the Effective Date.  The Directors currently serving are:  Creed L. Ford III, and Lynn Ford.  Creed Ford is and will continue as the Chairman of the Board as well as the President and chief Executive Officer of the Reorganized Debtor; his qualifications are be found in Paragraph 9.03.  Lynn Ford is the President of Rudy's Texas Bar-B-Q, LLC, the owner and franchisor of multiple barbecue restaurants as well as President of  Ford Restaurant Group, a management company providing accounting, payroll, human resources and other management functions for the Rudy's Bar-B-Q's and other restaurants.

9.03    **Management.**  Debtor's current core management team has breadth and depth in the restaurant industry found in few other hospitality ventures.  It is anticipated that this team will continue as the core management team of the Reorganized Debtor.  Its members are:

9.03.01    *Creed L. Ford III.*  Mr. Ford has over thirty-nine years in managing restaurants and restaurant chains.  He spent twenty (20) years with Brinker International[3] and, during that time, held the positions of manager, supervisor, Director of Operations and Chief Operating Officer.  After Brinker went public in 1984, he also served a member of the corporation's Board of Directors.  In 1997, Mr. Ford left Brinker to develop his own restaurant company and became a franchisee of Chili's in small Texas markets; he also co-founded the Debtor and acquired six (6) Johnny Carino's Restaurants from Brinker.  Under his watch, Fired Up grew Carino's to 180 restaurants and owned and operated Gumbo's Louisiana Café, The Brown Bar and Kona Ranch Steak House as well.  Since 2006, he has focused all his attention on growing and, more recently, nursing Carino's back to health from the beatings it took from the trends in the restaurant industry and the economy beginning in 2008.

---

[3] Brinker International's restaurant concepts include: Chili's, Macaroni Grill, On the Border, Maggiano's, Eatzi's, Spageddie's Italian Kitchen, Corner Baker, Flyer's Burgers, Taco Cabana and Grady's American Grill.

9.03.02    *Margaret Smith, CPA, Director of Finance.*  Margaret oversees key financial funds of the Debtor—including finance and accounting, treasury and planning and information technology.  She brings to this job almost thirty (30) years of broad financial and business experience within the hospitality industry—including financial audits of restaurants for Deloitte & Touche, financial analysis for the Walt Disney Company's theme parks and resorts, Director of Finance for Hard Rock Café International, and Vice-President of Finance for a start-up restaurant group, and fifteen (15) years with Rudy's Bar BQ.

9.03.03    *Matt West, Director of Restaurant Operations.*  Matt West has over twenty (20) years in the restaurant industry and has been with the Debtor for over fifteen (15) years.  Prior to joining the Debtor, he worked for Chili's Bar & Grill in all positions of the restaurant.  Since joining Debtor, he has held multiple positions including Manager, General Manager, Managing Partner, Area Director and has spent over four (4) years supporting Debtor's Franchise Partners.  Mr. West has been recognized for outstanding performance at all levels.  Throughout his career, he has shown consistent results in financials, guest services, kitchen operations, facilities, and managing those around him to achieve a common goal.

9.03.04    *Chris Peitersen, CRC, Director of Culinary Development, Franchise Support and Purchasing.*  Chef Peitersen oversees menu research, development, testing and implementation of all food and beverage items for Carino's.  In addition to his culinary responsibilities, he also manages all the purchasing functions, contracting activities and franchisee support functions among the Debtor's fifty-eight (58) franchises and forty-five (45) Company Stores.  Chef Peitersen was instrumental in developing and sourcing a menu for Carino's restaurants in Egypt, Kuwait, Bahrain and the United Arab Emirates.  In his two decades in the restaurant industry, he has worked for such concepts as Palomino Mediterranean Bistro, Olive Garden, Tony Roman's and Grisanti's Italian Kitchen.  He is a Certified Research Chef through the Research Chefs Association and was one of the youngest chefs ever to attain this certification level.

## ARTICLE X
## MEANS FOR IMPLEMENTATION OF PLAN

10.01  **Implementation of the Plan.**  The Plan will be implemented pursuant to 11 U.S.C. § 1123(a) with ownership and management as set forth above.  Debtor will continue to operate as a debtor-in-possession and discharge its duties under chapter 11 until the Effective Date of the Plan.  Debtor during this period will also take all actions necessary to effectuate the organizational and ownership changes discussed in Articles IX.  On and after the Effective Date of the Plan and the organizational changes contemplated by the Plan have been made, the Reorganized Debtor will be operated for the benefit of Debtor's Creditors in compliance with the terms of Debtor's chapter 11 Plan and then for the benefit of its shareholders.  When all payments to creditors due under the Plan are completed, the Reorganized Debtor's obligations to these pre-petition creditors will be deemed to have been satisfied in full.

10.02  **Sources of Funds for Implementation of the Plan.**

10.02.01    **In General.**  If the compromise and settlement discussed in Paragraph 4.09 as well as this Plan are approved by the Court, the GUC Trust will receive on or before the

Effective Date its initial funding the sum of $4.48 million for the benefit, and to satisfy the claims, of all Allowed General Unsecured Claims except those specifically excluded herein. If additional lease locations are rejected after August 1, 2014, then an additional sum equal to twenty-five percent (25%) of the Allowed Lease Rejection Claim for each additional rejected location will also be contributed to the GUC Trust ("Top-Up Funding") upon the later of the Effective Date or within seven (7) days of the Order Allowing the Lease Rejection Claim becomes final and non-appealable. At this time, it is projected that all payments to all Creditors due under this Plan other than those being paid from the GUC Trust will be derived from income generated by the Debtor's business operations.

10.02.02 **Exit Financing/Capital Infusion ("New Capital' or "New Value")** **(collectively "Exit Financing Notes").** Debtor has negotiated a term loan and revolving line of credit with Prosperity Bank collectively sufficient to fund the Initial Funding of the GUC Trust and repay GE Capital pursuant to its settlements with these parties. These notes will, *inter alia,* be guaranteed by Creed Ford III and Lynn S. Ford and/or collateralized by the assets of the Debtor. These new guarantees of new notes constitute New Value to the Debtor.

10.02.03 **Income from Business Operations.** Debtor intends to make all payments due under the Plan other than those being made to the GUC Trust and GE Capital from income generated by its business operations and the sale of certain assets it is no longer using (*see* Article IIE of the Disclosure Statement accompanying this Plan). Debtor's *pro formas* for the next five (5) years are attached as Exhibit B to Debtor's Disclosure Statement. They were prepared by the Debtor's management and financial team in conjunction with the Debtor's financial advisor. Even with the very conservative assumptions applied in putting these projections together, they indicate that the Debtor will generate sufficient income to make the payments proposed under this Plan.

10.02.04 **Working Capital Loan.** While Debtor's projections reflect its ability to make the payments proposed under this Plan, Debtor also recognizes that its business is seasonal in nature and, while expenses are relatively steady throughout the year, income is not. In order to make cash management easier and stabilize cash flow and cover any additional shortfalls in payments under the Plan, Debtor may also obtain a working capital loan from Prosperity Bank or use sums that become available on the revolving line of credit described in paragraph 10.02.05 that loan is paid down for working capital.

10.02.05 **Other Potential Revenue Sources.**

10.02.05.01 As discussed in Article VI, *supra,* and the Disclosure Statement, Debtor may have potential causes of action under chapter 5 of the Bankruptcy Code as well as a cause of action for violation of the automatic stay against Wells Fargo. As also discussed in Paragraph VI, all preference actions arising under 11 U.S.C. § 547 except as to those vendors with whom Debtor is doing business as of the Effective Date will be assigned to the GUC Trust, which will decide which to prosecute, and any recoveries on said actions will be added to the corpus of the GUC Trust for the benefit of the general unsecured creditors which are the beneficiaries of said trust. All other causes of action will be reevaluated on a case-by-case basis with Debtor's attorneys. Based on the conclusions reached with respect to the probability of success and collectability if a judgment is obtained, these causes of action may be pursued and the sums

collected, net of costs and attorney's fees and a reserve for any tax obligations that might arise therefrom, will added to the other funds used to pay creditors as set forth above.

10.02.05.02    Debtor was required to file suit against Wells Fargo Bank shortly after the Petition Date as Wells Fargo froze Debtor's pre-petition accounts so that Debtor was unable to close these accounts and transfer the funds to its debtor-in-possession accounts at Prosperity Bank.   In August and September, Wells Fargo debited Debtor's accounts without Court permission in the amount of approximately $22,000 for its post-petition legal fees; Debtor has sought to amend its suit to recover these funds and attendant damages.   Debtor at this time intends to continue with this suit.

10.03   **Authorization.**   Debtor shall be responsible for complying with the terms and provisions of the Plan as it may be modified as allowed by the Bankruptcy Code.   To this end, the Debtor is authorized, *inter alia*, to execute all documents necessary to effectuate the terms of the Plan.

10.04   **Methodology for Collection and Disbursement under the Plan.**

10.04.01     **Reorganized Debtor.**   The Reorganized Debtor shall be responsible for marshaling funds and making the payments due from it to designated creditors subject to the provisions of this Plan in a timely matter.

10.04.02     **GUC Trust.**   The GUC Trust, as more specifically set forth below, shall be responsible for administering and distributing the assets which are to fund it and making the payments due from it to all general unsecured creditors, except those specifically excluded herein, in a timely manner subject to the provisions of this Plan.

10.04.02.01    *Establishment and Administration of the GUC Trust.*   On the Effective Date, the GUC Trust shall be established pursuant to the GUC Trust Agreement for the purpose of, among other things, (i) administering the distribution of the GUC Trust Assets for the benefit of Allowed Claims in Class 11, 12, 13 and 14;  and (ii) making Distributions from the GUC Trust to Holders of Allowed Claims as provided for in the Plan and/or the GUC Trust Agreement to holders of Allowed Claims in Classes  11, 12, 13 and 14.   Upon the Effective Date the GUC Trust Agreement will be deemed approved and the GUC Trustee shall be authorized to take all steps necessary to complete the formation of the GUC Trust.

10.04.02.02.   *Assets of the GUC Trust.* On or before the Effective Date, or upon a later date if agreed upon by the Committee, the GUC Trustee and the Debtor, the Debtor shall transfer and assign to the GUC Trust all of its right, title and interest in and to the GUC Trust Assets and in accordance with 11 U.S.C. § 1141, all such assets shall automatically vest in the GUC Trust free and clear of all Claims and liens, subject only to the Allowed Claims of the Holders of GUC Trust Interests as set forth in the Plan and the expenses of the GUC Trust as set forth herein and in the GUC Trust Agreement.   Thereupon, neither the Debtor nor any other creditor (except the holders of GUC Trust Interests) shall have any interest in or with respect to the GUC Trust Assets.

### 10.04.02.03    *Appointment of a GUC Trustee/ Oversight Committee*

10.04.02.03.01        The GUC Trustee shall be selected by the Committee. The Committee shall file a notice ("GUC Trustee Notice") designating the Person who it has selected as GUC Trustee on a date that is not less than ten (10) days prior to the deadline for filing ballots and objections to confirmation of the Plan. The appointment of the GUC Trustee shall be approved in the Confirmation Order, and such appointment shall be as of the Effective Date. The GUC Trustee shall have and perform all of the duties, responsibilities, rights and obligations set forth in the Plan and GUC Trust Agreement.

10.04.02.03.02        The GUC Trust shall be governed by an Oversight Committee, which shall consist of three members selected by the Committee..

10.04.02.0.4    *Compensation.* The GUC Trustee shall be compensated solely from the GUC Trust Assets. The terms of the GUC Trustee's compensation shall be put on file by the Committee upon the filing of the GUC Trustee Notice. The Committee agrees that the Allowed Fee Claims and costs incurred by its  professionals shall be payable in their entirety from the GUC Trust Assets, subject to approval for those approved up to and including confirmation,  by the Bankruptcy Court

### 10.04.02.05    *Rights and Powers of the GUC Trust and the GUC Trustee*

10.04.02.05.01        The GUC Trustee shall be deemed the Estate's representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth in the GUC Trust Agreement, including, without limitation, the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules, including without limitation, the right to (i) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan and the GUC Trust Agreement; (ii) prosecute, settle, abandon or compromise any General Unsecured Claims in Classes 10 and 11, Voidable Transfers or causes of action not released under the Plan; (iii) make Distributions contemplated by the Plan and the GUC Trust Agreement; (iv) establish and administer any necessary reserves that may be required; (v) object to Disputed Claims in Classes 11, 12, 13 and 14 and prosecute, settle, compromise, withdraw or resolve in any manner approved by the Court such objections; (vi) employ and compensate professionals (including professionals previously retained by the Debtor and/or the Committee); and (vii) file all federal, state and local tax returns if necessary.

10.04.02.05.02        The GUC Trustee shall be solely responsible for reconciling, resolving, Allowing, and contesting all General Unsecured Claims in Classes 11, 12, 13 and 14. The Reorganized Debtor shall provide all reasonably requested information and cooperation requested by the GUC Trustee in aid of his duties under the Plan and the GUC Trust Agreement.

10.04.02.05.03        The GUC Trustee shall not be obligated to obtain a bond but may do so, in his, her or its sole discretion, in which case the expense incurred by such bonding shall be paid by the GUC Trust.

10.04.02.05.04          The GUC Trustee, the members of the Oversight Committee and their professionals shall be exculpated and indemnified pursuant to and in accordance with the terms of the Plan and GUC Trust Agreement.

10.04.02.06     *GUC Trust Interests*

10.04.02.06.01          On the Effective Date, each Holder of an Allowed General Unsecured Claim in Classes 11, 12, 13 and 14 shall, by operation of the Plan, receive its Pro Rata share of the GUC Trust Interests.  GUC Trust Interests shall be reserved for Holders of Disputed General Unsecured Claims and issued by the GUC Trust to, and held by the GUC Trustee in, a disputed claims reserve pending allowance or disallowance of such Claims.  No other entity shall have any interest, legal, beneficial or otherwise, in the GUC Trust Assets upon the assignment and transfer of such assets to the GUC Trust. Distributions from the GUC Trust on account of GUC Trust Interests shall be made from the GUC Trust Assets after paying, reserving against or satisfying, among other things, the operating and administrative expenses of the GUC Trust to the extent necessary, including but not limited to all costs, expenses and obligations incurred by the GUC Trustee (or professionals who may be employed by the GUC Trustee in administering the GUC Trust) in carrying out their responsibilities under the GUC Trust Agreement, or in any manner connected, incidental or related thereto.

10.04.02.06.02          The GUC Trust Interests shall be uncertificated and shall be nontransferable except upon death of the Holder or by operation of law.  Holders of GUC Trust Interests, in such capacity, shall have no voting rights with respect to such interests.  The GUC Trust shall have a term of five (5) years from the Effective Date, without prejudice to the rights of the GUC Trust Committee to extend such term conditioned upon the GUC Trust not becoming subject to the Securities Exchange Act of 1934 (as now in effect or hereafter amended).

10.04.02.06.03          It is intended that the GUC Trust be classified for federal income tax purposes as a "Liquidating Trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code.  In furtherance of this objective, the GUC Trustee shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the GUC Trust.  All GUC Trust Assets held by the GUC Trust on the Effective Date shall be deemed for federal income tax purposes to have been distributed by the Debtor on a Pro Rata basis to Holders of Allowed General Unsecured Claims and then contributed by such Holders to the GUC Trust in exchange for the GUC Trust Interests.  All Holders of General Unsecured Claims have agreed to use the valuation of the GUC Trust Assets transferred to the GUC Trust as established by the GUC Trustee for all federal income tax purposes.  The beneficiaries under the GUC Trust shall be treated as the deemed owners of the GUC Trust.  The GUC Trust shall be responsible for filing information on behalf of the GUC Trust as grantor trust pursuant to Treasury Regulation Section 1.671-4(a).

10.04.02.07.     *Distributions to Holders of General Unsecured Claims*

10.04.02.07.01          Initial Distributions.  The GUC Trustee shall make, or shall make adequate reserves for, the distributions required to be made under the Plan to Holders of Allowed General Unsecured Claims in classes 11, 12, 13 and 14.

35

10.04.02.07.02       Interim Distributions.   The GUC Trustee shall make interim distributions of Cash in accordance with this Plan and the GUC Trust Agreement in its sole discretion.

10.04.02.07.03       Final Distributions.   Except as provided herein, the GUC Trust shall be dissolved and its affairs wound up and the GUC Trustee shall make the final Distributions, upon the earlier of (i) the date which is five (5) years after the Effective Date, and (ii) that date when, (A) in the reasonable judgment of the GUC Trustee, substantially all of the assets of the GUC Trust have been liquidated and there are no substantial potential sources of additional Cash for Distribution; and (B) there remain no substantial Disputed Claims in Classes 11, 12, and 13.  Notwithstanding the foregoing, on or prior to a date not less than six (6) months prior to such termination, the Court, upon motion by a party in interest, may extend the term of the GUC Trust for one or more finite terms based upon the particular facts and circumstances present at that time, if an extension is necessary to the liquidating purpose of the GUC Trust. The date on which the GUC Trustee determines that all obligations under the Plan and GUC Trust Agreement have been satisfied is referred to as the "GUC Trust Termination Date."  On the GUC Trust Termination Date, the GUC Trustee shall, to the extent not already done, request that the Court enter an order closing the Bankruptcy Cases.
Upon dissolution of the GUC Trust, if the GUC Trustee reasonably determines that any remaining GUC Trust Assets are insufficient to render a further distribution practicable, or exceed the amounts required to be paid under the Plan, the GUC Trustee shall transfer such remaining funds to a charitable institution selected by the GUC Trustee, which charitable institution shall be qualified as a not-for-profit corporation under applicable federal and state laws.

10.04.03       Upon the Effective Date of the Plan, the Reorganized Debtor will commence operations.  Any filings with government entities to reflect the change of control of the Debtor shall be timely made.

## ARTICLE XI
### PROVISIONS GOVERNING DISTRIBUTIONS

11.01  **Distribution Responsibility**.  Subject to the specific treatment provisions of this Article, the Debtor and the GUC Trust shall be responsible for and shall be obligated to make, or administer where appropriate, all distributions required under this Plan.

11.02  **Payment/Delivery Agents**.   The Debtor and the GUC Trust, or such payment/delivery agent or agents as it may, in its sole discretion, employ, shall make all distributions and deliveries required to be made by it under this Plan.  Debtor anticipates, at this time, that the Reorganized Debtor or the GUC Trust, whichever is applicable under this Plan, shall be the Payment Delivery Agent.

11.03  **Date of Distributions**.   Distributions by the Debtor shall be made on the Effective Date, or any other payment or delivery date established herein Distributions to be made by the Debtor on a specified date shall be deemed made on that date if made no later than seven (7) Business Days after such date.

11.04    **Cash Payment.**  Cash payments made pursuant to this Plan shall be in U.S. funds, by check drawn on a domestic bank, or by wire transfer from a domestic bank.

11.05    **One Distribution Per Holder**.  If the holder of a Claim holds more than one Claim in any one class, all Claims of such holder in such class may be aggregated and deemed to be one Claim for distribution purposes, and **only** one distribution or delivery of stock may be made with respect to the single, aggregated Claim.

11.06    **Delivery of Distributions.**  Distributions to holders of Allowed Claims shall be made at the addresses set forth on the proofs of claim or proofs of interest filed by such holders (or at the last known addresses of such holders if no proof of claim is filed or if the Debtor or the Reorganized Debtor, as applicable, have been notified of a change of address).  If any holder's distribution is returned as undeliverable, or is not sent because no address is available, no further distributions to such holder shall be made unless and until the Debtor (or a payment agent, if applicable) is notified of such holder's then current address on or within 90 days from the date such distribution is made, at which time all missed distributions shall be made to such holder. Amounts in respect of undeliverable distributions made through a payment agent shall be returned to the Debtor, and remain with it until such distributions are claimed.  All claims for undeliverable distributions must be made on or before 180 days from the Effective Date (the "Distribution Bar Date").  After such Distribution Bar Date, all unclaimed property shall be distributed pro-rata among holders of Allowed General Unsecured Claims who have received and accepted prior distributions.  The claim of any holder with respect to such property, or the claims of any state under its unclaimed property laws with respect to such property (which state shall not be deemed a holder of a Claim under such laws for purposes of this Plan), shall be discharged and forever barred.

11.07    **Time Bar to Cash Payments.**  Checks issued by the Reorganized Debtor, or by a payment agent in respect of Allowed Claims shall be null and void if not cashed within ninety (90) days of the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Reorganized Debtor by the holder of the Allowed Claim with respect to which such check was originally issued.  Any claim in respect of such avoided check shall be made on or before the Distribution Bar Date.  After the Distribution Bar Date, all unclaimed property shall be distributed to holders of Allowed General Unsecured Claims who have accepted prior distribution.

11.08    **Effect of Pre-Confirmation Distributions.**  Nothing in this Plan shall be deemed to entitle the holder of a Claim that received, prior to the Effective Date, full or partial payment of such holder's Claim, by way of settlement or otherwise, pursuant to an order of the Bankruptcy Court, provision of the Bankruptcy Code, or other means, to receive a duplicate payment in full or in part pursuant to this Plan; and all such full or partial payments shall be deemed to be payments made under this Plan for purposes of satisfying the obligations of the Reorganized Debtor hereunder.

11.09    **Prepayment.**  Unless this Plan otherwise provides, the Reorganized Debtor shall have the right to prepay, without penalty, all or any portion of an Allowed Claim at any time.

## ARTICLE XII
## POST-CONFIRMATION PROCEDURE

12.01  **Conditions Precedent to Effectiveness.**  The Plan shall not been deemed effective until and unless: (i) the GUC Trust receives its Initial Funding; and (ii) a Confirmation Order satisfactory to the both the Debtor and the Committee in form and substance has been entered and become final and non-appealable.

12.02  **Dissolution of Committee.**  The Committee shall be dissolved automatically on the Effective Date and all members thereof shall be released and discharged from all rights, duties and responsibilities arising from or related to the Case.

12.03  **Compliance with All Applicable Laws.**  Except as otherwise provided in this Plan, the Debtor shall comply with any applicable law, rule, regulation, or order of a governmental authority relating to their businesses; provided that nothing contained herein shall require such compliance by the Debtor if any such law, rule, regulation, or order is preempted by the Bankruptcy Code or if the legality or applicability of any such law, rule, regulation, or order is being contested in good faith in appropriate proceedings by the Debtor, and, where appropriate, for which an adequate reserve has been set aside on the books of the Debtor.

12.04  **U.S. Trustees Matters.**

12.04.01  **Fees.**  The Debtor shall continue to pay U.S. Trustee fees until the case is closed, converted or dismissed.

12.04.02  **Reports.**  The Debtor shall file post-confirmation reports in the form prescribed by the United States Trustee until the case is closed, converted or dismissed.

12.05  **Compliance with Tax Requirements**.  In connection with this Plan, the Debtor shall comply with all withholding and reporting requirements imposed by federal, state, local and foreign taxing authorities, and all distributions hereunder shall be subject to such withholding and reporting requirements.

12.06  **Application for Final Decree.**  The Debtor shall file an application for final decree as soon as is practicable but not later than six (6) months after the Effective Date.  If the Plan cannot be substantially consummated as that term is defined in 11 U.S.C. § 1101(2) during this time period or if there are still pending matters to be ruled upon by the Court, the Debtor shall seek an extension of such deadline from the Court.  If the Debtor fails to file an Application for Final Decree prior to such deadline or fails to timely request an extension of the same, then the Court, on its own motion or at the request of any party in interest, including the United States Trustee, may enter an order closing the Debtor's case.

## ARTICLE XIII
## MODIFICATION OF PLAN

13.01  In accordance with 11 U.S.C. § 1127 and Fed R. Bankr. P. 3019, to the extent applicable, Debtor and the Committee may agree to modify or amend the Plan prior to the

Confirmation Date, provided that notice and an opportunity for hearing are given to any affected party and the Court finds that the proposed modification or correction does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted the modification in writing.

13.02   If the Court shall find that any severable portion of this Plan shall cause the Plan to be unconfirmable, the Debtor and the Committee reserve the right to modify the Plan to delete such provision.

13.03   Pursuant to 11 U.S.C. §1127 (b), the Debtor and the Committee may agree to modify the Plan any time after confirmation and before substantial consummation as long as the modification complies with the requirements of 11 U.S.C. §§ 1122 and 1123.  The Plan as modified will become the Plan if, after notice and hearing, the Court finds that circumstances warrant such modification and confirms the Plan as modified.

ARTICLE XIV
RETENTION OF JURISDICTION

Notwithstanding confirmation of the Plan or the Effective Date having occurred, the Court will retain jurisdiction for the following purposes:

14.01   **Allowance of Claims**.  To hear and determine the allowability of all claims upon objections to such claims.

14.02   **Proceedings Related to Executory Contracts and Unexpired Leases.**  To act with respect to proceedings regarding the assumption of any executory contract or unexpired lease of the Debtor pursuant to 11 U.S.C. §§ 365 and 1123 of the Code and Article VI of the Plan.

14.03   **Plan Interpretation.**  To resolve controversies and disputes regarding the interpretation of the Plan.

14.04   **Plan Implementation**.  To implement and enforced the provisions of the Plan and enter orders in aid of confirmation and implementation of the Plan.

14.05   **Plan Modification**.  To modify the Plan pursuant to 11 U.S.C. § 1127 and applicable Bankruptcy Rules, except that no modification shall be made to the Plan that would impair, diminish or affect in any way the rights of the participants of any of the classes of the Plan without the consent of such class.

14.06   **Adjudication of Controversies.**  To adjudicate such contested matters and adversary proceedings as may be pending or subsequently initiated in the Court against the debtor.

14.07  **Injunctive Relief**.  To issue any injunction or other relief as appropriate to implement the intent of the Plan, and to enter such further orders enforcing any injunction or other relief issued under the Plan or in the confirmation order.

14.08  **Interpleader Action**.  To entertain Interpleader actions concerning assets to be distributed or other assets of the Estate.

14.09  **Correct Minor Defects**.  To correct any defect, cure any omission or reconcile any inconsistency or ambiguity in the Plan, the conformation order or any document executed or to be executed in connection therewith, as may be necessary to carry out the purposes and intent of the Plan, provided that the rights of any holder of an allowed claim are not materially and adversely affected thereby.

14.10  **Authorization of Fees and Expense.**  To review and authorize payment of professional fees incurred prior to the effective date.

14.11  **Post-Confirmation Orders Regarding Confirmation**.  To enter and implement such orders as may be appropriate in the event the Confirmation order is, for any reason, stayed, reversed, revoked, modified, or vacated.

14.12  **Final Decree**.  To enter a final decree closing the Case pursuant to Fed. R. Bankr. P. 3022.

## ARTICLE XV
### DEFAULT AND OTHER RELATED PROVISIONS

15.01  In the event of a default by the Debtor under the Plan and to the extent specific provisions with respect to default under the treatment of a particular class do not conflict, creditors may exercise any rights granted to them under documents executed to evidence the Plan or any rights available to creditors under applicable non-bankruptcy contract law.  In the absence of documents executed to evidence the Plan, this Plan may be enforced as a contract. Notwithstanding any other provision, any creditor alleging a default shall give the Debtor written notice with an opportunity to cure within twenty-eight (28) days from the date of the notice before exercising any rights available upon default.

15.02  In the event of a default by a creditor, the Debtor may enforce this Plan as a contract in a court of competent jurisdiction.  The Debtor may escrow payments to any creditor which defaults under the Plan until the default is cured.  The Debtor shall give the creditor twenty-eight (28) days' notice and an opportunity to cure before exercising this provision.

15.03  Conversion to Chapter 7 shall be an additional remedy for default prior to substantial consummation of the Plan.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

16.01  **Request for Relief Under 11 U.S.C. § 1129(b).**  In the event any impaired Class shall fail to accept this Plan in accordance with 11 U.S.C. § 1129(a), Debtor reserves the right to, and does hereby request the Court confirm the Plan in accordance with 11 U.S.C. § 1129(b).

16.02  **Revocation**.  The Debtor with the consent of the Committee reserves the right to revoke and withdraw this Plan at any time prior to the Confirmation Date.

16.03  **Effect of Withdrawal or Revocation**.  If the Debtor with the consent of the Committee revokes or withdraws this Plan prior to the Confirmation Date or the Effective Date does not occur, then this Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor, the Committee or any person in any further proceedings involving the Debtor.

16.04  **Due Authorization by Creditors**.  Each and every Claimant who elects to participate in the distributions provided herein warrants that it is authorized to accept in consideration of its Claim commitments, agreements or understandings express or implied, that may defeat or modify the rights conveyed or obligations undertaken by it under this Plan.

16.05  **Entire Agreement.**  The Plan, as described herein, the Confirmation Order, and all other documents and instruments to effectuate the Plan provided for herein, constitute the entire agreement and understanding among the parties hereto relating to the subject matter hereof and supersedes all prior discussions and documents; provided, however, that the Disclosure Statement may be consulted as an aid to interpreting this Plan.

16.06  **Section 1146 Exemption.**  Pursuant to 11 U.S.C. § 1146(c), the issuance, transfer or exchange or any security under this Plan or the making or delivery of any instrument or transfer pursuant to, in implementation of or as contemplated by this Plan or the transfer of any property pursuant to this Plan shall not be taxed under any federal, state, or local law imposing a stamp, transfer or similar tax or fee.

16.07  **Governing Law**.  Unless a rule or law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided, the internal laws of the State of Texas shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

16.08  **Post-Confirmation Noticing**.  Subsequent to the Confirmation Date, the Debtor shall not be required to give notice to any creditor whose claim has been disallowed or any creditor who has received all payments to which that creditor may be entitled under the terms of the Plan.  Except for the Application for Final Decree, if a party is required to give notice in connection with a notice, pleading or application, such notice shall be deemed sufficient if it is sent to:  (a) the Debtor; (b) the Plan Agent; (c) the attorney for the Plan Agent; (d) all Secured Creditors; (e) the Internal Revenue Service; (f) the United States Trustee, and (g) unsecured creditors requesting notice.

16.09  **Prohibition Against Discriminatory Treatment of the Debtor.**  Pursuant to 11 U.S.C. § 525, a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, or discriminate with respect to such a grant against, the Debtor, or another Person with whom the Debtor has been associated, solely because of the commencement, continuation, or termination of the Chapter 11 Case or because of any provision of this Plan or the legal effect of this Plan, and the Confirmation Order shall constitute an express injunction against any such discriminatory treatment by a governmental unit.

DATED:      September 30, 2014.

(the remainder of this page left intentionally blank)

Respectfully submitted,

**FIRED UP, INC.**

By: _Harper Ford Rehme_
      Harper Ford Rehme
Title:  Secretary


**BARRON & NEWBURGER, P.C.**
1212 Guadalupe, Suite 104
Austin, Texas 78701
(512) 476-9103
(512) 476-9253 (Facsimile)

By:    /s/Barbara M. Barron
        Barbara M. Barron
        State Bar No. 01817300
        Stephen W. Sather
        State Bar No. 17657520

ATTORNEYS FOR DEBTOR-IN-POSSESSION


**THE OFFICIAL UNSECURED CREDITORS COMMITTEE**

By:    _____
        Richard Grasso
Title:  Co-Chairman

**PACHULSKI STANG ZIEHL & JONES, LLP**
919 North Market Street, 17th Floor
Wilmington, Del. 19801
(302) 778-6424

By:    /s/ Bradford J. Sandler
        Bradford J. Sandler
        Del. State Bar No. 4142
        Joshua Fried
        Cal. State Bar No. 181541

ATTORNEYS FOR THE OFFICIAL
UNSECURED CREDITORS COMMITTEE

Respectfully submitted,

**FIRED UP, INC.**


By:    _____
        Harper Ford Rehme
Title:  Secretary


**BARRON & NEWBURGER, P.C.**
1212 Guadalupe, Suite 104
Austin, Texas  78701
(512) 476-9103
(512) 476-9253 (Facsimile)


By:    /s/Barbara M. Barron_____
        Barbara M. Barron
        State Bar No. 01817300
        Stephen W. Sather
        State Bar No. 17657520

ATTORNEYS FOR DEBTOR-IN-POSSESSION


**THE OFFICIAL UNSECURED CREDITORS COMMITTEE**

By:    _Richard Grasso_ (signature)

Richard Grasso
Title:  Co-Chairman

**PACHULSKI STANG ZIEHL & JONES, LLP**
919 North Market Street, 17th Floor
Wilmington, Del. 19801
(302) 778-6424


By:    /s/ Bradford J. Sandler
        Bradford J. Sandler
        Del. State Bar No. 4142
        Joshua Fried
        Cal. State Bar No. 181541

ATTORNEYS FOR THE OFFICIAL
UNSECURED CREDITORS COMMITTEE